No. 12-2373

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

_____

UNITED STATES OF AMERICA,
APPELLEE

v.

ROBERT A. GEORGE,
DEFENDANT-APPELLANT

_____

ON APPEAL FROM A JUDGMENT IN A CRIMINAL CASE,
ENTERED IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

BRIEF FOR THE UNITED STATES

_____

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

MARK T. QUINLIVAN
ASSISTANT U.S. ATTORNEY
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY
SUITE 9200
BOSTON, MASSACHUSETTS 02210
(617) 748-3606

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ vi

STATEMENT OF JURISDICTION .......................................................... 1

STATEMENT OF THE ISSUES ................................................................ 1

STATEMENT OF THE CASE ................................................................... 3

    A.    Statement of Facts ......................................................................... 3

        1.    The Meeting at the South Shore Plaza and the Initiation of
              the Money Laundering Investigation ........................................... 4

        2.    George and Hansen Agree to Launder Dardinski's
              Money. ......................................................................................... 5

              a.    The March 18, 2009 Recorded Call ................................... 5

              b.    The April 6, 2009 Recorded Meeting ................................ 7

              c.    The August 14, 2009 Recorded Meeting ......................... 10

              d.    The August 14, 2009 Recorded Call ................................ 12

              e.    The December 7, 2009 Recorded Call ............................. 13

        3.    The December 16, 2009 Deal ..................................................... 14

        4.    The April 15, 2010 Deal ............................................................. 15

        5.    George Attempts to Remedy His Falling Out With Hansen
              By Having Dardinski "Scare" Hansen. ...................................... 16

        6.    Hansen Agrees to Cooperate ..................................................... 17

i

7.    Hansen Makes a $20,000 Payment to George ............................ 19

8.    George is Introduced to "Angel" ................................................ 21

9.    George Launders the Money from "Angel" .............................. 23

10.   George's Arrest .......................................................................... 24

B.   George's Indictment and Conviction .................................................... 25

SUMMARY OF ARGUMENT ................................................................................ 25

ARGUMENT ............................................................................................................ 32

I.    THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO
      CONCLUDE THAT GEORGE AGREED WITH HANSEN TO
      LAUNDER    FUNDS    HE    BELIEVED    DERIVED    FROM
      UNLAWFUL ACTIVITY ................................................................................ 32

      A.   Procedural History ................................................................................ 32

      B.   Standard of Review .............................................................................. 33

      C.   The Evidence Was Sufficient for the Jury to Conclude that
           George and Hansen Agreed to Launder Money They Believed
           Derived from Unlawful Activity. ......................................................... 34

II.   THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO
      CONCLUDE THAT THE "SPECIFIED UNLAWFUL ACTIVITY"
      UNDERLYING COUNTS ONE THROUGH THREE WAS WIRE
      FRAUD ........................................................................................................ 42

      A.   Procedural History ................................................................................ 42

      B.   Standard of Review .............................................................................. 43

ii

C.    The District Did Not Err in Allowing the Government to
Proceed Under a Wire Fraud Theory of Proof. .................................... 43

III.    THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO
CONCLUDE THAT GEORGE AIDED AND ABETTED THE
MONEY LAUNDERING DEALS ............................................................ 47

A.    Procedural History ................................................................... 47

B.    Standard of Review ................................................................... 47

C.    The Evidence Was Sufficient for the Jury to Convict
George of Aiding and Abetting the Money Laundering
Deals. ....................................................................................... 47

IV.    THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO
CONCLUDE THAT THE CHECK GEORGE GAVE DARDINSKI
INVOLVED    PROPERTY    REPRESENTED    TO    BE    THE
PROCEEDS OF DRUG TRAFFICKING ...................................................... 50

A.    Procedural History ................................................................... 50

B.    Standard of Review ................................................................... 52

C.    The Evidence Was Sufficient for the Jury to Conclude that
the $2,500 Check Involved Property Represented to be the
Proceeds of Drug Trafficking ................................................... 53

V.    THE DISTRICT COURT DID NOT PLAINLY ERR IN
ADMITTING THE STATEMENTS OF HANSEN, GEORGE'S
CO-CONSPIRATOR, UNDER FED. R. EVID. 801(D)(2)(E), AS
GEORGE FAILED TO SHOW THAT HE WITHDREW FROM THE
CONSPIRACY ................................................................................... 56

iii

A. Procedural History................................................................57

B. Standard of Review ..............................................................58

C. George Did Not Withdraw From the Conspiracy .................60

VI. GEORGE'S OTHER EVIDENTIARY CHALLENGES ARE UNAVAILING ................................................................................64

A. Standard of Review ..............................................................64

B. SA Tamuleviz's Testimony..................................................65

    1. Procedural History ......................................................65

    2. The District Court did not abuse its discretion in declining to strike SA Tamuleviz's related testimony and, even if an error occurred, it was harmless ..................................................66

C. Hansen's Plea Colloquy and Cooperation Agreement.........................69

    1. Procedural History ......................................................69

    2. The District Court Did Not Abuse its Discretion in Excluding Hansen's Plea Colloquy and Cooperation Agreement. ..................................................70

D. The Recordings of George and "Angel." ...........................72

    1. Procedural History ......................................................72

    2. The District Court Did Not Abuse its Discretion in Admitting the Challenged Recordings.......................................74

iv

E.    Dardinski's and SA Tamuleviz's Interpretation of the
      Statement that "He's Already Agreed to do the Rest" ........................ 76

      1.    Procedural History ........................................................ 76

      2.    The District Court Did Not Manifestly Abuse its
            Discretion in Admitting the Challenged Testimony ............... 76

VII.   GEORGE'S CUMULATIVE ERROR ARGUMENT FAILS ....................... 80

VIII.  THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING
       THAT   GEORGE   KNEW   OR   BELIEVED   THAT   THE
       LAUNDERED   FUNDS   WERE   THE   PROCEEDS   OF   A
       CONTROLLED   SUBSTANCE   OFFENSE,   AND   THAT   HE
       THEREFORE   MERITED   A   SIX-LEVEL   ENHANCEMENT
       UNDER USSG §2S1.1(B)(1)(B)(I) ............................................... 80

       A.    Procedural History ................................................................ 81

       B.    Standard of Review ............................................................... 83

       C.    The Evidence Supported the Enhancement ............................ 83

IX.    THE   DISTRICT   COURT   DID   NOT   CLEARLY   ERR   IN
       ORDERING THE FORFEITURE OF GEORGE'S LEXUS. ..................... 85

       A.    Procedural History ................................................................ 86

       B.    Standard of Review ............................................................... 86

       C.    The District Court Did Not Clearly Err in Ordering the
            Forfeiture of George's Lexus ................................................. 88

X.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
       DENYING GEORGE'S MOTION FOR A NEW TRIAL ......................... 88

CONCLUSION ............................................................................... 89

CERTIFICATE OF COMPLIANCE ...................................................... 90

CERTIFICATE OF SERVICE ............................................................. 91

# TABLE OF AUTHORITIES

## CASES

*Alleyne v. United States,*
  133 S. Ct. 2151 (2013) ......................................................................85

*Griffin v. United States,*
  502 U.S. 46 (1991) .............................................................45, 46, 79

*Jones v. United States,*
  526 U.S. 227 (1999) ..........................................................................84

*McMillan v. Pennsylvania,*
  477 U.S. 79 (1986) ............................................................................84

*Pinkerton v. United States,*
  328 U.S. 640 (1946) ..........................................................................59

*Smith v. United States,*
  133 S. Ct. 714 (2013) ........................................................................62

*United States v. Adair,*
  436 F.3d 520 (5th Cir. 2006) ............................................................35

*United States v. Albertelli,*
  687 F.3d 439 (1st Cir. 2012), *cert. denied,*
  133 S. Ct. 566, 133 S. Ct. 566, 133 S. Ct. 2389, 133 S. Ct. 2390 (2013) .............78

*United States v. Aviles-Colon,*
  536 F.3d 1 (1st Cir. 2008) .................................................................58

*United States v. Batchu,*
  724 F.3d 1 (1st Cir.), *cert. denied,* 134 S. Ct. 663 (2013) ....................................85

vii

*United States v. Bayard*,
642 F.3d 59 (1st Cir. 2011) ................................................................80

*United States v. Benavente Gomez*,
921 F.2d 378 (1st Cir. 1990) ..............................................................35

*United States v. Benjamin*,
252 F.3d 1 (1st Cir. 2001) ..................................................................39

*United States v. Bingham*,
653 F.3d 983 (9th Cir. 2011), *cert. denied*,
132 S. Ct. 1954, 132 S. Ct. 1602 (2012) ............................................71

*United States v. Braxtonbrown-Smith*,
278 F.3d 1348 (D.C. Cir. 2002) .........................................................55

*United States v. Burks*,
678 F.3d 1190 (10th Cir. 2012) ..........................................................49

*United States v. Carpenter*,
736 F.3d 619 (1st Cir. 2013) ..............................................................88

*United States v. Cedeno-Perez*,
579 F.3d 54 (1st Cir. 2009) ................................................................35

*United States v. Ciresi*,
697 F.3d 19 (1st Cir. 2012), *cert. denied*, 133 S. Ct. 1511 (2013) ........58

*United States v. Davila-Gonzalez*,
595 F.3d 42 (1st Cir. 2010) ................................................................81

*United States v. Davis*,
717 F.3d 28 (1st Cir. 2013) .........................................................48, 49

*United States v. Delgado*,
903 F.2d 1495 (11th Cir. 1990) .....................................................70, 71

*United States v. DeSimone*,
699 F.3d 113 (1st Cir. 2012) .........................................................80, 86

viii

*United States v. Diaz-Arias*,
   717 F.3d 1 (1st Cir. 2013) ................................................. 65

*United States v. Djokich*,
   693 F.3d 37 (1st Cir. 2012) ............................................... 43

*United States v. Doe*,
   — F.3d —,, 2013 WL 6697824 (1st Cir. Dec. 20, 2013) ..................... 74

*United States v. Earle*,
   488 F.3d 537 (1st Cir. 2007) ............................................. 68

*United States v. Gabriele*,
   63 F.3d 61 (1st Cir. 1995) ............................................ 53, 60

*United States v. Grandmaison*,
   77 F.3d 555 (1st Cir. 1996) .............................................. 45

*United States v. Guevara*,
   706 F.3d 38 (1st Cir. 2013) .............................................. 62

*United States v. Haralaky*,
   734 F.3d. 88 (1st Cir. 2013) ............................................. 85

*United States v. Juodakis*,
   834 F.2d 1099(1st Cir. 1987) ............................................. 60

*United States v. Lizardo*,
   445 F.3d 73 (1st Cir. 2006) .............................................. 77

*United States v. Loder*,
   23 F.3d 586 (1st Cir. 1994) .............................................. 49

*United States v. Lombard*,
   102 F.3d 1 (1st Cir. 1996) ............................................... 85

*United States v. Lothian*,
   976 F.2d 1257 (9th Cir. 1992) ............................................ 49

ix

*United States v. Maldonado*,
   708 F.3d 38 (1st Cir. 2013) ................................................................. 88

*United States v. McGauley*,
   279 F.3d 62 (1st Cir. 2002) .................................................54, 55, 87

*United States v. Mehanna*,
   735 F.3d 32 (1st Cir. 2013) ............................................................*passim*

*United States v. Mercado*,
   412 F.3d 243 (1st Cir. 2005) .......................................................... 58-59

*United States v. Monserrate-Valentin*,
   729 F.3d 31 (1st Cir. 2013) ................................................................. 3

*United States v. Nieves*,
   322 F.3d 51 (1st Cir. 2003) ................................................................. 62

*United States v. O'Brien*,
   560 U.S. 218 (2010) ........................................................................... 84

*United States v. Pagan-Ferrer*,
   736 F.3d 573 (1st Cir. 2013) ............................................................. 53

*United States v. Petroziello*,
   548 F.2d 20 (1st Cir. 1977) ...............................................57, 59, 60

*United States v. Pires*,
   642 F.3d 1 (1st Cir. 2011) ................................................................. 38

*United States v. Potter*,
   463 F.3d 9 (1st Cir. 2006) ................................................................. 60

*United States v. Poulin*,
   631 F.3d 17 (1st Cir. 2011) ............................................................... 34

*United States v. Roberson*,
   459 F.3d 39 (1st Cir. 2006) .........................................................52, 60

*United States v. Rodriguez*,
   731 F.3d 20 (1st Cir. 2013) ................................................................3

*United States v. Rodriguez*,
   735 F.3d 1 (1st Cir. 2013) .................................................................80

*United States v. Rosado-Perez*,
   605 F.3d 48 (1st Cir. 2010) ...............................................................78

*United States v. Sanabria*,
   645 F.3d 505 (1st Cir. 2011) .............................................................78

*United States v. Savarese*,
   686 F.3d 1 (1st Cir.), *cert. denied*, 133 S. Ct. 772 (2012)...............59, 83

*United States v. Sawyer*,
   85 F.3d 713 (1st Cir. 1996) ...............................................................46

*United States v. Sua*,
   307 F.3d 1150 (9th Cir. 2002) ...........................................................71

*United States v. Symonevich*,
   688 F.3d 12 (1st Cir. 2012) ...............................................................56

*United States v. Taylor*,
   284 F.3d 95 (1st Cir.1998) .................................................................75

*United States v. Tetioukhine*,
   725 F.3d 1 (1st Cir. 2013) ..................................................................64

*United States v. Tum*,
   707 F.3d 68 (1st Cir.), *cert. denied*, 133 S. Ct. 2786 (2013)........... 39-40

*United States v. Urciuoli*,
   513 F.3d 290 (1st Cir. 2008) .............................................................46

*United States v. Valerio*,
   676 F.3d 237 (1st Cir. 2012) .......................................................34, 41

*United States v. Vazquez*,
   724 F.3d 15 (1st Cir. 2013) .......................................................85

*United States v. Watts*,
   519 U.S. 148(1997) ................................................................85

*United States v. Zanghi*,
   189 F.3d 71 (1st Cir. 1999) .......................................................39

*United States v. Zavala-Marti*,
   715 F.3d 44 (1st Cir. 2013) .......................................................83

*Williams v. United States*,
   458 U.S. 279 (1982) ................................................................67

*Yates v. United States*,
   354 U.S. 298 (1957) ................................................................46

## STATUTES

18 U.S.C. §2 .................................................................................25, 44

18 U.S.C. §982 ..............................................................................86

18 U.S.C. §982(a)(1) ......................................................................87

18 U.S.C. §983(c)(3) ......................................................................87

18 U.S.C. §1956 ....................................................................55, 81, 87

18 U.S.C. §1956(a)(1) ...........................................................34-35, 53

18 U.S.C. §1956(a)(1)(A)(i) ..........................................................26

18 U.S.C. §1956(a)(1)(B)(i) .......................................................32-34

18 U.S.C. §1956(a)(3) ...........................................................25, 32, 35

18 U.S.C. §1956(a)(3)(B) ...............................................................44, 50, 53

18 U.S.C. §1956(c)(1)...........................................................................35, 39

18 U.S.C. §1956(c)(7)(A) ...........................................................................44

18 U.S.C. §1956(c)(7)(B)(i)........................................................................46

18 U.S.C. §1956(h) ................................................... 25, 32, 34-35, 42

18 U.S.C. §1957....................................................... 26, 32-35, 38-39

18 U.S.C. §1957(c) ..............................................................................35, 39

18 U.S.C. §1961(1) ....................................................................................44

18 U.S.C. §3231 ...........................................................................................1

18 U.S.C. §3742(a) ......................................................................................1

21 U.S.C. §881(a)(7)..................................................................................87

28 U.S.C. §1291 ..........................................................................................1

31 U.S.C. §5317 ........................................................................................86

31 U.S.C. §5317(c)(1)(A) ..........................................................................87

31 U.S.C. §5324 ........................................................................................87

31 U.S.C. §5324(a)(1)................................................................................25

## RULES

Fed. R. Crim. P. 29......................................................................................33, 57

Fed. R. Crim. P. 30(d)......................................................................................52

Fed. R. Crim. P. 32.2...................................................................................86

Fed. R. Evid. 403 .................................................................................*passim*

Fed. R. Evid. 404(b)..................................................................73, 74, 75, 76

Fed. R. Evid. 701 ....................................................................30, 65, 76, 78

Fed. R. Evid. 702 ...............................................................................77-78

Fed. R. Evid. 801(d)(2)(E) ........................................................ 2, 56-57, 65

Fed. R. Evid. 803(3).............................................................................29, 67, 68

## SENTENCING GUIDELINES

USSG §2B1.1(b)(1)(G)........................................................................81

USSG §2S1.1(b)(1)(A) ........................................................................81

USSG §2S1.1(b)(1)(B)(i)................................................................*passim*

USSG §2S1.1(b)(2)(B).........................................................................81

USSG §3D1.2(b)...................................................................................81

USSG §3D1.3(a) ...................................................................................81

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over the case because the indictment charged the defendant, Robert A. George, with offenses against the United States.   18 U.S.C. §3231.   The Judgment in a Criminal Case was docketed on November 6, 2012.   [D.168; Add.2-11].[1]   George filed a timely notice of appeal on November 12, 2012.   [D.169].   This Court has jurisdiction over George's appeal from his conviction and sentence pursuant to 28 U.S.C. §1291 and 18 U.S.C. §3742(a).

## STATEMENT OF THE ISSUES[2]

1.    The evidence was sufficient for the jury to conclude that George agreed with Hansen to launder funds he believed derived from unlawful activity.

2.    The evidence was sufficient for the jury to conclude that the "specified unlawful activity" underlying Counts One through Three was wire fraud.

---

[1] Citations are as follows:  Docket entries are cited as "[D._]."  George's brief is cited as "(Brief at __)"; and his addendum is cited as "[Add.__]."  The joint appendix is cited as "[App.__]."  The Presentence Report ("PSR") is cited as "[PSR ¶__]."

[2] The government addresses the issues in a different order than presented by George, addressing George's challenges to the sufficiency of the evidence first, his evidentiary challenges next, followed by his sentencing and forfeiture challenges and claim that the district court erred in denying his motion for a new trial.

3.      The evidence was sufficient for the jury to conclude that George aided and abetted the money laundering deals.

4.      The evidence was sufficient for the jury to conclude that the check that George gave Dardinski involved property represented to be the proceeds of drug trafficking.

5.      George failed to show that he withdrew from the conspiracy in April or December 2009, and the district court therefore did not plainly err in admitting the statements of Hansen, George's co-conspirator, under Fed. R. Evid. 801(d)(2)(E).

6.      George's other evidentiary challenges are unavailing.

7.      George's cumulative error argument fails.

8.      The district court did not clearly err in finding that George knew or believed that the laundered funds were the proceeds of drug trafficking, and that he therefore merited a six-level enhancement under USSG §2S1.1(b)(1)(B)(i).

9.      The district court did not clearly err in ordering the forfeiture of George's Lexus.

10.     The district court did not abuse its discretion in denying George's motion for a new trial.

## STATEMENT OF THE CASE

### A.　Statement of Facts[3]

This case involved a joint investigation by the Drug Enforcement Administration ("DEA") and the Internal Revenue Service ("IRS") into a conspiracy between George, a prominent criminal defense attorney,[4] and Michael Hansen, a mortgage broker, to launder money represented to be the proceeds of unlawful activity.　The investigation was initiated in March 2009 when Ronald Dardinski, who had just been released from state prison, informed law enforcement officers that George had told him that George could "get rid of" the money that Dardinski had made in a larceny scheme that had led to Dardinski's incarceration on state charges.

---

[3] Because George was convicted by a jury and challenges the sufficiency of the evidence, this Court takes the facts in the light most favorable to the verdict.　*See United States v. Rodriguez*, 731 F.3d 20, 23 (1st Cir. 2013).　Although this standard is so well established that it ordinarily does not merit further discussion, George, in his brief on appeal, presents the facts as if he were litigating them anew.　Suffice to say this approach does not help him.　*See United States v. Monserrate-Valentin*, 729 F.3d 31, 49 (1st Cir. 2013) ("Figueroa was able to present his side of the story to the jury, and we have to assume that the jury rejected it.").

[4] George has been a member of the bar since 1980 and, according to his website, was regarded as a "premier defense attorney" who has a history of successful results in the most difficult, complex, and hard-fought contexts, including representing defendants in both state and federal court.　[App.364-365].

1.    **The Meeting at the South Shore Plaza and the Initiation of the Money Laundering Investigation**

Sometime in early 2009, Dardinski saw George standing in line at the food court at the South Shore Plaza in Braintree, Massachusetts, and greeted him. [App.423-425].   Dardinski, who had just been released from state prison after serving four years for larceny, had previously hired George to represent him in two unrelated state court criminal proceedings.   [App.387-391, 417].   Dardinski had spoken with George about representing him in the larceny cases that led to his state prison sentence – a scheme in which Dardinski took money from customers for cars he had repossessed but failed to deliver them – and he told George "everything" about those crimes during those discussions, including the fact that he had made $750,000 from the scheme.   [App.373-374, 403-404, 414-415].   Dardinski did not ultimately hire George to represent him in those cases, however, and had long felt that George had not earned his fee in one of the unrelated cases in which George had represented him.   [App.388-390].   Dardinski complained to George about this on a number of occasions, including calling George several times after his release from state prison to ask for his money back.   [App.389, 418-419].

Notwithstanding that disagreement, Dardinski and George sat down to have a brief conversation when they saw each other.   [App.424-425].   At one point during the conversation, George asked Dardinski, "Oh, what did you ever do with all that

4

money?"  [App.425].  Dardinski said that he still had "a bunch of it hidden," and George responded, "Well, I can get rid of it for you."  [App.425-426].  Dardinski said that he would give George a call, and they went their separate ways.  [App.426].

About a week later, Dardinski reported this conversation to DEA Special Agent ("SA") Joseph Tamuleviz, to whom Dardinski had provided information two years earlier in a federal drug case.  [App.430, 910-913].[5]  SA Tamuleviz met with Dardinski to discuss the conversation that Dardinski had had with George and, after consulting with his superiors at the DEA and the U.S. Attorney's Office, Tamuleviz opened an investigation into George.  [App.430-431, 910-919].  Dardinski agreed to work as a cooperating witness in the investigation, including agreeing to place consensually recorded telephone calls to George.  [App.431, 915-919 & Exh.10].

## 2.    George and Hansen Agree to Launder Dardinski's Money

### a.    The March 18, 2009 Recorded Call

On March 18, 2009, Dardinski placed a consensually recorded telephone call to George to talk about laundering his money.  [App.446, 1408-1410].  After exchanging greetings, George told Dardinski that he had a "guy" who would launder Dardinski's money and explained how the deal would work:

---

[5] Dardinski also had worked as a cooperating witness for other federal and state law enforcement agencies in the past.  [App.421-422, 903-906].

5

**DARDINSKI:**   You know, it's a hundred grand.   It's a hundred grand.

**GEORGE:**   Well I need to tell ya – you don't have a worry in the world with this guy.

**DARDINSKI:**   Alright.   And I'm not gonna have to pay no taxes? Nothing – it's never gonna come back to me?

**GEORGE:**   Nope.   It's his responsibility.   What's he gonna do is give you the check that you need.   Now you gotta give me – ah, you know I can't do it – I have to have it.   I'll call him up.   I'll tell him we're all set to go.

**DARDINSKI:**   Okay.

**GEORGE:**   I'll get, I'll get a hold of him tonight.   He lives in Dover. And, uh, you just give me a couple days.   That's all because I'm on a murder trial and I'll get it done and I'll have the check.   I'll deliver the check to you myself.

**DARDINSKI:**   Alright now – What's it gonna be, like a mortgage or something?

**GEORGE:**   You know, according to the way he explained it to me, uh, you don't even have to sign anything.

**DARDINSKI:**   Okay.

**GEORGE:** All you're gonna do is get a check.   I, I, I mean I thought that was the best thing for – when he said that to me.

[App.1408-1409].

Dardinski then told George that he also wanted to launder drug money, saying,

"I got some other money from – I sold some coke to a guy and I gotta hide that money

6

too." [App.1409]. George quickly responded that, "I don't want to know that stuff because it's illegal," but nonetheless continued the conversation with Dardinski, telling him that, "if this is important so you have to get it into your hand, huh, you should meet me on my way home that's all I am telling you." [App.1410].

Dardinski did not meet with George later that day, however, and, on March 31, 2009, George called Dardinski and complained that Dardinski was "just jerking me around." [App.1411]. Dardinski insisted that he was serious but that things had been "crazy," and George responded, "Then meet me today so I can get the thing done." [*Id.*].

### b.    The April 6, 2009 Recorded Meeting

On April 6, 2009, Dardinski met with George inside George's Lexus in the parking lot outside a Barnes & Noble. [App.460, 930, 1170, 1413-1420]. After they greeted each other, George pressed Dardinski to get the deal done, warning that his partner was "sittin' there in Dedham waiting in the office" and that if George did not contact him that day, "it's all done." [App.1414]. Dardinski insisted that he had some concerns about how the deal, however, and George again explained his understanding of how it would work:

**DARDINSKI:**  How is this not gonna come back to me?  Like even if he gives me a check, what do I do with the check?

**GEORGE:**  Okay, this is, this is, this is my understanding.  He wants nothing to do with you.  It's like he doesn't even want to meet you.

**DARDINSKI:**  Okay.

**GEORGE:**  Okay.  I'm gonna give him a hundred thousand dollars. I'm gonna give him the money.  He's making 29 hundred, which by the way I think is like worth it when you think of what he's doing.

**DARDINSKI:**  Well –

**GEORGE:**  He's gonna cut you a check from his company, East Coast Mortgage, for $80,000.

**DARDINSKI:**  Okay.

**GEORGE:**  Um, no backup paperwork, nothing, because I didn't ask him for any.  *  *  *

*      *      *

**DARDINSKI:**  How do I explain it?

**GEORGE:**  Well, what you're gonna do with the check –

**DARDINSKI:**  Anything over like three grand or something they, the IRS is on it.

**GEORGE:**  Well, what you're gonna do, well what you're gonna do with the check is you know, I would think you're paying off the $79 or $80,000 restitution fee. You know, you could say you borrowed it.  I don't know what you do.  That's, to him, that's your problem.

8

**DARDINSKI:**  Okay.

**GEORGE:**  The thing is to me, it's his problem because the check's from him.

**DARDINSKI:**  Right, that's what I'm sayin'.

**GEORGE:**  I'm – I, but it's gonna be from him – it's gonna be from a mortgage company.

[App.1414-1415].

Dardinski then expressed concern about the fee he was paying for the transaction, noting that he had asked someone what the percentage rate was and "they said it was like 6%, is what the usual rate is."  [App.1416].  George responded that his partner not only was doing Dardinski a "huge favor," but also said that "he's already agreed to do the rest," a reference to the drug money that Dardinski had earlier said he needed to hide:

**GEORGE:**  And he just said, "Hey, you know, uh –

**DARDINSKI:**  That's what he wants.

**GEORGE:**  I'm doing a huge favor – I'm doing a favor.  I don't – I don't even know the guy."  *And by the way, he's already agreed to do the rest.*

**DARDINSKI:**  Yeah, the rest.  I – that's the problem.

**GEORGE:**     Yeah, but I – but I didn't push him on it, because he thinks I'm full of shit.

[App.1416 (emphasis added)].   When George said that his partner had "already agreed to do the rest," he lowered his voice to a whisper.   [Exh.11A, Track 3].

After some further discussion about how Dardinski would explain coming into the money, George said that he was not doing anything wrong by arranging the deal between Dardinski and Hansen because he would not personally profit from it:

> **GEORGE:**   As far as I'm, as far as I'm concerned about you, as far as I'm concerned about you, whatever you were into back in those days you were into.   I don't want to know anything.   All I know is that you went to jail, you need the money –
>
> **DARDINSKI:**   Right.
>
> **GEORGE:**   You're, you're paying a guy two, you know, you're paying a guy two points on a hundred dol – to, to, cut a, to cut you a check for 80 dol – I'm not doing anything wrong because I'm not benefiting from it.

[App.1418].   George also told Dardinski, "Can I just tell you something about this guy?   We don't do this, we're done with him."   [App.1419].

### c.    The August 14, 2009 Recorded Meeting

Following the April 6 meeting, George told Dardinski that the person who was doing the deal was Michael Hansen, and gave Hansen's contact information to Dardinski.   [App.439, 481-482, 702, 839].   Dardinski thereafter had several conversations with Hansen, during which Dardinski stalled for time because the DEA wanted Dardinski to negotiate downward the percentage he would be paying Hansen,

10

and because the DEA had not yet obtained permission to use government funds in the sting operation.   [App.481-484, 495-496, 925].

On August 14, 2009, Dardinski met Hansen in person for the first time in the parking lot of East Coast Mortgage in Dedham, Massachusetts.   [App.482-483, 1421-1435].   Dardinski asked if "my friend Bob" had talked to Hansen, and Hansen responded, "Yeah, a couple months back …"   [App.1421].   Dardinski explained that the delay in doing the deal was that the money was in Syracuse with his sister and he had to go pick it up, and also added that he "had to be careful with probation." [App.1421-1422].   Hansen responded, "Right, I got the message."   [App.1422]. Hansen then assured Dardinski that the deal would not put him in any form of jeopardy, and said he either would give Dardinski a check himself, or he would write a check to George's IOLTA account and George, in turn, would write Dardinski a check from that account.   [App.1423-1424].

Dardinski then said that he wanted to do up to ten transactions of $100,000 each, and Hansen's reaction and the ensuing exchange made clear that Hansen knew that the money that he would be laundering came from unlawful activity:

> **DARDINSKI:**   Um, you know, like I said I got a ton of money stashed here, there, and everywhere.   You know, I was thinking maybe do a hundred thousand.   You get to know me.   I get to know you.   And then we'll do it, I can do it, like once a month.
>
> **HANSEN:**   Okay.

11

**DARDINSKI:**   You know, just to get rid of it and be done with it.

**HANSEN:**   How many times do you think you'll need it?

**DARDINSKI:**   Probably ten.

**HANSEN:**   That a boy!   Good job, brother!   Was it worth it?

**DARDINSKI:**   Uh, I did four years.

**HANSEN:**   Yeah.   Fuck it.   It's worth it.

[App.1424].

### d.     The August 14, 2009 Recorded Call

After his meeting with Hansen, Dardinski called George to tell him about the meeting with Hansen.   [App.1436-1442].   George asked, "How'd it go?" and whether Dardinski was "going to definitely do it," and Dardinski responded, "Yeah. * * * I'm gonna do 100 and then we're gonna go from there."   [App.1436].   George then asked whether Dardinski had straightened things out "between us" – referring to George and Hansen – as the two apparently had had a falling out owing to the delay in completing the deal.   [App.1437].   Dardinski responded that he had told Hansen that the delay was "my fault not yours," and that Hansen was no longer mad at George.   [*Id.*].   George expressed hope that he would get back in touch with Hansen since Hansen was "doin' business with a client of mine," and also said that he was glad that Dardinski had met with Hansen.   [App.1437-1438].

12

### e.    The December 7, 2009 Recorded Call

On December 7, 2009, Dardinski and George spoke again on the telephone. [App.1443-1449].   George told Dardinski at the outset of the call not to "talk to me about that situation you're talking about," but then immediately said that he was "glad that [Dardinski] was doin' it with [Hansen]," and asked Dardinski whether Hansen was "ready to do what you asked him to do?"   [App.1443].   Dardinski responded in the affirmative, and said that Hansen was going to give George the check.   [*Id*.].   George demurred, saying that the deal was not supposed to work that way and instructing Dardinski to tell Hansen that "he has to call me to give me the check":

> **GEORGE:**   Why, why am I involved in this?
>
> **DARDINSKI:**   I don't know, that's how we originally were gonna do it.
>
> **GEORGE:**   So you tell him ah no, he's giving you a mortgage.   He's giving you a mortgage against a piece of property, uh, in Lakeville, in Lakeville.   He's giving you a mortgage against a piece of property in Lakeville.   Tell him that he, you know, tell him that he, uh that's the way that business is done.   How much is he chargin' you?
>
> **DARDINSKI**:   Uh, it's it's – I'm gonna, he's gonna, like we talked about it before.   It's, he's gonna – I'm gonna give him the hundred up front and he's gonna give you 80.

*    *    *

13

**GEORGE:**  Because I'm not doing anything.  I don't trust him is what I'm saying.   I don't – I thought this was just him and you dealin' –

**DARDINSKI:**  Yeah.

**GEORGE:**   And now he's trying to bring me in.  He's trying to leverage it, to get me involved.  You tell him unless he calls and discusses it with me, not to make checks out, not to make checks out to me.

[App.1444].

Later during the conversation, George again said that while he had introduced Dardinski to Hansen, he did not want to be personally involved in the deal. [App.1446].   Although he continued to insist that "I have nothing to do with this," George nonetheless instructed Dardinski once again that "the check should be cut from East Coast Mortgage directly to the company."   [App.1447].   When Dardinski protested that "that's how we were gonna do it before when we talked about it," George said that his role was limited to putting Dardinski in touch with Hansen so that Hansen could launder Dardinski's money.   [App.1447-1448].

### 3.     The December 16, 2009 Deal

On December 16, 2009, Dardinski met with Hansen in the parking lot of East Coast Mortgage in Dedham.   [App.500-505, 1457-1459].   Prior to the meeting, Dardinski had been given $100,000 in cash by the DEA, which he had in a duffel bag. [App.448, 501-502, 926].   After they greeted each other, Dardinski told Hansen to

14

make the check out to Crane Industries, a fictitious company set up by the DEA, and also told Hansen that he wanted to do additional deals because he had made money selling drugs.   [App.449, 1457].   Hansen said that he would have to go to the bank, so Dardinski gave Hansen the bag of cash and said that he would come by and pick up the check the following day, telling Hansen, "[i]t's all small shit because it's, some of it's money from that other, from that deal I had goin' with that guy for the, for the blow * * *."   [App.1458-1459].

Two days later, Dardinski picked up the check, which was in the amount of $80,000 and made payable to Crane Industries.   [Exhs.1A, 13D; App.449, 505-506, 923-924, 977].   This transaction was the basis of Count Two of the indictment.

### 4.     The April 15, 2010 Deal

On April 15, 2010, Dardinski met with Hansen in the parking lot of Joe's Bar and Grill in Dedham.   [App.507-510, 1461-1467].   Prior to the meeting, Dardinski had been given $100,000 in cash by the DEA, which he had in a New York Knicks bag.   [App.507-508, 926].   Dardinski handed Hansen the bag of cash, but told him not to "ride around with this" because "[t]here's probably fuckin' coke from this guy on it or something," and warned him that "the drug dog will be fuckin' biting you or something."   [App.1461-1462].   After complaining that George was not showing up at meetings, Dardinski told Hansen to make the check out again to Crane

15

Industries.  [App.1462-1465].  Hansen gave Dardinski a check in the amount of $80,000, and made payable to Crane Industries.  [Exhs.1B, 13D; App.449, 514, 977-978].  This transaction was the basis of Count Three of the indictment.

### 5.    George Attempts to Remedy His Falling Out With Hansen By Having Dardinski "Scare" Hansen.

Following the April 15 deal, George and Dardinski had a series of telephone conversations during which George complained about the falling out between himself and Hansen, and he asked Dardinski to "scare" Hansen so that Hansen would get back in touch with George and the two could continue to do business together. [App.1468-1518].  During these conversations, George often made reference to the money laundering scheme, typically by suggesting that one way to "scare" Hansen was to make him think that law enforcement had become aware of the money laundering scheme in the hopes that Hansen would get back in touch with George.

On April 26, 2010, for example, when Dardinski asked George how badly George wanted to "scare" Hansen, George suggested that Hansen might get back in touch him if Hansen thought he had some "exposure for him, as a result of what[] he's done with you [Dardinski]* * *."  [App.1470-1471].  Similarly, on May 12, 2012, George again raised the idea that Hansen might get back in touch with him if Hansen thought that law enforcement had learned of the money laundering scheme:

16

**DARDINSKI:**  I'm gonna go try and scare him or something.  What do you think?

**GEORGE:**  Good idea.  As long as you don't, you don't do anything illegal.

**DARDINSKI:**  Yeah.  No.  I'm just gonna – I don't know.  I'll shake him up a little or something.  I don't know.

**GEORGE:**  *Imagine if you get contacted by the feds or something, uh, 'cause you were, 'cause you were concerned about money laundering and he's involved.*

**DARDINSKI:**  Yeah, I – I get contacted?

**GEORGE:**  *Look, you understand what I'm saying if you wanted to scare him.*

[App.1505-1506 (emphasis added)].

### 6.    Hansen Agrees to Cooperate

On June 8, 2010, Hansen was approached by agents of the DEA and IRS and, after consulting with his attorney, he agreed to cooperate in the investigation. [App.936-938].   On July 29, 2010, at the direction of law enforcement, Hansen met with George at the Dedham Hilton Hotel.   [App.1519-1534].   After some small talk, George asked why Hansen was mad at him, including asking, "was it also over that other guy?  Did you do business with him?"  [App.1520].   Hansen said yes, and then said that he was mad at George because during the last deal Dardinski "starts talking about fucking drugs," and Hansen said that he "wigged out."  [App.1522,

17

1524].   George expressed no surprise, saying, "You know what makes you a miracle worker?  That he delivered that money to you."  [App.1522].   George also told Hansen that he did not agree to funnel Dardinski's money through his own account because "that's money laundering," and also expressed agitation that Dardinski had discussed this with him over the telephone:

> **GEORGE:**  Then, that's what he told me.  Then at the end when he was ready to do the deal with you.  The problem – I don't know when he did the deal.  I don't care when.  He said to me, "Listen.  Hansen wants to cut the check to you, and he wants you to run it through your account."  I'm like, "Ron, you think I'm fucking stupid?"  I said "First of all, I don't – This is on the phone.  "I don't know what you're talking about."  Number two is, why would I run something through my account if I'm not making anything on the deal?  You know I'm not making anything on the deal because you know that Hansen is take – taking whatever your deal is on the points.  *You done – So, what do you think you're gonna put $80,000 in my account and I'm gonna give you back $80,000?  What are you fucking nuts?  That's money laundering. What are you crazy?*"  Because he told me he needed the money to pay his probation fees.
>
> **HANSEN:**  You know what?  I couldn't remember why the guy kept bullshitting me.
>
> **GEORGE:**  Okay.  Yeah – he has a huge restitution.
>
> **HANSEN:**  Oh.  Alright.
>
> **GEORGE:**  Huge.  I'm talking at like 230.  I was like two hundred and thirty, two hundred forty that's the only one – that's why he had to do another deal.  *He doesn't even launder money to do drug deals.  He has to launder money to get it so he can pay his probation.* * * *

[App.1523 (emphasis added)].

18

At the end of the conversation, George and Hansen agreed that George would tell Dardinski not to have any further contact with Hansen.   [App.1526-1527].   On August 12, 2010, George called Dardinski and told him to "steer clear of the guy [Hansen]" because "he doesn't want to do business."   [App.1528-1529].

### 7.     Hansen Makes a $20,000 Payment to George

On August 17, 2010, Hansen met with George at Hansen's office.   [App.945, 1535-1545].   George said that he had instructed Dardinski not to contact Hansen again, and complained to Hansen that Dardinski had talked about the details of the deal – which George characterized as money laundering – over the phone:

> **GEORGE:**   He says to me, he calls me.   I was just happy you [Hansen] were doing the deal because I said to myself, "that damn fucking [Hansen] knows I wasn't full of shit and he knows I didn't take the deal somewhere else."
>
> **HANSEN:**   Yeah.
>
> **GEORGE:**   But, he says [Hansen] wants you, or [Hansen] asked me to ask you, he will cut the check to you and then you put it in your account, and then you'll cash the check or cut me a check.   *In other words, a 'double-mammo', money laundering.*   And I said, *he said it on the fucking telephone, right?*   Now at this point I'm saying, "Should I call Hanson up who won't take my call?   And just tell him not to talk to this guy on the phone; I don't know what's going on here, you know?"   And I said, "Ronnie, what the fuck would I run a check through my account that I'm not making any money on?"   In other words, that wasn't even the right answer.

[App.1537-1538 (emphasis added)].   Hansen then asked George why he had told Dardinski that he was not making money on the deal, and George replied with a smirk that he was not making money on the deal, after which Hansen wrote George a check for $20,000 to "straighten out that too" because "a deal's a deal":

> **HANSEN:**   You told him you weren't making any money on it?
>
> **GEORGE:**   I told him I wasn't making any money on it.
>
> **HANSEN:**   What the fuck did you tell him that for?
>
> **GEORGE:**   Because I wasn't.
>
> **HANSEN:**   You fucker.   I wanna straighten out on that too.
>
> **GEORGE:**   You can straighten me out at any time you want.   But that's not the point.   *That's something I made up* – I, I – Listen.
>
> **HANSEN:**   I want to – brother – I'm telling ya –
>
> *      *      *
>
> **HANSEN:**   Here.   Take this.   We'll figure this out.   Call a spade a spade.   We're done.
>
> **GEORGE:**   Are you kidding?
>
> **HANSEN:**   No.   I want 'cause I –
>
> **GEORGE:**   Alright, listen 'cause this is how I'm gonna say it.   You know what I'm going to say to you?   Whatever you do is fine.   I'm not saying another word.   I don't care what you do.   You can give me, I'm not gonna say you can give me – If you wanna give me nothing, it doesn't matter to me.   If you wanna give me something, you can give me something.   That's not what this is about.

**HANSEN:**   I know it's not what this is about.

**GEORGE:**   You have to swear on your kids that you know it, that it's not about this.

**HANSEN:**   Oh, I know that.

**GEORGE:**   It's all about nothing but our friendship, and that's all it was.

**HANSEN:**   But a deal's a deal.   * * *

[App.1538-1540 (emphasis added)].   Hansen also confirmed that he had done two deals with Dardinski and said he would pay George $20,000 because "the deal's half so * * * I want the slate even."   [App.1540].

George did not deposit the check, however, claiming during two recorded calls that he had tried and was told that there were insufficient funds in the account. [App.1553-56, 1564-1565].   Hansen said that he would give George cash instead, and George said that he would hold onto Hansen's check until they met. [App.1565-1566].   On September 23, 2010, George met with Hansen at Hansen's office, and Hansen gave George $20,000 in cash, after which George returned the check that Hansen had earlier given him.   [App.946-947, 1152-1153, 1553-1554].

## 8.    George is Introduced to "Angel"

Around the same time, George called Dardinski and asked what kind of cars Dardinski might have access to, as George's lease on his Lexus had expired.

21

[App.1546-1550].   During the conversation, Dardinski said that he needed someone else to launder his money "cause it's gettin' edgy for me," and George responded, "we'll find someone else maybe.   I'll, I'll direct you to someone else."   [App.1549].

On January 20, 2011, George asked Dardinski during a recorded call if Dardinski had "any cases to send me," saying, "We could make some money!" [App.1574].   Dardinski responded that he knew a couple of guys he could refer to George, including a Dominican drug dealer.   [App.1574-1575].   During subsequent meetings and telephone conversations, Dardinski told George that the money he had laundered with Hansen had come from drugs sales conducted by that dealer, that the dealer wanted an attorney on retainer, and that the dealer had "runners" who also might need representation.   [App.1593-1610].

As a result of these conversations, Dardinski introduced George to "Angel Ramos" at the Hilton Hotel in Dedham, Massachusetts, on February 28, 2011, who Dardinski told George was the Dominican drug dealer he had earlier mentioned. [App.1153-1157, 1611-1636].   In fact, "Angel Ramos" was DEA Task Force Officer Pedro Nieves acting in an undercover capacity.   [App.955, 1153-1157]. After "Angel" explained that he needed legal counsel available to represent him and his "runners" and did not want any payments to be traced back to him or his

22

associates, "Angel" and George agreed that "Angel" would pay George a retainer of $25,000 a month   [Exh.11C; App.1171-1173, 1613-1630].

On March 4, 2011, George met Dardinski again at the Hilton Hotel in Dedham. [App.1637-1666].   Dardinski said, among other things, that he had an additional half-million dollars that he needed to launder, and George responded, "I got someone, that might be able to do what Michael was doing."   [App.1652-1653]. After George and Dardinski talked further about setting Dardinski up with someone new to launder more of Dardinski's money, "Angel" entered the room and gave George $25,000 in cash as a retainer.   [App.958-959, 1174-1182, 1656-1666].

### 9.   George Launders the Money from "Angel"

After receiving the $25,000 from "Angel" on March 4, George deposited $9,000 in cash into his account at a Bank of America branch located at 1455 Highland Avenue in Needham, Massachusetts, at 2:21 p.m., and deposited $8,000 in cash into his account at a different Bank of America branch located at 355 Chestnut Street in Needham at 2:33 p.m.   [Exhs.4A, 4B; App.338-350, 959-960].   The two branches are located approximately one-half mile away from each other.   [App.362, 960]. These deposits were the basis of Counts Four, Five and Seven of the indictment.

On March 18, 2011, George met with Dardinski and gave Dardinski a check made payable to Crane Industries in the amount of $2,500 as payment for Dardinski's

23

fee.  [Exh.6A; App.560-563, 1676-1677].  In the memo section of the check, George wrote "office disposal," even though Dardinski had not done any office disposal work for George.  [Exh.6A; App.564, 1672].  The check was written from the same account into which George had deposited the $17,000 in cash.  [App.962]. This check was the basis of Count Six of the indictment.

### 10.   George's Arrest

On March 23, 2011, George was arrested at his home.  [App.918, 990-994]. After George was apprised of his rights, and while he was being transported to the U.S. Marshal's Service at the federal courthouse, George asked what he was being charged with.  [App.993-994].  SA Tamuleviz told George that he would be given a copy of the complaint when they got to the Marshal's Service, but George attempted to guess and, after mentioning two cases that had nothing to do with the investigation, said, "Does this have anything to do with Dardinski?"  [App.994].

At the time of the offenses of conviction, George had not filed federal income taxes for tax years 2007 and 2008, and he owed the IRS $90,472.52 for tax year 2007, $128,390.92 for tax year 2008, and $167,016.98 for tax year 2009.  [Exhs.26A-26E; App.880-892, 1105-1108].

**B.**  <u>**George's Indictment and Conviction**</u>

On April 7, 2011, a federal grand jury in the District of Massachusetts returned an indictment charging George with money laundering conspiracy, in violation of 18 U.S.C. §1956(h) (Count One); aiding and abetting money laundering, in violation of 18 U.S.C. §§2 and 1956(a)(3) and (Counts Two and Three); money laundering, in violation of 18 U.S.C. §1956(a)(3) (Counts Four through Six); and structuring transactions to evade reporting requirements, in violation of 31 U.S.C. §5324(a)(1) (Count Seven).  [App.26-39].

On June 11, 2012, following an eight-day trial, a jury convicted George on all seven counts of the indictment.  [App.1402-1403].  On October 31, 2012, the district court (Gorton, J.) sentenced George to 42 months of imprisonment on the seven counts of conviction, all to be served concurrently, and one year of supervised release.  [App.2100-2101].

The procedural issues that arose at trial and sentencing are addressed below in response to the specific claims raised by George in his opening brief.

<u>**SUMMARY OF ARGUMENT**</u>

1.     The evidence was sufficient for the jury to conclude that George conspired with Hansen to launder funds they believed derived from unlawful activity. To the extent George is claiming that the government had to show that he knew the

25

funds derived specifically from wire fraud or drug trafficking, that claim fails because the objects of the conspiracy were violations of 18 U.S.C. §§1956(a)(1)(A)(i) and 1957, and those statutes only require proof that the defendant knew that the property represented proceeds from *some* form, although not necessarily *which* form, of activity that constitutes a felony under federal, state, or foreign law. In this case, the record was replete with evidence that George and Hansen believed the money to be laundered derived from unlawful activity. George himself raised the specter of laundering the money Dardinski had made from his state larceny scheme, and a rational jury could have found based on George's later conversations with Dardinski – in which he repeatedly explained to Dardinski how the deals would work – that George and Hansen had entered into an agreement to launder those funds. Hansen also made clear his understanding that the funds derived from Dardinski's larceny scheme when he later met personally with Dardinski. And a rational jury could have concluded that when George whispered to Dardinski that "he's already agreed to do the rest," a statement made after Dardinski had earlier told George that he needed to hide drug money, that George and Hansen had entered into an agreement to launder that money as well.

2. The evidence was sufficient for the jury to conclude that Dardinski represented that the "specified unlawful activity" underlying Counts One through

26

Three was wire fraud, and that that was a legally sufficient theory of proof. Dardinski testified that he would receive faxes from the home office of American Service Lenders in Texas instructing him which vehicles to repossess, and he sometimes would tell customers that he could sell them those very same vehicles, some of which were on the lot. The use of interstate wires thus furthered Dardinski's larceny scheme, even if only in an incidental way. Even if this Court were to disagree, George's conviction on those counts should not be overturned because the jury returned a general verdict on all three counts of conviction, and they are independently supported by evidence showing that the "specified unlawful activity" at issue was drug trafficking.

3. The evidence was sufficient for the jury to conclude that George aided and abetted the money laundering deals. After first raising the possibility of getting "rid of" the money Dardinski had made in his larceny scheme, George not only entered into an agreement with Hansen to launder that money, but he explained to Dardinski how the deals would work and gave Hansen's contact information to Dardinski. A rational jury could easily have concluded from this evidence that George was guilty of aiding and abetting the money laundering deals.

4. The evidence was sufficient for the jury to conclude that the check for $2,500 that George gave Dardinski involved property represented to be the proceeds

27

of drug trafficking.   This Court has held that a defendant may be convicted of money laundering where the laundered funds come from a bank account containing commingled "clean" and "dirty" money, and that is what happened here.   George deposited cash that "Angel" represented to be the proceeds of drug trafficking into his bank account and, although he used a substantial portion of that sum to pay off another debt, some of that money remained in the account when George wrote Dardinski a check for $2,500 marked office disposal.   George's forfeited claim of instructional error thus fails because his requested instruction was not substantively correct.

5.   George did not withdraw from the conspiracy either in April or December 2009, and the district court consequently did not plainly err in admitting any of Hansen's statements that postdated his purported withdrawal as co-conspirator statements.   None of the statements that George made during these conversations come close to satisfying the demanding standards required for withdrawal, and the actions that George took following those conversations confirm that he had not disavowed the purposes of the conspiracy.

6.   George's other evidentiary challenges lack merit.

a.   The district court did not abuse its discretion in declining to strike SA Tamuleviz's testimony about a check for $80,000 that Hansen had written out to

George's law office. That check was only offered as evidence of the ultimately abandoned plan to funnel Dardinski's money through George's IOLTA account, and it therefore was arguably admissible under the state-of-mind exception under Fed. R. Evid. 803(3). Tamuleviz's testimony about the check, in turn, was limited to identifying the check and testifying that Hansen had given it to him, and did not constitute hearsay. In any event, any error in the admission of this testimony was harmless, as there is little chance that the jury gave it any weight in reaching its verdict, particularly where the court expressly instructed the jury that the check had been stricken from evidence and could not be considered in the jury's deliberations.

b. The district court did not abuse its discretion in declining to admit Hansen's plea colloquy or so-called cooperation agreement. Neither document evidenced the government's belief in Hansen's innocence of conspiracy or money laundering charges, and the district court therefore properly excluded the documents under Fed. R. Evid. 403.

c. The district court did not abuse its discretion in admitting the recordings of February 28 and March 4, 2011, with redactions. The recordings were not offered that George to show that had a propensity to commit a crime, but rather were offered to establish the full nature and context of George's relationship with "Angel," including George's understanding that his money came from drug

trafficking, and that both George and "Angel" were wary of surveillance. The district court also balanced any possible prejudice by ordering that several passages from the February 28 recording be redacted, and by instructing the jury that George had not engaged in any unlawful or illegal conduct by simply accepting payment from "Angel" as a legal fee.

        d.   Because George was attempting to be deliberately ambiguous when he told Dardinski that "he's already agreed to do the rest," the district court did not manifestly abuse its discretion in allowing Dardinski and SA Tamuleviz to offer lay opinion testimony about what George meant. Dardinski was a participant in the conversation in question and his understanding of what George meant was rationally based on their earlier conversation of March 18, and SA Tamuleviz's testimony similarly met the formal requirements of Fed. R. Evid. 701. Any possible error also was harmless, as the jury was able to listen to the tape of the meeting and could decide for itself what George meant, and the district court specifically instructed the jury that it was the sole judge of the facts.

    7.   George's cumulative error argument fails, as there are no errors to accumulate.

    8.   The district court did not clearly err in finding that George knew or believed that the laundered funds were the proceeds of drug trafficking, and that he

therefore merited a six-level enhancement under USSG §2S1.1(b)(1)(B)(i).   The district court found that the "only reasonable conclusion" from George's statement that "he's already agreed to do the rest" was that Hansen had agreed to launder Dardinski's drug money, and that finding was not clearly erroneous.

9.   The district court did not clearly err in ordering the forfeiture of George's Lexus.   George used the Lexus to travel to several meetings with Hansen and Dardinski and, more importantly, met with Dardinski inside that vehicle on April 6, 2009, when they discussed how the money laundering deals would work.   That meeting plainly was in furtherance of the conspiracy, and the fact that it took place inside the Lexus rather than a public place suggested that George wanted to keep the meeting as free as possible from detection.   The district court did not clearly err in ordering the forfeiture of the Lexus in these circumstances.

10.   George's motion for a new trial simply repackages the same claims that he has otherwise raised on appeal, and because those claims all lack merit, the district court did not err in denying the motion.

31

## ARGUMENT

### I.  THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO CONCLUDE THAT GEORGE AGREED WITH HANSEN TO LAUNDER FUNDS HE BELIEVED DERIVED FROM UNLAWFUL ACTIVITY.

George contends (Brief at 51-62) that the government failed to prove beyond a reasonable doubt that he and Hansen entered into an agreement to launder funds they believed derived from wire fraud or drug trafficking.   That contention lacks merit.

### A.  Procedural History

Count One of the indictment charged George with money laundering conspiracy in violation of 18 U.S.C. §1956(h), the objects of which were violations of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957.  [App.26-28].   On September 30, 2011, George filed a motion to dismiss Count One, arguing that because none of the proceeds in the relevant financial transactions were in fact proceeds of specified unlawful activity but rather were "sting" proceeds that the government provided to Dardinski, the government should have charged him with conspiring to violate 18 U.S.C. §1956(a)(3), which criminalizes money laundering pursuant to undercover "sting" operations."   [D.29].    The district court denied the motion in a memorandum and order dated March 9, 2012, explaining that to convict George of conspiracy as opposed to the substantive offense of money laundering, "the government must prove only that a defendant voluntarily entered into an agreement

32

to launder illicit funds intending that they be so laundered, regardless of whether the subject funds were actually illicit or were only represented to be so by the government." [App.180-181]. The court therefore ruled that the government had the discretion to charge George §§1956(a)(1)(B)(i) and 1957 as objects of the alleged conspiracy. [App.181]. That ruling is not challenged on appeal.

At the close of the evidence, George moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 on Count One, arguing that the government had failed to offer any evidence that Hansen had agreed with George to launder criminally-derived funds. [App.1253-1255]. The district court orally denied the motion without prejudice to it being reconsidered after the verdict. [App.1264]. On August 6, 2012, George filed a written motion for judgment of acquittal in which he again argued that the evidence was insufficient to convict him of money laundering conspiracy. [App.1849-1863]. The district court denied the motion in a margin entry on October 2, 2012. [App.1904].

### B. <u>Standard of Review</u>

This Court reviews a district court's denial of a Rule 29 motion for judgment of acquittal de novo. *See United States v. Mehanna*, 735 F.3d 32, 42 (1st Cir. 2013). That determination entails asking "whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in

the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt." *United States v. Poulin*, 631 F.3d 17, 22 (1st Cir. 2011) (internal quotations omitted). This Court will "take into account all evidence, both direct and circumstantial, and resolve evidentiary conflicts and credibility disputes in favor of the jury's verdict." *United States v. Valerio*, 676 F.3d 237, 244 (1st Cir. 2012).

### C. The Evidence Was Sufficient for the Jury to Conclude that George and Hansen Agreed to Launder Money They Believed Derived from Unlawful Activity.

George contends that the evidence was insufficient to prove that he entered into a conspiracy with Hansen to launder funds that either of them believed to be the proceeds of wire fraud or drug trafficking. That claim lacks merit.

George was convicted of money laundering conspiracy in violation of 18 U.S.C. §1956(h), and the indictment alleged that the two objects of the conspiracy charged in the indictment were violations of §§1956(a)(1)(B)(i) and 1957. Neither of those provisions requires proof that George believed that the funds he agreed to launder derived specifically from wire fraud or drug trafficking. Under the former provision, the government was only required to show that George believed that the relevant financial transaction "represents the proceeds of *some* form of unlawful activity," 18 U.S.C. §1956(a)(1) (emphasis added), and the definitional section of

that statue makes clear that under §1956(a)(1), the person need only know that "the property involved in the transaction represented proceeds from some form, *though not necessarily which form*, of activity that constitutes a felony under State, Federal, or foreign law * * *."  18 U.S.C. §1956(c)(1) (emphasis added).  Likewise, under §1957, "the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity."  18 U.S.C. §1957(c).

Hence, to convict George of money laundering conspiracy, the government did not need to prove that he believed that the funds being laundered derived specifically from wire fraud or drug trafficking.  Rather, the government only was required to show that George entered into an agreement with Hansen to launder funds that he believed represented the proceeds of *some* form of unlawful activity.  *See, e.g., United States v. Cedeno-Perez*, 579 F.3d 54, 59 (1st Cir. 2009).[6]  There was ample evidence of that in this case.  With respect to the source of the funds, Dardinski

_____

[6] As noted above, George does not renew on appeal his claim that Count One of the indictment should have been dismissed because the government did not charge that the object of the conspiracy was a violation of 18 U.S.C. §1956(a)(3), and any claims in this regard therefore is waived.  *See United States v. Benavente Gomez*, 921 F.2d 378 (1st Cir. 1990).  Even if not waived, the claim would fail as the district court correctly ruled.  *See United States v. Adair*, 436 F.3d 520, 525-26 (5th Cir. 2006) ("We thus hold that a criminal defendant may be prosecuted for conspiracy to commit money laundering under §1956(h) in a government sting case without proving that the funds provided by the government agent were actually the proceeds of unlawful activity.").

35

testified that he had spoken with George about the possibility of representing him in connection with his state larceny charges, and that he told George "everything" about his crimes during these discussions, including the fact that he had made $750,000 in the scheme.   [App.373-374, 403-404, 414-415].   A rational jury could have concluded that when George asked Dardinski what he had done with "all that money," and said that he could "get rid of it for you," George was referring to the money that Dardinski had made during his larceny scheme, and it was that money that George agreed with Hansen to launder.

Similarly, when Dardinski and Hansen met on August 14, 2009, Hansen asked Dardinski whether it was "worth it" after Dardinski said that he wanted to do ten transactions of $100,000 each, and when Dardinski responded that he "did four years," Hansen said, "Yeah.  Fuck it.  It's worth it."  [App.1422].  A rational jury could have concluded from this evidence that Hansen was asking whether Dardinski's larceny scheme was worth it, and that this reflected Hansen's understanding that he was laundering the money Dardinski made from that scheme.

Moreover, although the government was not obligated to prove that the money being laundered derived specifically from drug trafficking, a rational jury could have concluded that George and Hansen also agreed to launder funds that they believed to include drug proceeds.  After Dardinski said that he had "sold some coke to a guy

36

and I gotta hide that money too," George told Dardinski during their meeting on April 6, 2009, that his partner was taking a large cut of Dardinski's money, in part, because "he's already agreed to do the rest," dropping his voice to a whisper when he made that statement.   [App.1416; Exh.11A, Track 3].   Hansen also exhibited no surprise when Dardinski told him during the first deal that some of the money being laundered came from cocaine sales, and thereafter did a second money laundering deal with Dardinski.   [App.1458-1467].   A rational jury could have concluded this evidence that George and Hansen had agreed to launder the drug money that Dardinski had said he needed to hide.   Indeed, at sentencing, the district court stated that the "only reasonable conclusion" from the April 6 exchange was that George knew or believed that some of the laundered funds would be the proceeds of drug trafficking. [App.2066].   This Court need not adopt that assessment to conclude that a rational jury could certainly reach the same result from this evidence.

There also was ample evidence that George and Hansen entered into an agreement to launder that money.   After George first raised the possibility of getting "rid of" Dardinski's money, he told Dardinski during subsequent calls and meetings that he had a "guy" – who turned out to be Hansen – who would "give you the check that you need," and explained that "[h]e's gonna cut you a check from his company, East Coast Mortgage, for $80,000."   [App.1408-1409, 1414].   George's statement

37

to Dardinski that his partner had "already agreed to do the rest" also was further evidence that he and Hansen had entered into an agreement to launder Dardinski's money, as was the fact that Hansen subsequently did the money laundering deals with Dardinski.

The conclusion that the government needed only prove that George agreed to launder funds he believed derived from some form of unlawful activity to convict him of conspiracy is not altered by the fact that, in its charge, the district court instructed the jury that the government had alleged in the indictment that George conspired to launder funds derived from wire fraud or drug trafficking. [App.1384-1386].   As this Court has explained, "[i]n circumstances where, as here, a district court overstates the government's burden of proof to the defendant's benefit in its charge to the jury, a reviewing court faced with a challenge to the sufficiency of the evidence must measure that challenge against the correct legal standard, not against the erroneous standard set forth in the charge."   *United States v. Pires*, 642 F.3d 1, 8 (1st Cir. 2011).   This Court therefore has held in analogous circumstances that it judges the sufficiency of the evidence under the correct legal standard:

> While the government did not have to prove that Benjamin knew the property was derived from a specified unlawful activity, the district court instructed the jury that they needed to find "that the defendant knew the property was derived from bank fraud."   The court acknowledged at a later proceeding that this instruction improperly increased the burden for the government.   Thus, while there was no

> need for the government to prove Benjamin's knowledge on this point, the improper instruction likely meant that the jury found that Benjamin had such knowledge. Even if he did not have that knowledge, however, that fact does not affect our analysis of the sufficiency of the evidence under §1957 because we consider what the jury needed to find as though it had been instructed properly. As we have held, "[a] patently erroneous * * * instruction does not establish the standard by which we measure the sufficiency of the evidence on appeal."

*United States v. Benjamin*, 252 F.3d 1, 7 n.4 (1st Cir. 2001) (quoting *United States v. Zanghi*, 189 F.3d 71, 80 (1st Cir. 1999)). So, too, in this case, this Court should consider what the jury needed to find as though it had been properly instructed.

None of the contrary arguments that George advances has merit. George first misses the mark in asserting (Brief at 53) that there was no basis for the jury to conclude that he believed that Dardinski's state larceny offense "constituted the proceeds of a federally-prosecutable wire fraud." The government was not required, once again, to prove that George believed that the money to be laundered derived specifically from wire fraud, nor even that the funds derived from a federal as opposed to a state or foreign offense. *See* 18 U.S.C. §§1956(c)(1); 1957(c). All the government needed to prove was that George agreed to launder funds he believed derived from unlawful activity, and there was evidence of that in spades. And, in any event, proof of knowledge that interstate wires were used in a fraudulent scheme is not required to convict a defendant of the substantive offense of wire fraud. *See United States v. Tum*, 707 F.3d 68, 73 (1st Cir.) ("The wire-fraud statute's

interstate-nexus requirement is purely jurisdictional and not a substantive element of the offense, meaning the government did not have to prove that Tum had reason to think that a communication would cross state lines."), *cert. denied*, 133 S. Ct. 2786 (2013).

George also asserts (Brief at 52-53 & n.17, 56-57) that because Dardinski had "lots and lots" of legitimate money from his repossession business that he did not want to deposit for fear that the Department of Revenue or Probation would seize the funds, the government failed to prove that George entered into an agreement to launder funds he believed were derived from criminal activity. But George repeatedly made clear his understanding during the recorded conversations that Dardinski's funds were not simply being *hidden* but *laundered*. George told Dardinski, for example, that he could "scare" Hansen by suggesting that law enforcement had become aware of the money laundering scheme, and he also told both Dardinski and Hansen that he did not agree to funnel Dardinski's money through his IOLTA account because that would have been "money laundering." [App.1471-1472, 1505-1506, 1523, 1537-1538]. The jury also heard evidence George had been the attorney of record in six separate cases involving federal money laundering charges. [App.365-366]. A rational jury could easily conclude from this evidence that George not only entered into an agreement with Hansen to *launder*

Dardinski's money, but that he well knew that the crime of money laundering under federal law requires the concealment of the proceeds of *unlawful* activity.

George also argues (Brief at 57-59) that a rational jury could not conclude that he and Hansen agreed to launder drug money from his statement to Dardinski that "he's already agreed to do the rest," pointing to the fact that Hansen later told George that he had "wigged out" when Dardinski had mentioned drug trafficking, which George argues is proof that no agreement to launder drug money ever existed. But, once again, the government did not need to prove that George believed that the money to be laundered derived specifically from drug trafficking and, in any event, it was for the jury to resolve any conflicts in the evidence. *See Valerio*, 676 F.3d at 244. As set forth above, a rational jury could have concluded that when George told Dardinski that "he's already agreed to do the rest," George meant that Hansen had agreed to launder Dardinski's drug money, and the fact that Hansen expressed no surprise when Dardinski said that some of the money being laundered came from cocaine sales was confirmation of this, as was the fact that Hansen went on to do a second deal with Dardinski.

In sum, the evidence was sufficient for the jury to conclude that George and Hansen entered into an agreement to launder money they believed derived from unlawful activity.

41

II.  **THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO CONCLUDE THAT THE "SPECIFIED UNLAWFUL ACTIVITY" UNDERLYING COUNTS ONE THROUGH THREE WAS WIRE FRAUD.**

George contends (Brief at 46-51) that the government failed to show that the use of interstate wires furthered Dardinski's larceny scheme, and the district court therefore erred in allowing the government to proceed under the theory that the "specified unlawful activity" underlying Counts One through Three was wire fraud. That claim also fails.

A.  **Procedural History**

At trial, Dardinski testified that his conviction on state larceny charges stemmed from a scheme in which, while operating a franchise of American Service Lenders, a repossession company based in Odessa, Texas, he took advance money from customers for cars he said were available for sale, but then failed to deliver the cars, netting a total of $750,000.   [App.373-376].   Dardinski operated the franchise, which was located in Massachusetts, from October 15, 2001 through February 1, 2002.   [App.410-414 & Exhs.8A, 8B].   Dardinski testified he would repossess cars after the home office in Texas would fax him a repossession order of the car(s) to repossess, and also testified that some of the cars he told customers were available for sale were the very same cars he had earlier repossessed, including some cars that were on his lot when the fraudulent transaction was made.   [App.487-489].

42

During the charge conference, and after the close of the evidence, George argued that the evidence failed to show that the facsimiles that Dardinski received from the home office in Texas in any way furthered Dardinski's state larceny offenses, and the government therefore failed to show that the "specified unlawful activity" underlying Counts One through Three was wire fraud.   [App.1282-1283]. George renewed this argument in his post-judgment motion for judgment of acquittal, which the district court denied.   [App.1877-1878, 1904].

**B.**    **Standard of Review**

Because George's challenge involves an inquiry into the sufficiency of the evidence supporting a legal theory of proof, this Court's review is de novo.  *See United States v. Djokich*, 693 F.3d 37, 47 (1st Cir. 2012).

**C.**    **The District Did Not Err in Allowing the Government to Proceed Under a Wire Fraud Theory of Proof.**

George argues that the district court erred in allowing the government to proceed under the theory that the "specified unlawful activity" underlying Counts One through Three was wire fraud, asserting that the evidence failed to show that the facsimiles that Dardinski received from his home office in Texas in any way furthered his larceny scheme.   He is wrong.

As set forth above, Count One of the indictment charged George with money laundering conspiracy, in violation of 18 U.S.C. §1956(h), and Counts Two and

43

Three of the indictment charged George with aiding and abetting money laundering, in violation of 18 U.S.C. §§2 and 1956(a)(3)(B), and alleged that he aided and abetted another to knowingly conduct and attempt to conduct a financial transaction involving property represented to be the proceeds of "specified unlawful activity"; namely, wire fraud or drug trafficking.    [App.29-30].    Section 1956(a)(3)(B) provides, in relevant part, that:

> (3) Whoever with the intent – * * * (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity * * * conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both.

The statutory definition of "specified unlawful activity" includes wire fraud. *See* 18 U.S.C. §1956(c)(7)(A) (incorporating offenses listed in 18 U.S.C. §1961(1)).    In this case, the evidence at trial showed that Dardinski represented that the funds to be laundered were derived, at least in part, from his larceny scheme, and that he also had told George "everything" about how that scheme operated when discussing the possibility that George might represent him in those cases.    That was sufficient to convict him of Counts One through Three.

Nor is there any merit to George's contention that the evidence was legally insufficient to support a wire fraud theory of proof.    It is well-established that the use

44

of the mails or wires to further a fraudulent scheme need only be "incidental." *United States v. Grandmaison*, 77 F.3d 555, 566 (1st Cir. 1996). The evidence in this case satisfied that standard. The use of interstate wires furthered Dardinski's larceny scheme because, as he testified at trial, some of the cars he told customers were available for sale were the very same cars his home office had earlier instructed him to repossess. [App.487-489]. Indeed, some of those cars were on Dardinski's lot at the time the fraudulent sale was made. [App.489]. Because Dardinski would not have been able to identify those specific cars to the victims if he had not been earlier instructed by his home office by fax to repossess them, the use of interstate wires, while perhaps not central to his larceny scheme, nonetheless furthered that scheme, even if only in an incidental way.

Even if this Court were to disagree, the verdicts on Counts One through Three should not be disturbed. The jury returned a general verdict on Counts One through Three, and the Supreme Court has held that a general verdict stands if the evidence is sufficient to support any of the alternative charged theories of illegal activity. *See Griffin v. United States*, 502 U.S. 46, 59-60 (1991); *see also Mehanna*, 735 F.3d at 48 (explaining that where one of two possible grounds for a general verdict is suspect, reversal is warranted only where a "mistake of law" underlies the argument, not where the claim is rooted in the sufficiency of the evidence so long as the evidence

45

was adequate to support one of the government's alternative theories of proof). Here, even if this Court were to conclude that there was insufficient evidence for the jury to conclude that the "specified unlawful activity" underlying Counts One through Three was wire fraud, reversal is not warranted because, as set forth above, a rational jury could have concluded that Dardinski represented the "specified unlawful activity" in this case to be drug trafficking, which also is included within the statutory definition of a "specified unlawful activity."    18 U.S.C. §1956(c)(7)(B)(i).

Nor do any of the cases upon which George relies undermine that conclusion. *Yates v. United States*, 354 U.S. 298 (1957), involved a general verdict in which one of the two possible bases of conviction was legally inadequate because of a statutory time bar.    That is not the situation here, and the Supreme Court has rejected the invitation to extend *Yates* to cases in which one of the possible bases of conviction was not unconstitutional or illegal, but merely unsupported by sufficient evidence. *See Griffin* 502 U.S. at 56-60.    *United States v. Urciuoli*, 513 F.3d 290 (1st Cir. 2008), and *United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996), likewise are inapposite because they similarly stand for the proposition that when a jury has been presented with several bases of conviction, one of which is *legally* erroneous, the conviction cannot stand.    That rule has no application here, where George's claim is that the evidence was insufficient to support a wire fraud theory of proof.

46

III.   **THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO CONCLUDE THAT GEORGE AIDED AND ABETTED THE MONEY LAUNDERING DEALS.**

George contends (Brief at 62-64) that his convictions on Counts Two and Three cannot stand because the government failed to prove that he aided or abetted the two money laundering deals.   That claim is equally insubstantial.

A.     <u>Procedural History</u>

George argued in his post-trial motion for judgment of acquittal that the evidence was insufficient to convict him of aiding and abetting the Hansen/Dardinski money laundering deals, which the district court denied.   [App.1851-1863, 1904].

B.     <u>Standard of Review</u>

This Court reviews de novo George's preserved challenge to the sufficiency of the evidence on Counts Two and Three.   *See Mehanna*, 735 F.3d at 42.

C.     <u>The Evidence Was Sufficient for the Jury to Convict George of Aiding and Abetting the Money Laundering Deals.</u>

George asserts (Brief at 63) that his convictions on Counts Two and Three must be reversed because "the government simply failed to fulfill its burden to show that George participated in the money laundering deals between Hansen or Dardinski, or sought by his actions to make them succeed."   That claim is macilent.

Aiding and abetting requires proof that: "1) the substantive offense was actually committed; 2) the defendant assisted in the commission of that crime or

47

caused it to be committed; and 3) the defendant intended to assist in the commission of that crime or to cause it to be committed." *United States v. Davis*, 717 F.3d 28, 33 (1st Cir. 2013). The government easily satisfied that standard in this case. As set forth above, after first raising the possibility of getting "rid of" the money Dardinski had made in his larceny scheme, George not only entered into an agreement with Hansen to launder that money, but he explained to Dardinski how the deals would work when they spoke in subsequent conversations, and also gave Hansen's contact information to Dardinski. [App.425-426, 439, 481-482, 1408-1420]. A rational jury could readily conclude from this evidence that George aided and abetted the two substantive money laundering offenses committed by Hansen.

George's contrary arguments are insubstantial. George asserts (Brief at 63) that on December 7, 2009, nine days before the first transaction, he "clearly told Dardinski, in unequivocal terms, [that] he would have nothing to do with any transaction with Hansen, and told Dardinski to make that fact clear to Hansen." But those statements do not satisfy the demanding requirements of withdrawal as shown in greater detail below in Part V, and, in any event, George already had taken actions to assist in the commission of the money laundering transactions when these statements were made, and the subsequent transactions were the reasonably foreseeable consequence of his actions. This Court therefore need not resolve the

48

question whether withdrawal can ever be a defense to the crime of aiding and abetting,[7] as George's claim would fail even assuming that such a defense is a viable one.  *See United States v. Lothian*, 976 F.2d 1257, 1265 (9th Cir. 1992) (although taking a broad view of withdrawal, holding that withdrawal is not a defense to charged acts that are the reasonably foreseeable results of pre-withdrawal conduct).

George also emphasizes (Brief at 63-64) that he did not speak to Hansen from April 2009 until after the deals had been consummated, that he had only intermittent communications with Dardinski during that time, and that subsequent recordings demonstrated that he "did not even know that the transactions had occurred, much less know their structure."  It is well-settled, however, that a "culpable aider and abetter need not perform the substantive offense, be present when it is performed, or be aware of the details of its execution," *Davis*, 711 F.3d at 33 (internal quotation omitted), and the fact that George did not personally participate in the deals and may not have known the details of how they transpired does not undermine the conclusion that he was guilty of aiding and abetting those transactions.  *See United States v. Loder*, 23 F.3d 586, 591 (1st Cir. 1994) (holding that government need not prove that defendant was aware of all the details of the fraud to sustain a conviction for aiding and abetting mail fraud).

---

[7] Other courts of appeals appear to be divided on this question.  *See United States v. Burks*, 678 F.3d 1190, 1195-96 (10th Cir. 2012) (citing cases).

## IV. THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO CONCLUDE THAT THE CHECK GEORGE GAVE DARDINSKI INVOLVED PROPERTY REPRESENTED TO BE THE PROCEEDS OF DRUG TRAFFICKING.

George contends (Brief at 79-82) that the government failed to prove that the $2,500 used to fund the check he gave to Dardinski actually derived from the $25,000 given to George by "Angel," and the district court consequently erred in denying his motion for judgment of acquittal and in refusing to instruct the jury that it must find that the funds actually derived from the $25,000.   Both claims fail.

### A.     Procedural History

Count Six of the indictment charged George with money laundering, in violation of 18 U.S.C. §1956(a)(3)(B), and alleged that he had knowingly conducted a financial transaction – giving Dardinski the check for $2,500 marked "office disposal" – involving property represented by "Angel" to be the proceeds of drug trafficking, with the intent to conceal or disguise the nature, location, source, ownership, or control of those funds.   [App.33].   At trial the following evidence was introduced regarding this transaction:

- On March 3, 2011, there was a balance of $122.82 in the bank account from which George wrote the check to Dardinski;

- On March 4, 2011, George deposited $17,000 in cash into that bank account in two separate transactions, money that had been given to him by "Angel" and represented to be the proceeds of drug trafficking;

50

- On that same day, a check in the amount of $16,557.41, and made payable to the Massachusetts Department of Revenue, cleared George's bank account;

- On March 18, 2011, George gave Dardinski a check in the amount of $2,500 marked "office disposal."

[App.560-563, 1135-1136, 1676-1677 & Exhs.6A, 24A, 25E].

After the close of the evidence, George argued that he was entitled to a judgment of acquittal on Count Six because the government failed to prove that the $2,500 check he gave Dardinski came from the $25,000 in cash given to him by "Angel." [App.1263]. The government responded that the jury could find George guilty based on the following evidence: (1) George and Dardinski had extensive discussions about Dardinski receiving a 10% referral fee for any monies that George was paid by a client whom Dardinski steered to George; (2) "Angel" gave George $25,000 in cash and represented that that money came from drug trafficking; and (3) George made good on his promise and gave Dardinski a check for $2,500. [App.1262-1264]. The district court agreed with the government's view and denied George's Rule 29 motion without prejudice to it being raised after the verdict. [App.1264]. George renewed this argument in his post-trial motion for judgment of acquittal, which the district court denied. [App.1866-1867, 1904].

George also requested a jury instruction that the government must prove that the money used to fund the $2,500 check to Dardinski in fact came from the same money provided to George by "Angel." [App.1847-1848]. The district court did not give George's requested instruction, and George did not lodge a specific objection to the court's failure to do so after the jury was charged but before it retired to deliberate. [App.1398-1400].

**B.**    **Standard of Review**

This Court reviews George's preserved challenge to the sufficiency of the evidence on Counts Six de novo. *See Mehanna*, 735 F.3d at 42. George did not lodge a specific objection to the district court's failure to give the instruction he requested after the jury charge was given but before the jury retired to deliberate, however, and this Court therefore reviews George's claim of instructional error only for plain error. *See United States v. Roberson*, 459 F.3d 39, 45 (1st Cir. 2006) ("To preserve an objection to a jury instruction under Fed. R. Crim. P. 30(d), a litigant must lodge a specific objection and state the grounds for the objection *after* the court has charged the jury and before the jury begins deliberations.") (emphasis in original). Under that demanding standard, George must demonstrate that "an error occurred, which was clear or obvious, and which not only affected the defendant's substantial rights, but also seriously impaired the fairness, integrity, or public

52

reputation of judicial proceedings." *United States v. Pagan-Ferrer*, 736 F.3d 573, 593-94 (1st Cir. 2013) (internal quotation omitted).

The conclusion that George forfeited his claim of instructional error is not altered by the fact that, after the jury charge was given, George stated that he wished "to reserve my objections that I made during the charge conference and this morning." [App.1399]. This Court has made clear that incorporating by reference an objection made at some earlier point in the proceedings is insufficient to satisfy the requirements of Rule 30. *See United States v. Gabriele*, 63 F.3d 61, 66 & n.4 (1st Cir. 1995) (claim of error in jury instruction reviewed for plain error where defendant "did not object to the definition of 'knowing' following the jury charge," and instead "simply renewed his objections to Requests 18A and 19 by reference"). In any event, and as shown below, George's claim of instructional error fails no matter which standard of review is employed.

### C.    The Evidence Was Sufficient for the Jury to Conclude that the $2,500 Check Involved Property Represented to be the Proceeds of Drug Trafficking.

George contends that the plain terms of §1956(a)(3) require that the government prove that the financial transaction at issue actually "involves" the property "represented" to be proceeds of specified unlawful activity, and the government failed to make that showing because it failed to prove that the money

used to fund the $2,500 check derived from the $25,000 that "Angel" gave to him. That is incorrect, as this Court rejected a nearly identical claim in a case prosecuted under §1956(a)(1), which contains nearly identical relevant statutory language, and the Court's reasoning applies with equal force here.

In *United States v. McGauley*, 279 F.3d 62 (1st Cir. 2002), the defendant challenged the sufficiency of the evidence regarding two counts of conviction that alleged that she had withdrawn two checks for $49,447.40 from one bank account, which she then deposited into two new accounts she opened jointly with her parents. The defendant pointed out that only one check in the amount of $155.76 involving the proceeds of unlawful activity had been deposited into the first account, and argued that no reasonable juror could conclude, based upon the deposit of that one check, that each of the two withdrawals was the proceeds of some form of unlawful activity.

This Court disagreed, explaining that the jury could have concluded that the two withdrawals involved proceeds from the deposit of the check that had been commingled with other money, and that was all the government needed to prove to convict her under the statute:

> Contrary to McGauley's argument, the government did not have to prove that the full amount of the two $49,497.40 checks constituted the proceeds of mail fraud. Such an interpretation of §1956 would eviscerate the statute, permitting one to avoid its reach simply by

54

> commingling proceeds of unlawful activity with legitimate funds.   Nor
> does McGauley cite authority for her implied proposition that there is a
> *de minimis* exception to §1956 that removes from the money laundering
> prohibition transactions in which legitimate funds greatly outweigh
> illegitimate ones.   The jury could have found that the checks drawn on
> CCB & T account #174667702 included proceeds of mail fraud (the
> $155.76 check), and that the transactions were designed, in whole or in
> part, "to conceal or disguise" the nature, location, and source of those
> proceeds.

279 F.3d at 71.   Other courts of appeals have likewise concluded that, where the

funds in a financial transaction charged under §1956 come from a bank account

containing commingled "clean" and "dirty" money, the government need not "trace"

the funds used in the transaction to the charged unlawful conduct.   *See, e.g., United*

*States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1353 (D.C. Cir. 2002) (citing cases).

This Court's decision in *McGauley* forecloses the claim that George here

mounts.   A rational jury could have concluded from the evidence that even after the

check to the Massachusetts Department of Revenue cleared his account, George had

a balance of $565.41, and that $442.59 of that balance came from the $17,000 in cash

that George deposited after receiving the payment of $25,000 from "Angel."   The

evidence thus was sufficient for the jury to conclude that the $2,500 check to

Dardinski included property represented to be proceeds of drug trafficking.

George's alternative argument – that he is entitled to a new trial because the

district court did not give his requested instruction on this issue – also fails.   The

55

district court instructed the jury that to convict George on Count Six, the government had to establish, *inter alia*, "that the transaction involved property represented by a law enforcement officer and believed by the defendant to be the proceeds of unlawful activity * * *." [App.1387-1388]. That instruction tracked the language of the statute and thus accomplished in more appropriate terms the distinction which George wanted to make – that the financial transaction must have "involved" the property represented to be the proceeds of drug trafficking. *See United States v. Symonevich*, 688 F.3d 12, 24-26 (1st Cir. 2012) (no error in declining to give instruction that was substantially incorporated into the jury charge as rendered).

## V.    THE DISTRICT COURT DID NOT PLAINLY ERR IN ADMITTING THE STATEMENTS OF HANSEN, GEORGE'S CO-CONSPIRATOR, UNDER FED. R. EVID. 801(d)(2)(E), AS GEORGE FAILED TO SHOW THAT HE WITHDREW FROM THE CONSPIRACY.

George contends (Brief at 39-46) that the district court erred in admitting several of the statements made by Hansen during the recorded conversations because he withdrew from the conspiracy on April 6, 2009, and no later than December 7, 2009, and any statements made by Hansen that post-dated his withdrawal therefore were not admissible under Rule 801(d)(2)(E) as co-conspirator statements. George did not object to the admission of Hansen's statements on this ground in the district court, and he cannot show error, let alone plain error, on appeal.

56

### A.   **Procedural History**

George objected at trial to the admission of any statements made in the recorded conversations by Hansen, arguing that there was insufficient evidence to show that he had agreed with Hansen to launder criminally-derived funds and, as a result, that Hansen's statements could not be admitted as co-conspirator statements under Rule 801(d)(2)(E).   [App.468-469].   The district court conditionally admitted the conversations under *United States v. Petroziello*, 548 F.2d 20 (1st Cir. 1977), subject to the government showing by a preponderance of the evidence that a conspiracy existed, that Hansen and George were members of the conspiracy at the time the statements were made, and that the statements were made in furtherance of the conspiracy.   [App.476-477].

After the close of the evidence, George again argued that Hansen's statements were not admissible under Rule 801(d)(2)(E) because the government had failed to show that he had agreed with Hansen to launder criminally-derived funds. [App.1253-1255].   The district court ruled that the out-of-court statements by Hansen were admissible under Rule 801(d)(2)(E), finding by a preponderance of the evidence that the statements satisfied the standards set forth in *Petroziello* and its progeny.   [App.1264-1265].   George did not, either in his objections at trial or after

the close of the evidence, argue that some portions of those statements should not be allowed because he had withdrawn from any conspiracy that may have existed.

### B.     <u>Standard of Review</u>

To preserve a challenge to a district court's *Petroziello* ruling, a defendant must object on hearsay grounds when his or her coconspirator's statement is provisionally admitted and must renew the objection at the close of evidence.   *See United States v. Aviles-Colon*, 536 F.3d 1, 13-14 (1st Cir. 2008).   This Court reviews preserved challenges to the admission of a co-conspirator's statement(s) for clear error, and unpreserved challenges for plain error.   *See United States v. Ciresi*, 697 F.3d 19, 26 (1st Cir. 2012), *cert. denied*, 133 S. Ct. 1511 (2013).

In this case, George did not preserve the objection to Hansen's statements that he now advances on appeal in the district court.   When he objected to the admission of Hansen's statements at the time they were conditionally admitted and after the close of the evidence, George did so only on the ground that the government had failed to show that he had conspired with Hansen to launder criminally-derived funds; he did not object on the ground that he had withdrawn from the conspiracy and that and any statements by Hansen that postdated his withdrawal therefore were inadmissible.   [App.468-469, 1253-1255].   Hence, because "an objection on one ground does not preserve appellate review of a different ground," *United States v.*

*Mercado*, 412 F.3d 243, 247 (1st Cir. 2005), this claim should be reviewed only for plain error.  *See United States v. Savarese*, 686 F.3d 1, 12 (1st Cir. 2012) ("Although Savarese contested the admission of this evidence at trial, he did so on other grounds, and thus our review is for plain error only.").

Nor does the fact that George requested a withdrawal instruction weigh in favor of a different conclusion.  During the charge conference, and after the district court had already made its *Petroziello* ruling, the government requested that the jury be instructed that George was liable for all foreseeable acts of co-conspirators in furtherance of conspiracy, a so-called *Pinkerton* instruction.[8]  [App.1275-1276].  George, in turn, argued that the court should not give a *Pinkerton* instruction but that, if the court were inclined to do so, it should also give a withdrawal instruction, explaining that, "[w]ithdrawal means it has an impact o[n] the *Petroziello* decision and it impacts *Pinkerton*, meaning once a defendant withdraws from a conspiracy, he's no longer responsible for the actions of any other co-conspirators." [App.1276].  George did not ask the district court to reconsider its *Petroziello* ruling on this ground, however, and he also failed to lodge a specific objection to the district court's decision not to give a withdrawal instruction after the jury charge was given but before the jury retired to deliberate.  [App.1398-1400].  Consequently, even

---

[8] *See Pinkerton v. United States*, 328 U.S. 640 (1946).

assuming that George's request for a withdrawal instruction could be imported to his *Petroziello* challenge, this Court's review is only for plain error. *See Roberson*, 459 F.3d at 45; *Gabriele*, 63 F.3d at 66 & n.4.

### C.     George Did Not Withdraw From the Conspiracy

George contends (Brief at 40-41) that he withdrew from the conspiracy on April 6, 2009, when he told Dardinski that he and Hansen were "all done" with Dardinski if the deal did not go down that day, and then "largely" would not answer or return Dardinski's calls.   And even if he did not withdraw from the conspiracy on that date, George argues (Brief at 41-42), he did so no later than December 7, 2009, when "[n]o less ten times," he told Dardinski that he "would not be involved in Dardinski's dealings with Hansen."   As a result, George argues, the district court erred in admitting any of Hansen's statements that postdated his withdrawal.   Those arguments fail across the board.

"Withdrawal is a demanding defense requiring affirmative evidence of an effort to defeat or disavow or confess," *United States v. Potter*, 463 F.3d 9, 20 (1st Cir. 2006), and "[t]ypically, there must be evidence either of a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." *United States v. Juodakis*, 834 F.2d 1099, 1102 (1st Cir. 1987) (per curiam).   There was no evidence in this case that George

took such affirmative steps either in April or December of 2009.  George did not confess to authorities, of course, and there was no evidence presented at trial that he ever communicated to Hansen, his co-conspirator, that he had abandoned the enterprise and its goals.  George's withdrawal claim thus fails at the most elemental level because whatever he might have said to Dardinski, the defense of withdrawal requires that he communicated to *Hansen* that he had abandoned the enterprise and its goals.

Moreover, even assuming that George intended Dardinski to communicate his intentions to Hansen, his statements and actions fail to show that he withdrew from the conspiracy.  George's statement to Dardinski on April 6 that he and Hansen were "all done" with Dardinski if the deal did not go down that day merely evinces his impatience to get the deal done; it does not come close to an affirmative showing that George had abandoned the enterprise.  To the contrary, George discussed his understanding of how the deal would work during that very same conversation and also told Dardinski that Hansen had "already agreed to do the rest," which a rational jury could have concluded referred to Hansen's agreement to launder drug money as set forth above.  [App.1413-1420].  And following their meeting on April 6, George gave Hansen's contact information to Dardinski.  [App.439, 481-482].  Those statements and actions show that George had not disavowed the purposes of

61

the conspiracy.  *See United States v. Nieves*, 322 F.3d 51, 55 (1st Cir. 2003) ("Even assuming that the district court believed Nieves's rendition of her conversation with the CW, the sentencing court did not err in finding that by later agreeing to help the CW contact Alex in order to procure drugs, Nieves had not truly disavow[ed] the purposes of the conspiracy.") (internal quotation omitted).

George's assertion (Brief at 40-43) that he "largely" stopped communicating with Dardinski after April 6, and had ceased communicating with Hansen altogether after that date, also misses the mark.  "Avoiding contact with one's coconspirators, without more, is not in any way, shape, or form tantamount to abandoning the conspiracy."  *Mehanna*, 732 F.3d at 57.  Indeed, even where a defendant fails to show up at a planned meeting and refuses to answer telephone calls from a co-conspirator or a cooperating witness, those actions "constitute *inaction* rather than affirmative steps to distance himself from his prior involvement."  *United States v. Guevara*, 706 F.3d 38, 46 n.9 (1st Cir. 2013) (emphasis in original); *see also Smith v. United States,* 133 S. Ct. 714, 720 (2013) ("Passive nonparticipation in the continuing scheme is not enough to sever the meeting of the minds that constitutes the conspiracy.").

George's argument that he withdrew from the conspiracy on December 7 similarly fails.  Although George did say words to the effect that he had "nothing to

62

do with this" on several occasions during this conversation, he said many other things to Dardinski that belied those statements. George told Dardinski, for example, to tell Hansen that Hansen should be "giving you a mortgage against a piece of property," and, when Dardinski said that Hansen wanted to make a check out to George, George instructed Dardinski to tell Hansen that "unless he calls and discusses it with me, not to make checks out, not to make checks out to me," and also told Dardinski that "the check should be cut from East Coast Mortgage directly to the company." [App.1444, 1447]. Those statements are the very antithesis of an unqualified communication that George had abandoned the enterprise and its goals. Indeed, as the district court noted in denying George's motion to dismiss the complaint, these conversations reveal at most "that George was wary of talking shop over the phone and perhaps may have intermittently communicated his reluctance to be involved in any illegal schemes out of an abundance of caution," and "one could fairly construe the conversation on December 7, 2009 as proof that George simply did not want an $80,000 check made payable to himself personally unless he talked with Hansen first." [App.192].

Furthermore, George's subsequent actions make clear that he did not abandon the enterprise or disavow its goals. When George later asked Dardinski to "scare" Hansen so that Hansen would get back in touch with him, George took pains to

63

emphasize that he did not want Dardinski to scare Hansen so much that Hansen would stop doing deals with Dardinski. [App.1475-1476]. And George ultimately accepted $20,000 from Hansen for his part in the money laundering deals, and their conversations about that payment – which included George telling Hansen that his statement to Dardinski that he was not making money on the deal was "something that I made up," and Hansen's response that he was giving George $20,000 because "a deal's a deal" – demonstrated that that had been part of the agreement all along. [App.1535-1566]. George consequently has failed to show that he withdrew from the conspiracy, and the district court therefore did not commit a clear or obvious error in admitting Hansens's statements that postdated that purported withdrawal.

## VI.    GEORGE'S    OTHER    EVIDENTIARY    CHALLENGES    ARE UNAVAILING.

George contends (Brief at 65-79) that the district court committed several other evidentiary errors, but none warrant the granting of a new trial.

### A.    <u>Standard of Review</u>

Because George preserved below each of the four evidentiary challenges he raises on appeal, this Court reviews the district court's rulings for abuse of discretion, *see United States v. Tetioukhine*, 725 F.3d 1, 6 (1st Cir. 2013), with the exception of the district court's admission of Dardinski's and SA Tamuleviz's interpretation of

George's statement under Rule 701, which is reviewed for manifest abuse of discretion, *see United States v. Diaz-Arias*, 717 F.3d 1, 11 (1st Cir. 2013).

### B.     SA Tamuleviz's Testimony

#### 1.     Procedural History

On June 4, 2012, the fifth day of trial, SA Tamuleviz was shown Exhibit 1C, which was a check from Hansen made out to George's law office in the amount of $80,000, and dated August 20, 2009.   [App.972].   George objected to any testimony about the check, arguing that SA Tamuleviz obtained it from Hansen after Hansen had already agreed to cooperate in the investigation, and the check therefore constituted hearsay and was not admissible as the statement of a co-conspirator under Rule 801(d)(2)(E).   [App.972-975].    The district court overruled the objection and, after SA Tamuleviz identified the check and testified that he had obtained it from Hansen on June 10, 2010, Exhibit 1C was admitted into evidence over George's objection.   [App.975-977].   George questioned SA Tamuleviz about the check on cross-examination, and SA Tamuleviz stated that the check had never been endorsed or negotiated.   [App.995-1000].

George filed a written motion to strike Exhibit 1C and related testimony the following day, which the government opposed.   [App.1726-1733].   After the close of the evidence, the district court granted the motion to strike Exhibit 1C, explaining

that the check was being introduced to prove the truth of the matter asserted – that the check was accurate on its face and that Hansen intended to pay George $80,000 in August 2009 – and that, although the check was dated while the conspiracy was ongoing, there was no independent evidence that it actually was written at that time. [App.1251-1252].  Therefore, the court ruled, George had a right under the Sixth Amendment to confront Hansen himself about the check, and SA Tamuleviz had no personal knowledge of the check absent Hansen's hearsay statements.  [App.1252].

The next day, the district court noted that it would inform the jury that the check would be stricken from the record, and George requested that the court also strike SA Tamuleviz's related testimony.  [App.1300-1301].  After hearing further argument about the matter, the court stated that it would strike the check and not refer to the testimony.  [App.1301].  After the jury entered the room, the court instructed the jury that Exhibit 1C "is stricken from the record, and evidence that the Court orders stricken is no longer evidence in the case and must not be considered by you once you commence your deliberations."  [App.1303].

> **2.    The District Court did not abuse its discretion in declining to strike SA Tamuleviz's related testimony and, even if an error occurred, it was harmless.**

There was no error in the admission of SA Tamuleviz's testimony because, contrary to the district court's ruling striking Exhibit 1C, the check did not constitute

inadmissible hearsay or violate George's rights under the Confrontation Clause. A check, in itself, is not a statement or assertion. Indeed, the Supreme Court has explained, "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" *Williams v. United States*, 458 U.S. 279, 284 (1982).

Nor was the check offered as evidence for the truth of its implied assertion that Hansen had paid George $80,000 by means of the check. Rather, the check was offered for an entirely different purpose – as evidence that one of the plans to launder Dardinski's money was to funnel it through George's IOLTA account, as Hansen described on August 14, 2009, when he met with Dardinski. [App.1423-1424].[9] The check – which was dated six days after that meeting and made out to George's law office in the amount of $80,000, the agreed-upon sum after Hansen took his cut – was offered as evidence of that latter, eventually-abandoned plan. Hence, even if the check were deemed to be hearsay, it arguably would be admissible under the state-of-mind exception as evidence of Hansen's "then existing state of mind * * * such as intent, plan, motive, design, mental feeling * * *." Fed. R. Evid. 803(3).

---

[9] The district court misunderstood why the check was offered into evidence. It was not to prove Hansen intended to pay George $80,000 as part of the money laundering scheme, rather it was being offered to show that one of the plans was to funnel the funds through George's IOLTA account. [App.1423-1424].

If the check was admissible under Rule 803(3), then SA Tamuleviz's objected-to testimony on direct examination – which did not recount anything that Hansen had said to him, but rather was limited to identifying the check and testifying that Hansen had given it to him – was also admissible. As a result, George's contention that Tamuleviz's testimony violated his rights under the Confrontation Clause is misplaced.

Even if this Court were to disagree, any possible error was harmless beyond a reasonable doubt. In evaluating harmlessness, this Court considers a number of factors including "the importance of the challenged statement in the prosecution's case, whether the statement was cumulative, the presence or absence of evidence corroborating or contradicting the statement on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case." *United States v. Earle*, 488 F.3d 537, 546 (1st Cir. 2007). Those factors all lead to the conclusion that any possible error was harmless. In light of the court's clear directive that the check was stricken from the record and must not be considered during deliberations, it is implausible that the jury gave SA Tamuleviz's testimony describing that check any weight, particularly since the government did not refer to that testimony in its summation. SA Tamuleviz's testimony identifying the check also was cumulative of other evidence in the case – the jury also heard Hansen telling

Dardinski that one plan was to write check to George's IOLTA account, and then to have George write a check to Dardinski – and George was able to cross-examine Tamuleviz about his testimony. [App.995-1000, 1423-1424]. Finally, the overall strength of the government's case was quite strong, as shown above, and there is no chance that SA Tamuleviz's testimony was somehow critical to the jury's finding of guilt. In sum, any possible error in the admission of SA Tamuleviz's related testimony was harmless.

### C.    **Hansen's Plea Colloquy and Cooperation Agreement**

#### 1.    **Procedural History**

In his case-in-chief, George offered the plea colloquy in Hansen's criminal case as well as what he referred to as Hansen's cooperation agreement with the government, arguing, *inter alia*, that he was entitled to use them to impeach Hansen's credibility. [App.1249-1250, 1256-1258]. The government objected to the introduction of either document, arguing that they were irrelevant and would cause the jury to speculate about the details of Hansen's criminal case and his plea agreement with the government. [App.1259-1261].

The district court ruled that neither document would be admitted into evidence, explaining that "they do not seem to the Court to be relevant to the crimes charged

69

against the defendant and will only confuse the jury, so I'm not going to allow their admission."  [App.1261-1262].

> **2.** **The District Court Did Not Abuse its Discretion in Excluding Hansen's Plea Colloquy and Cooperation Agreement.**

George contends the district court erred in excluding Hansen's plea colloquy and cooperation agreement, asserting (Brief at 69-70) that those documents would have supported his defense that no conspiracy existed and that he did not aid or abet any criminal transactions.  That argument is devoid of merit.  As the Eleventh Circuit has explained in rejecting a virtually identical plaint to that posed by George here, there are "many factors that influence the government's decision not to prosecute a defendant on certain charges, one of the most common being the government's interest in obtaining the cooperation of the defendant as a witness against codefendants," and, as a result, "we cannot attribute the government's decision not to prosecute to an independent determination that the defendant is not guilty."  *United States v. Delgado*, 903 F.2d 1495, 1499 (11th Cir. 1990).   Thus, the court explained, even if such evidence were relevant, it would not be permissible under Rule 403 because:

> If the evidence were admitted, the government's counsel likely would take the stand and testify that the charges were dropped for reasons unrelated to the guilt of the defendant.  The reasons expressed by the government's counsel could be highly incriminating with regard to the

70

> defendant who is seeking to have the evidence admitted. Thus, the
> district court should probably hold the technically admissible opinion
> evidence inadmissible because it would open the door to evidence on
> collateral issues that would likely confuse the jury.

*Id.* at 1499; *see also United States v. Sua*, 307 F.3d 1150, 1153 (9th Cir. 2002) ("[W]e

embrace *Delgado*'s holding that a district court may properly exclude, under Fed. R.

Evid. 403, a plea agreement offered for the purpose of establishing the government's

belief in a person's innocence.").

The Ninth Circuit has reached a similar conclusion in affirming the exclusion

of an indictment in a related case that had been offered to show that the government

did not believe that the defendant was a member of the charged conspiracy, noting

that "[t]he government may decide to charge or not to charge a suspect in an

indictment for a variety of reasons that have nothing to do with his guilt or innocence,

taking into consideration the availability of prosecutorial resources, alternative

priorities, the expectation of prosecution by other authorities, or any number of other

valid discretionary reasons." *United States v. Bingham*, 653 F.3d 983, 999 (9th Cir.

2011) (citing *Delgado* and *Sua*), *cert. denied*, 132 S. Ct. 1594, 132 S. Ct. 1602

(2012).

The reasoning of these cases applies with equal force here. Neither Hansen's

plea agreement nor his cooperation agreement demonstrates the government's belief

that Hansen was innocent of conspiring with George or engaging in money

71

laundering, and the district court rightly determined that they were inadmissible under Rule 403 because they would likely cause the jury to speculate about why the government agreed to accept Hansen's plea to lesser charges. Indeed, as the Eleventh Circuit correctly noted in *Delgado*, if the district court had allowed these documents into evidence, it would have opened the door for the government to counter them with testimony about why it agreed to let Hansen plead guilty to lesser charges, resulting in testimony about a collateral issue that would confuse the jury. The district court did not err in excluding these documents from evidence.

### D.    The Recordings of George and "Angel."

#### 1.    Procedural History

George filed a pretrial motion in limine to exclude what he asserted were inflammatory, prejudicial, and/or irrelevant utterances during the recorded conversations of February 28 and March 4, 2011.  [D.73].  The district court denied the motion "for the most part" during the pretrial conference, explaining that while the conversations were often rambling and difficult to follow, "most of the objected-to statements appear generally relevant to the defendant's knowledge and intent."  [App.230-231].  The court instructed the parties, however, to remove any gratuitous comments.  [App.231].

During trial, George sought both in a written motion and at trial to strike and/or preclude the majority of the evidence elicited regarding these meetings under Rules 403 and 404(b), arguing that the majority of the conversations were not relevant to the charges against him and those conversations therefore were unduly prejudicial, and that the conversations also constituted impermissible bad acts evidence. [App.548-549, 1156-1157, 1711-1714].   The district court allowed George's motion in part and denied it in part, ruling that no evidence with respect to the March 4 meeting would be stricken from the record, but ordering that portions of the February 28 meeting be stricken on the ground that they were unduly prejudicial and cumulative.   [App.1013-1015].   The court also said that it would consider a limiting instruction that George was not being charged with committing a crime by receiving money from "Angel," and was only being charged with laundering and structuring the money he had received.   [App.1015-1016].

George requested such an instruction in his supplemental request for jury instructions, which the government did not oppose.   [App.1839, 1841].   The district court gave the requested instruction, instructing the jury as follows:   "Now, I hereby instruct you, as a matter of law, that Mr. George did not engage in any unlawful behavior by simply accepting the undercover agent as a new client or by accepting

the $25,000 in cash as a legal fee.   There are no charges in this case that he did anything unlawful or illegal in that regard."   [App.1394-1395].

### 2.    The District Court Did Not Abuse its Discretion in Admitting the Challenged Recordings.

The district court did not abuse its discretion in admitting the February 28 and March 4 recordings, with redactions.   This Court has explained that Rule 404(b) – which provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" – "only prohibits evidence of prior bad acts when such evidence is introduced for the sole purpose of proving that a defendant had a propensity to commit a crime." *United States v. Doe*, ─ F.3d ─, 2013 WL 6697824, at *9 (1st Cir. Dec. 20, 2013) (internal quotation omitted).   The recordings were not offered for that purpose.   Rather, and as the district court correctly ruled, the recordings were relevant, among other things, to establish the full nature and context of George's relationship with "Angel," including George's understanding that his money came from drug trafficking.   *See id.* (no abuse of discretion in admitting evidence of the defendant's past drug transactions because, *inter alia*, "it painted a picture of the relationship between Campbell and Buchanan, thereby providing the jury with context surrounding the drug sale.").

74

In addition, the recordings showed that both George and "Angel" wanted to avoid any form of detection or surveillance.   "Angel" stated during the February 28 meeting that he did not want to communicate with George by fax or e-mail, for example, and George specifically instructed "Angel" during the March 4 meeting not to contact him by telephone if anything happened, saying: "If someone gets busted, or you're concerned about somebody, or huh, there's something you need to talk to me about, you don't talk on the phone."   [App.1657].   The conversations thus were also relevant to establish George's desire to avoid detection or surveillance and his understanding that "Angel" also wanted to do so, thus reflecting consciousness of guilt.  *See United States v. Taylor*, 284 F.3d 95, 103-04 (1st Cir.1998) (testimony that defendant carried a gun and asked if witness worked for law enforcement not inadmissible under Rule 404(b) because, *inter alia,* "his actions could be seen as reflecting his efforts to avoid police detection and thus his consciousness of his own guilt").

Moreover, the district court carefully balanced any possible prejudice from the recordings, ordering that several passages from the February 28 conversation be redacted.   [App.1013-1015].   The district court also specifically instructed the jury, at George's request and without objection from the government, that George did not engage in any unlawful or illegal conduct simply by accepting payment from

75

"Angel" as a legal fee.   [App.1394-1395].   In these circumstances, the district court did not abuse its discretion by resolving the Rule 403 balancing of unfair prejudice versus probative value in favor of admitting the evidence.

### E.    Dardinski's and SA Tamuleviz's Interpretation of the Statement that "He's Already Agreed to do the Rest"

#### 1.    Procedural History

The district court allowed Dardinski to testify, over George's objection, that when George said "he's already agreed to do the rest" on April 6, Dardinski understood that comment to mean that they "had discussed the proceeds from the drug money and all that, and that's where all the money was coming from." [App.464].   The district court also allowed SA Tamuleviz to testify, over George's objection, that he understood that statement to mean that the "rest of the money at that time would be from the money Mr. Dardinski made from the repossession and also from the cocaine."   [App.1096].

#### 2.    The District Court Did Not Manifestly Abuse its Discretion in Admitting the Challenged Testimony.

Dardinski and SA Tamuleviz testified as lay witnesses, and the testimony of lay witnesses is governed by Fed. R. Evid. 701, which provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the

> determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

In this case, George plainly was attempting to be deliberately ambiguous when he whispered "he's already agreed to do the rest," and the district court did not manifestly abuse its discretion in allowing Dardinski and SA Tamuleviz to testify about their understanding of what George meant by that statement.

First, as to Dardinski, this Court has held that a witness may testify about his subjective interpretation of a conversation in which he is a participant "as long as his opinion is rationally based on his perception and is helpful either to an understanding of his testimony or to the determination of a fact in issue." *United States v. Lizardo*, 445 F.3d 73, 83 (1st Cir. 2006) (internal quotation omitted). That is the situation here. Dardinski was a participant in the conversation with George; his interpretation of what George meant was rationally based on his earlier conversation with George of March 18, when he had told George that he needed to launder drug money; and the district court could reasonably have concluded in these circumstances that Dardinski's interpretation would be helpful to the jury. *See id.* (no manifest abuse of discretion in allowing co-defendant to testify about meaning of statements in recorded conversation in which, although participants did not employ code words, "the statements were either deliberately ambiguous or of uncertain meaning").

77

Second, and for similar reasons, SA Tamuleviz's testimony was permissible under Rule 701 because it also was helpful to the jury in understanding what George meant by his whispered, deliberately ambiguous statement. *See United States v. Albertelli*, 687 F.3d 439, 447 (1st Cir. 2012) (no manifest abuse of discretion in case agent's testimony about meaning of recorded conversations because, "while not the most traditional lay opinion, Kelsch's testimony formally meets the requirements of Rule 701, being "rationally based on [his] perception" of the conversations; "helpful" in the Rule 701 sense broadly understood; and yet not based on expert knowledge within the meaning of Rule 702") (internal citation omitted), *cert. denied*, 133 S. Ct. 566, 133 S. Ct. 2389, 133 S. Ct. 2390 (2013).

Even if this Court were to disagree, any possible error in the introduction of this testimony – which only affected Counts One through Three – was harmless. *See United States v. Sanabria*, 645 F.3d 505, 516 (1st Cir. 2011) ("We will find non-constitutional evidentiary errors harmless where it is highly probable that the error[s] did not influence the verdict.") (internal quotation omitted). The jury was able to listen to the tape of the recorded meeting and reach its own conclusion about the meaning of George's whispered comment. *See United States v. Rosado-Perez*, 605 F.3d 48, 56 (1st Cir. 2010) (noting that jury could "independently evaluate" law enforcement officer's interpretations of coded conversations). The district court

78

also instructed the jury that it was the sole judge of the facts, that it was the jury's province to accept or reject any of the witnesses' testimony, and that the testimony of law enforcement officers was not necessarily deserving of more or less weight than of an ordinary witness.  [App.1364, 1371-1373].  Hence, it is highly probable that, even without the challenged testimony, the jury would have concluded that when George whispered "he's already agreed to do the rest" while speaking with Dardinski, he meant that Hansen had agreed to launder Dardinski's drug money.

Finally, even if this Court were to conclude that any error was not harmless, the verdicts should still stand.  Dardinski's and SA Tamuleviz's testimony was relevant to show that George agreed with Hansen to launder what he believed was drug money, and did not implicate the government's proof that George and Hansen had agreed to launder funds that they believed to be derived from other unlawful activity; namely, Dardinski's larceny scheme.   Hence, and as set forth above in Part II, because the jury returned a general verdict on Counts One through Three, that verdict stands even if this Court were to conclude that Dardinski's and/or SA Tamuleviz's testimony was improperly admitted and that any error was not harmless. *See Griffin*, 502 U.S. at 59-60; *Mehanna*, 735 F.3d at 48.

## VII. GEORGE'S CUMULATIVE ERROR ARGUMENT FAILS.

George contends (Brief at 81-82) that even if none of the grounds of error that he has identified individually require that his convictions be reversed, his conviction alternatively should be reversed under the cumulative error doctrine. But George has not shown that the district court committed any errors, and "without *any* errors, there is nothing to accumulate." *United States v. Bayard*, 642 F.3d 59, 66 (1st Cir. 2011) (emphasis in original). And this conclusion would not change even if this Court were to find that any one of the errors alleged by George has merit, as where there is only one possible error related to a defendant's conviction, "[t]here is no cumulative error argument available to him." *United States v. Rodriguez*, 735 F.3d 1, 14 n.6 (1st Cir. 2013); *see also United States v. DeSimone*, 699 F.3d 113, 128 (1st Cir. 2012) ("The cumulative error doctrine is of no use to DeSimone because the only identified error was harmless.").

## VIII. THE DISTRICT COURT DID NOT CLEARLY ERR IN FINDING THAT GEORGE KNEW OR BELIEVED THAT THE LAUNDERED FUNDS WERE THE PROCEEDS OF A CONTROLLED SUBSTANCE OFFENSE, AND THAT HE THEREFORE MERITED A SIX-LEVEL ENHANCEMENT UNDER USSG §2S1.1(b)(1)(B)(i).

George contends (Brief at 82-84) that the district court clearly erred in finding that he knew or believed that the laundered funds were proceeds of drug trafficking,

80

and that he therefore merited a six-level enhancement under USSG §2S1.1(b)(1)(B)(i).[10]   That claim also fails.

## A.    **Procedural History**

The Probation Office calculated George's adjusted offense level for Counts One through Six, which were grouped together under USSG §3D1.2(b), to be 26. [PSR ¶¶82-88].   The adjusted offense level for these grouped counts was derived from a base offense level ("BOL") of 18 under USSG §2B1.1(b)(1)(G) because the value of the laundered funds was between $100,000 and $200,000; a six-level increase under USSG §2S1.1(b)(1)(B)(i) because George knew or believed that any of the laundered funds were the proceeds of, or were intended to promote a controlled substance offense; and a two-level increase under USSG §2S1.1(b)(2)(B) because George was convicted of violating 18 U.S.C. §1956.   [PSR ¶¶82-88].   Because the adjusted offense level of 26 for these grouped counts exceeded the adjusted offense level of 20 for Count 7, the total offense level ("TOL") was 26 under USSG §3D1.3(a).   [PSR ¶¶81, 91].   George's TOL of 26, when combined with his

---

[10] In his brief, George asserts that this enhancement arises under USSG §2S1.1(b)(1)(A), and the Probation Office and district court likewise identified §2S1.1(b)(1)(A) as the relevant provision of the Guidelines under which this enhancement applies.   [PSR ¶83; App.2069].   In fact, the enhancement arises under USSG §2S1.1(b)(1)(B)(i), *see United States v. Davila-Gonzalez*, 595 F.3d 42, 45-46 (1st Cir. 2010), and the government therefore cites to §2S1.1(b)(1)(B)(i).

Criminal History Category of I, yielded an advisory Guidelines sentencing range ("GSR") of 63 to 78 months.   [PSR ¶127].

George objected to the six-level enhancement under USSG §2S1.1(b)(1)(B)(i), arguing that the evidence failed to show that he knew or believed that the laundered funds derived from drugs, as opposed to the state larceny offenses that Dardinski had committed.   [App.1969-1972].   George also argued that although existing authority permitted the district court to make this finding under a preponderance of the evidence standard, the standard should be proof beyond a reasonable doubt or, at a minimum, clear and convincing evidence.   [App.1969 n.1].   The government responded in a sentencing memorandum that the evidence supported the six-level enhancement under §2S1.1(b)(1)(B)(i).   [App.1975-1976].

The district court convened a sentencing hearing on October 31, 2012.   After hearing further argument from the parties, the court stated that it was satisfied that George had agreed to launder funds received from drug transactions, stating that, "on the basis of all of the testimony at the trial, all of the conversations between the defendant, Mr. Dardinski, and Mr. Hansen, there is no other reasonable conclusion that this Court can reach."   [App.2066].

**B.**    **Standard of Review**

In evaluating a preserved objection to the procedural reasonableness of a sentence, this Court "review[s] factual findings for clear error, arguments that the sentencing court erred in interpreting or applying the guidelines de novo, and judgment calls for abuse of discretion."    *United States v. Zavala-Marti*, 715 F.3d 44, 50 (1st Cir. 2013) (internal quotation omitted).    Where, as here, a defendant challenges the factual predicate supporting a court's application of a sentencing enhancement, this Court asks "only whether the court clearly erred in finding that the government proved the disputed fact by a preponderance of the evidence." *Savarese*, 686 F.3d at 15 (internal quotation omitted).

**C.**    **The Evidence Supported the Enhancement.**

In cases involving money laundering and monetary transaction reporting, the Guidelines impose a six-level enhancement "if the defendant knew or believed that any of the laundered funds were the proceeds of, or were intended to promote (i) an offense involving the manufacture, importation, or distribution of a controlled substance or a listed chemical * * *."    USSG §2S1.1(b)(1)(B)(i).    George contends that the government did not demonstrate that he knew or believed that any of the laundered funds were the proceeds of drug trafficking, but, as shown above, the evidence at trial amply supported that finding.    Indeed, the court could have made

83

this finding based solely on the conversations between George and Dardinski on March 18 and April 6, 2009, in which Dardinski said that he wanted to hide money from cocaine sales and George subsequently told him that Hansen had "already agreed to do the rest."   The district court found that the "only reasonable conclusion" from those conversations is that George knew or believed that some of the laundered funds were the proceeds of drug trafficking, and that finding was not clearly erroneous.

George alternatively argues (Brief at 83-84) that under the Fifth and Sixth Amendments, the government had to prove that the enhancement applies under a beyond a reasonable doubt standard or, at a minimum, by clear or convincing evidence given the "significant increase" in the GSR.   That claim is foreclosed by controlling precedent.   The Supreme Court has explained that, while an element of the offense "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt," *Jones v. United States*, 526 U.S. 227, 232 (1999), a sentencing factor that does not implicate a statutory maximum "can be proved to a judge at sentencing by a preponderance of the evidence."   *United States v. O'Brien*, 560 U.S. 218, 224 (2010) (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 91-92 (1986)).   This Court thus has long held that for purposes of sentencing, the government has the burden to prove facts that do not implicate a statutory maximum

84

only by a preponderance of the evidence.  *See, e.g., United States v. Vazquez*, 724 F.3d 15, 29 (1st Cir. 2013); *United States v. Batchu*, 724 F.3d 1, 6 (1st Cir.), *cert. denied*, 134 S. Ct. 663 (2013); *see generally United States v. Watts*, 519 U.S. 148, 156 (1997) (per curiam) ("[W]e have held that application of the preponderance standard at sentencing generally satisfies due process.").  Moreover, in *United States v. Lombard*, 102 F.3d 1, 5 (1st Cir. 1996), this Court held that, in view of Supreme Court precedent, "the Constitution does not require a heightened proof standard" such as the clear and convincing standard that George here advocates.

Nor is this conclusion undermined by *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013), in which the Supreme Court held that facts that increase a statutory mandatory minimum sentence must also be proven beyond a reasonable doubt.  Because the six-level enhancement under §2S1.1(b)(1)(B)(i) does not trigger the application of a mandatory minimum sentence, the preponderance of the evidence standard continues to apply.  *See United States v. Haralaky*, 734 F.3d. 88, 99 (1st Cir. 2013).

## IX.    THE DISTRICT COURT DID NOT CLEARLY ERR IN ORDERING THE FORFEITURE OF GEORGE'S LEXUS.

George next argues (Brief at 84-86) that the district court erred in ordering the forfeiture of his Lexus, asserting that the government failed to establish a "substantial

connection" between that vehicle and the charged offenses.  That claim also goes nowhere.

### A.    Procedural History

Following the jury's verdict, the government moved for a preliminary order of forfeiture of George's Lexus under 18 U.S.C. §982, 31 U.S.C. §5317, and Fed. R. Crim. P. 32.2, asserting that that vehicle was property that had been involved in the charged offenses because George met with Dardinski inside the Lexus on April 6, 2009, and he also used it as transportation to and from several of the meetings with Dardinski and Hansen.  [App.1908-1914].  George opposed the government's motion, arguing that the Lexus did not bear a "substantial connection" to the charged offenses.  [App.1919-1924].  On October 31, 2012, the district court entered the preliminary order of forfeiture.  [App.1925-1929].

On April 17, 2013, the government moved for a final order of forfeiture, informing the court that no other claims of interest in the Lexus had been filed. [App.1930-1933].  On May 24, 2013, the district court entered the final order of forfeiture.  [App.1938-1942].

### B.    Standard of Review

This Court reviews questions of law regarding a forfeiture order de novo, and a district court's factual findings for clear error.  *See DeSimone*, 699 F.3d at 128.

### C.    The District Court Did Not Clearly Err in Ordering the Forfeiture of George's Lexus.

The criminal forfeiture statutes for violations of 18 U.S.C. §1956 and 31 U.S.C. §5324 contain virtually identical language, providing that the court, in imposing sentence, "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."    18 U.S.C. §982(a)(1); *accord* 31 U.S.C. §5317(c)(1)(A) (virtually identical language).    This Court has interpreted the language of §982(a)(1) broadly, holding that the term "involved in such offense" includes "any property used to facilitate the laundering offense," and that property facilitates an offense if it "make[s] the prohibited conduct * * * less difficult or more or less free from obstruction or hindrance or detection."    *McGauley*, 279 F.3d at 75-77 & n.14.[11]

In this case, the district court found that George's Lexus made it easier for him to commit the offenses of conviction, and did not clearly err in doing so.    George not only used the Lexus as transportation to attend several of the meetings with Hansen and Dardinski, but he met with Dardinski inside that vehicle on April 6, the meeting

---

[11] The government notes that while it must establish a "substantial connection" between the property and the offense under civil forfeiture statutes, *see* 18 U.S.C. §983(c)(3); 21 U.S.C. §881(a)(7), the criminal forfeiture statutes pursuant to which George's Lexus was forfeited require forfeiture of property "involved in" a violation of the statutes under which George was convicted.    18 U.S.C. §982(a)(1) and 31 U.S.C. §5317(c)(1)(A).    George's Lexus was properly forfeited under either of those standards for the reasons set forth below.

in which George not only explained to Dardinski how the money laundering deal would work, but also said that Hansen had agreed to launder Dardinski's drug money.    [App.1414-1416].    That meeting plainly was in furtherance of the conspiracy, and the fact that it took place inside the Lexus rather than George's law office or some other public place suggested that George wanted to keep the meeting as free as possible from detection.    The district court did not clearly err in ordering the forfeiture of George's Lexus in these circumstances.

## X.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING GEORGE'S MOTION FOR A NEW TRIAL.

George lastly argues (Brief at 86-88) that the district court erred in denying his motion for a new trial.    This Court reviews the denial of motion for a new trial for abuse of discretion, *see United States v. Carpenter, 7*36 F.3d 619, 626 (1st Cir. 2013), and there was none here.    George's new trial claim amounts to little more than a repackaging of the other claims that he has raised on appeal, all of which lack merit for the reasons set forth above.    The district court consequently did not abuse its discretion in denying his motion.    *See United States v. Maldonado*, 708 F.3d 38, 46 (1st Cir. 2013).

## **CONCLUSION**

For these reasons, the government respectfully requests that the Court affirm

the judgment.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:    /s/ *Mark T. Quinlivan*
MARK T. QUINLIVAN
Assistant U.S. Attorney

89

# CERTIFICATE OF COMPLIANCE WITH
## Rule 32(a)

### Certificate of Compliance with Type-Volume Limitation
### Typeface Requirements, and Type Style Requirements

1.    This brief complies with this Court's Order of December 5, 2013, allowing the government to file an opening brief containing not more than 20,000 words, because this brief contains **19.812** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) (*i.e.*, the corporate disclosure statement, table of contents, table of citations, addendum, and certificates of counsel).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Word Perfect X5.

                                    /s/ *Mark T. Quinlivan*
                                    MARK T. QUINLIVAN
                                    Dated:  January 8, 2014

## <u>CERTIFICATE OF SERVICE</u>

I, Mark T. Quinlivan, AUSA, certify that on January 8, 2014, I electronically served a copy of the foregoing document on the following registered participants of the CM/ECF system: Robert M. Goldstein, 20 Park Plaza, Suite 1000, Boston, MA 02116.

 /s/ *Mark T. Quinlivan*  
MARK T. QUINLIVAN

No. 12-2373

=========================================

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

————————————

## UNITED STATES OF AMERICA,
## APPELLEE

### v.

## ROBERT A. GEORGE,
## DEFENDANT-APPELLANT

————————————

## ADDENDUM TABLE OF CONTENTS

————————————

1.  18 U.S.C. §1956...................................................................G.Add.1

2.  18 U.S.C. §1957...................................................................G.Add.9

3.  31 U.S.C. §5324.................................................................G.Add.10

(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established.

(d) Any property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States. All provisions of law relating to the seizures, summary, and judicial forfeiture procedures, and condemnation of vessels, vehicles, merchandise, and baggage for violation of the customs laws; the disposition of such vessels, vehicles, merchandise, and baggage or the proceeds from such sale; the remission or mitigation of such forfeitures; and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to seizures and forfeitures incurred or alleged to have been incurred under the provisions of this section, insofar as applicable and not inconsistent with such provisions. Such duties as are imposed upon the collector of customs or any other person in respect to the seizure and forfeiture of vessels, vehicles, merchandise, and baggage under the customs laws shall be performed with respect to seizures and forfeitures of property used or intended for use in violation of this section by such officers, agents, or other persons as may be designated for that purpose by the Attorney General.

(e) This section shall not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1986, as amended, if no part of the gross receipts derived from such activity inures to the benefits of any private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the conduct of such activity.

(Added Pub. L. 91–452, title VIII, § 803(a), Oct. 15, 1970, 84 Stat. 937; amended Pub. L. 99–514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub. L. 103–322, title XXXIII, § 330016(1)(N), Sept. 13, 1994, 108 Stat. 2148.)

### REFERENCES IN TEXT

Paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1986, referred to in subsec. (e), is classified to section 501(c)(3) of Title 26, Internal Revenue Code.

### AMENDMENTS

1994—Subsec. (a). Pub. L. 103–322 substituted "fined under this title" for "fined not more than $20,000".

1986—Subsec. (e). Pub. L. 99–514 substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954".

### TRANSFER OF FUNCTIONS

Offices of collector of customs, comptroller of customs, surveyor of customs, and appraiser of merchandise in Bureau of Customs of Department of the Treasury to which appointments were required to be made by President with advice and consent of Senate ordered abolished, with such offices to be terminated not later than Dec. 31, 1966, by Reorg. Plan No. 1 of 1965, eff. May 25, 1965, 30 F.R. 7035, 79 Stat. 1317, set out in the Appendix to Title 5, Government Organization and Employees. Functions of offices eliminated were already vested in Secretary of the Treasury by Reorg. Plan No. 26 of 1950, eff. July 31, 1950, 15 F.R. 4935, 64 Stat. 1280, set out in the Appendix to Title 5.

### NATIONAL GAMBLING IMPACT STUDY COMMISSION

Pub. L. 104–169, Aug. 3, 1996, 110 Stat. 1482, as amended by Pub. L. 105–30, § 1, July 25, 1997, 111 Stat. 248, established the National Gambling Impact Study Commission to conduct a comprehensive legal and factual study of the social and economic impacts of gambling in the United States on Federal, State, local, and Native American tribal governments, as well as on communities and social institutions generally, including individuals, families, and businesses within such communities and institutions, and to submit a report, not later than two years after its first meeting, to the President, the Congress, State Governors, and Native American tribal governments containing the Commission's findings and conclusions, together with any recommendations of the Commission, and further provided for membership of the Commission, meetings, powers and duties of the Commission, personnel matters, contracts for research with the Advisory Commission on Intergovernmental Relations and the National Research Council, definitions, appropriations, and termination of the Commission 60 days after submission of its final report.

### PRIORITY OF STATE LAWS

Enactment of this section as not indicating an intent on the part of the Congress to occupy the field in which this section operates to the exclusion of State of local law on the same subject matter, or to relieve any person of any obligation imposed by any State or local law, see section 811 of Pub. L. 91–452, set out as a Priority of State Laws note under section 1511 of this title.

### COMMISSION ON REVIEW OF NATIONAL POLICY TOWARD GAMBLING

Sections 804–809 of Pub. L. 91–452 established Commission on Review of National Policy Toward Gambling, provided for its membership and compensation of members and staff, empowered Commission to subpoena witnesses and grant immunity, required Commission to make a study of gambling in United States and existing Federal, State, and local policy and practices with respect to prohibition and taxation of gambling activities and to make a final report of its findings and recommendations to President and to Congress within four years of its establishment, and provided for its termination sixty days after submission of final report.

## § 1956. Laundering of monetary instruments

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(A) with the intent to promote the carrying on of specified unlawful activity; or

(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both. For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.

(3) Whoever, with the intent—

(A) to promote the carrying on of specified unlawful activity;

(B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or

(C) to avoid a transaction reporting requirement under State or Federal law,

conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph and paragraph (2), the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

(b) PENALTIES.—

(1) IN GENERAL.—Whoever conducts or attempts to conduct a transaction described in subsection (a)(1) or (a)(3), or section 1957, or a transportation, transmission, or transfer described in subsection (a)(2), is liable to the United States for a civil penalty of not more than the greater of—

(A) the value of the property, funds, or monetary instruments involved in the transaction; or

(B) $10,000.

(2) JURISDICTION OVER FOREIGN PERSONS.—For purposes of adjudicating an action filed or enforcing a penalty ordered under this section, the district courts shall have jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found, and—

(A) the foreign person commits an offense under subsection (a) involving a financial transaction that occurs in whole or in part in the United States;

(B) the foreign person converts, to his or her own use, property in which the United States has an ownership interest by virtue of the entry of an order of forfeiture by a court of the United States; or

(C) the foreign person is a financial institution that maintains a bank account at a financial institution in the United States.

(3) COURT AUTHORITY OVER ASSETS.—A court may issue a pretrial restraining order or take any other action necessary to ensure that any bank account or other property held by the defendant in the United States is available to satisfy a judgment under this section.

(4) FEDERAL RECEIVER.—

(A) IN GENERAL.—A court may appoint a Federal Receiver, in accordance with subparagraph (B) of this paragraph, to collect, marshal, and take custody, control, and possession of all assets of the defendant, wherever located, to satisfy a civil judgment under this subsection, a forfeiture judgment under section 981 or 982, or a criminal sentence under section 1957 or subsection (a) of this section, including an order of restitution to any victim of a specified unlawful activity.

(B) APPOINTMENT AND AUTHORITY.—A Federal Receiver described in subparagraph (A)—

(i) may be appointed upon application of a Federal prosecutor or a Federal or State regulator, by the court having jurisdiction over the defendant in the case;

(ii) shall be an officer of the court, and the powers of the Federal Receiver shall include the powers set out in section 754 of title 28, United States Code; and

(iii) shall have standing equivalent to that of a Federal prosecutor for the purpose of submitting requests to obtain information regarding the assets of the defendant—

(I) from the Financial Crimes Enforcement Network of the Department of the Treasury; or

(II) from a foreign country pursuant to a mutual legal assistance treaty, multilateral agreement, or other arrangement for international law enforcement assistance, provided that such requests are in accordance with the policies and procedures of the Attorney General.

(c) As used in this section—

(1) the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7);

(2) the term "conducts" includes initiating, concluding, or participating in initiating, or concluding a transaction;

(3) the term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected;

(4) the term "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree;

(5) the term "monetary instruments" means (i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery;

(6) the term "financial institution" includes—

(A) any financial institution, as defined in section 5312(a)(2) of title 31, United States Code, or the regulations promulgated thereunder; and

(B) any foreign bank, as defined in section 1 of the International Banking Act of 1978 (12 U.S.C. 3101);

(7) the term "specified unlawful activity" means—

(A) any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31;

(B) with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving—

(i) the manufacture, importation, sale, or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act);

(ii) murder, kidnapping, robbery, extortion, destruction of property by means of explosive or fire, or a crime of violence (as defined in section 16);

(iii) fraud, or any scheme or attempt to defraud, by or against a foreign bank (as defined in paragraph 7 of section 1(b) of the International Banking Act of 1978));[1]

(iv) bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official;

(v) smuggling or export control violations involving—

(I) an item controlled on the United States Munitions List established under section 38 of the Arms Export Control Act (22 U.S.C. 2778); or

(II) an item controlled under regulations under the Export Administration Regulations (15 C.F.R. Parts 730–774);

(vi) an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States; or

(vii) trafficking in persons, selling or buying of children, sexual exploitation of children, or transporting, recruiting or harboring a person, including a child, for commercial sex acts;

(C) any act or acts constituting a continuing criminal enterprise, as that term is defined in section 408 of the Controlled Substances Act (21 U.S.C. 848);

(D) an offense under section 32 (relating to the destruction of aircraft), section 37 (relating to violence at international airports), section 115 (relating to influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member), section 152 (relating to concealment of assets; false oaths and claims; bribery), section 175c (relating to the variola virus), section 215 (relating to commissions or gifts for procuring loans), section 351 (relating to congressional or Cabinet officer assassination), any of sections 500 through 503 (relating to certain counterfeiting offenses), section 513 (relating to securities of States and private entities), section 541 (relating to goods falsely classified), section 542 (relating to entry of goods by means of false statements), section 545 (relating to smuggling goods into the United States), section 549 (relating to removing goods from Customs custody), section 554 (relating to smuggling goods from the United States), section 555 (relating to border tunnels), section 641 (relating to public money, property, or records), section 656 (relating to theft, em-

---

[1] So in original. The second closing parenthesis probably should not appear.

bezzlement, or misapplication by bank officer or employee), section 657 (relating to lending, credit, and insurance institutions), section 658 (relating to property mortgaged or pledged to farm credit agencies), section 666 (relating to theft or bribery concerning programs receiving Federal funds), section 793, 794, or 798 (relating to espionage), section 831 (relating to prohibited transactions involving nuclear materials), section 844(f) or (i) (relating to destruction by explosives or fire of Government property or property affecting interstate or foreign commerce), section 875 (relating to interstate communications), section 922(l) (relating to the unlawful importation of firearms), section 924(n) (relating to firearms trafficking), section 956 (relating to conspiracy to kill, kidnap, maim, or injure certain property in a foreign country), section 1005 (relating to fraudulent bank entries), 1006[2] (relating to fraudulent Federal credit institution entries), 1007[2] (relating to Federal Deposit Insurance transactions), 1014[2] (relating to fraudulent loan or credit applications), section 1030 (relating to computer fraud and abuse), 1032[2] (relating to concealment of assets from conservator, receiver, or liquidating agent of financial institution), section 1111 (relating to murder), section 1114 (relating to murder of United States law enforcement officials), section 1116 (relating to murder of foreign officials, official guests, or internationally protected persons), section 1201 (relating to kidnaping), section 1203 (relating to hostage taking), section 1361 (relating to willful injury of Government property), section 1363 (relating to destruction of property within the special maritime and territorial jurisdiction), section 1708 (theft from the mail), section 1751 (relating to Presidential assassination), section 2113 or 2114 (relating to bank and postal robbery and theft), section 2252A (relating to child pornography) where the child pornography contains a visual depiction of an actual minor engaging in sexually explicit conduct, section 2260 (production of certain child pornography for importation into the United States), section 2280 (relating to violence against maritime navigation), section 2281 (relating to violence against maritime fixed platforms), section 2319 (relating to copyright infringement), section 2320 (relating to trafficking in counterfeit goods and services), section 2332 (relating to terrorist acts abroad against United States nationals), section 2332a (relating to use of weapons of mass destruction), section 2332b (relating to international terrorist acts transcending national boundaries), section 2332g (relating to missile systems designed to destroy aircraft), section 2332h (relating to radiological dispersal devices), section 2339A or 2339B (relating to providing material support to terrorists), section 2339C (relating to financing of terrorism), or section 2339D (relating to receiving military-type training from a foreign terrorist organization) of this title, section

tion 46502 of title 49, United States Code, a felony violation of the Chemical Diversion and Trafficking Act of 1988 (relating to precursor and essential chemicals), section 590 of the Tariff Act of 1930 (19 U.S.C. 1590) (relating to aviation smuggling), section 422 of the Controlled Substances Act (relating to transportation of drug paraphernalia), section 38(c) (relating to criminal violations) of the Arms Export Control Act, section 11 (relating to violations) of the Export Administration Act of 1979, section 206 (relating to penalties) of the International Emergency Economic Powers Act, section 16 (relating to offenses and punishment) of the Trading with the Enemy Act, any felony violation of section 15 of the Food and Nutrition Act of 2008 (relating to supplemental nutrition assistance program benefits fraud) involving a quantity of benefits having a value of not less than $5,000, any violation of section 543(a)(1) of the Housing Act of 1949 (relating to equity skimming), any felony violation of the Foreign Agents Registration Act of 1938, any felony violation of the Foreign Corrupt Practices Act, or section 92 of the Atomic Energy Act of 1954 (42 U.S.C. 2122) (relating to prohibitions governing atomic weapons)[3]

ENVIRONMENTAL CRIMES

(E) a felony violation of the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.), the Ocean Dumping Act (33 U.S.C. 1401 et seq.), the Act to Prevent Pollution from Ships (33 U.S.C. 1901 et seq.), the Safe Drinking Water Act (42 U.S.C. 300f et seq.), or the Resources Conservation and Recovery Act (42 U.S.C. 6901 et seq.); or

(F) any act or activity constituting an offense involving a Federal health care offense;

(8) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States; and

(9) the term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity.

(d) Nothing in this section shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this section.

(e) Violations of this section may be investigated by such components of the Department of Justice as the Attorney General may direct, and by such components of the Department of the Treasury as the Secretary of the Treasury may direct, as appropriate, and, with respect to offenses over which the Department of Homeland Security has jurisdiction, by such components of the Department of Homeland Security as the Secretary of Homeland Security may direct, and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of

---

[2] So in original. Probably should be preceded by "section".

[3] So in original. Probably should be followed by a semicolon.

the Secretary of the Treasury, the Secretary of Homeland Security, and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Secretary of Homeland Security, the Postal Service, and the Attorney General. Violations of this section involving offenses described in paragraph (c)(7)(E) may be investigated by such components of the Department of Justice as the Attorney General may direct, and the National Enforcement Investigations Center of the Environmental Protection Agency.

(f) There is extraterritorial jurisdiction over the conduct prohibited by this section if—

(1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and

(2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

(g) NOTICE OF CONVICTION OF FINANCIAL INSTITUTIONS.—If any financial institution or any officer, director, or employee of any financial institution has been found guilty of an offense under this section, section 1957 or 1960 of this title, or section 5322 or 5324 of title 31, the Attorney General shall provide written notice of such fact to the appropriate regulatory agency for the financial institution.

(h) Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

(i) VENUE.—(1) Except as provided in paragraph (2), a prosecution for an offense under this section or section 1957 may be brought in—

(A) any district in which the financial or monetary transaction is conducted; or

(B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

(2) A prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought in the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place.

(3) For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place.

(Added Pub. L. 99–570, title I, § 1352(a), Oct. 27, 1986, 100 Stat. 3207–18; amended Pub. L. 100–690, title VI, §§ 6183, 6465, 6466, 6469(a)(1), 6471(a), title VII, § 7031, Nov. 18, 1988, 102 Stat. 4354, 4375, 4377, 4378, 4398; Pub. L. 101–647, title I, §§ 105–108, title XII, § 1205(j), title XIV, §§ 1402, 1404, title XXV, § 2506, title XXXV, § 3557, Nov. 29, 1990, 104 Stat. 4791, 4792, 4831, 4835, 4862, 4927; Pub. L. 102–550, title XV, §§ 1504(c), 1524, 1526(a), 1527(a), 1530, 1531, 1534, 1536, Oct. 28, 1992, 106 Stat. 4055, 4064–4067; Pub. L. 103–322, title XXXII, § 320104(b), title XXXIII, §§ 330008(2), 330011(I), 330012, 330019, 330021(1), Sept. 13, 1994, 108 Stat. 2111, 2142, 2145, 2146, 2149, 2150; Pub. L. 103–325, title IV, §§ 411(c)(2)(E), 413(c)(1), (d), Sept. 23, 1994, 108 Stat. 2253–2255; Pub. L. 104–132, title VII, § 726, Apr. 24, 1996, 110 Stat. 1301; Pub. L. 104–191, title II, § 246, Aug. 21, 1996, 110 Stat. 2018; Pub. L. 104–294, title VI, §§ 601(f)(6), 604(b)(38), Oct. 11, 1996, 110 Stat. 3499, 3509; Pub. L. 106–569, title VII, § 709(a), Dec. 27, 2000, 114 Stat. 3018; Pub. L. 107–56, title III, §§ 315, 317, 318, 376, title VIII, § 805(b), title X, § 1004, Oct. 26, 2001, 115 Stat. 308, 310, 311, 342, 378, 392; Pub. L. 107–273, div. B, title IV, §§ 4002(a)(11), (b)(5), (c)(2), 4005(d)(1), (e), Nov. 2, 2002, 116 Stat. 1807, 1809, 1812, 1813; Pub. L. 108–458, title VI, § 6909, Dec. 17, 2004, 118 Stat. 3774; Pub. L. 109–164, title I, § 103(b), Jan. 10, 2006, 119 Stat. 3563; Pub. L. 109–177, title III, § 311(c), title IV, §§ 403(b), (c)(1), 405, 406(a)(2), 409, Mar. 9, 2006, 120 Stat. 242–244, 246; Pub. L. 110–234, title IV, §§ 4002(b)(1)(B), (D), (2)(M), 4115(c)(1)(A)(i), (B)(ii), May 22, 2008, 122 Stat. 1096, 1097, 1109; Pub. L. 110–246, § 4(a), title IV, §§ 4002(b)(1)(B), (D), (2)(M), 4115(c)(1)(A)(i), (B)(ii), June 18, 2008, 122 Stat. 1664, 1857, 1858, 1870; Pub. L. 110–358, title II, § 202, Oct. 8, 2008, 122 Stat. 4003; Pub. L. 111–21, § 2(f)(1), May 20, 2009, 123 Stat. 1618; Pub. L. 112–127, § 6, June 5, 2012, 126 Stat. 371.)

REFERENCES IN TEXT

Sections 7201 and 7206 of the Internal Revenue Code of 1986, referred to in subsec. (a)(1)(A)(ii), are classified, respectively, to sections 7201 and 7206 of Title 26, Internal Revenue Code.

The Federal Rules of Civil Procedure, referred to in subsec. (b)(2), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

The Controlled Substances Act, referred to in subsec. (c)(7)(B)(i), (D), is title II of Pub. L. 91–513, Oct. 27, 1970, 84 Stat. 1242, which is classified principally to subchapter I (§ 801 et seq.) of chapter 13 of Title 21, Food and Drugs. Section 422 of the Act is classified to section 863 of Title 21. For complete classification of this Act to the Code, see Short Title note set out under section 801 of Title 21 and Tables.

The Chemical Diversion and Trafficking Act of 1988, referred to in subsec. (c)(7)(D), is subtitle A (§§ 6051–6061) of title VI of Pub. L. 100–690, Nov. 18, 1988, 102 Stat. 4312. For complete classification of subtitle A to the Code, see Short Title of 1988 Amendment note set out under section 801 of Title 21, Food and Drugs, and Tables.

Section 38(c) of the Arms Export Control Act, referred to in subsec. (c)(7)(D), is classified to section 2778(c) of Title 22, Foreign Relations and Intercourse.

Section 11 of the Export Administration Act of 1979, referred to in subsec. (c)(7)(D), is classified to section 2410 of Title 50, Appendix, War and National Defense.

Section 206 of the International Emergency Economic Powers Act, referred to in subsec. (c)(7)(D), is classified to section 1705 of Title 50.

Section 16 of the Trading with the Enemy Act, referred to in subsec. (c)(7)(D), is classified to section 16 of Title 50, Appendix.

Section 15 of the Food and Nutrition Act of 2008, referred to in subsec. (c)(7)(D), is classified to section 2024 of Title 7, Agriculture.

Section 543(a)(1) of the Housing Act of 1949, referred to in subsec. (c)(7)(D), is classified to section 1490s(a)(1) of Title 42, The Public Health and Welfare.

The Foreign Agents Registration Act of 1938, referred to in subsec. (c)(7)(D), is act June 8, 1938, ch. 327, 52 Stat. 631, which is classified generally to subchapter II (§ 611 et seq.) of chapter 11 of Title 22, Foreign Rela-

tions and Intercourse. For complete classification of this Act to the Code, see Short Title note set out under section 611 of Title 22 and Tables.

The Foreign Corrupt Practices Act, referred to in subsec. (c)(7)(D), probably means the Foreign Corrupt Practices Act of 1977, title I of Pub. L. 95–213, Dec. 19, 1977, 91 Stat. 1494, which enacted sections 78dd–1 to 78dd–3 of Title 15, Commerce and Trade, and amended sections 78m and 78ff of Title 15. For complete classification of this Act to the Code, see Short Title of 1977 Amendment note set out under section 78a of Title 15 and Tables.

The Federal Water Pollution Control Act, referred to in subsec. (c)(7)(E), is act June 30, 1948, ch. 758, as amended generally by Pub. L. 92–500, §2, Oct. 18, 1972, 86 Stat. 816, which is classified generally to chapter 26 (§1251 et seq.) of Title 33, Navigation and Navigable Waters. For complete classification of this Act to the Code, see Short Title note set out under section 1251 of Title 33 and Tables.

The Ocean Dumping Act, referred to in subsec. (c)(7)(E), probably means title I of the Marine Protection, Research, and Sanctuaries Act of 1972, Pub. L. 92–532, Oct. 23, 1972, 86 Stat. 1053, which is classified generally to subchapter I (§1411 et seq.) of chapter 27 of Title 33. For complete classification of title I to the Code, see Tables.

The Act to Prevent Pollution from Ships, referred to in subsec. (c)(7)(E), is Pub. L. 96–478, Oct. 21, 1980, 94 Stat. 2297, which is classified principally to chapter 33 (§1901 et seq.) of Title 33. For complete classification of this Act to the Code, see Short Title note set out under section 1901 of Title 33 and Tables.

The Safe Drinking Water Act, referred to in subsec. (c)(7)(E), is title XIV of act July 1, 1944, as added Dec. 16, 1974, Pub. L. 93–523, §2(a), 88 Stat. 1660, which is classified generally to subchapter XII (§300f et seq.) of chapter 6A of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 201 of Title 42 and Tables.

The Resources Conservation and Recovery Act, referred to in subsec. (c)(7)(E), probably means the Resource Conservation and Recovery Act of 1976, Pub. L. 94–580, Oct. 21, 1976, 90 Stat. 2796, which is classified generally to chapter 82 (§6901 et seq.) of Title 42. For complete classification of this Act to the Code, see Short Title of 1976 Amendment note set out under section 6901 of Title 42 and Tables.

CODIFICATION

Pub. L. 110–234 and Pub. L. 110–246 made identical amendments to this section. The amendments by Pub. L. 110–234 were repealed by section 4(a) of Pub. L. 110–246.

AMENDMENTS

2012—Subsec. (c)(7)(D). Pub. L. 112–127 inserted "section 555 (relating to border tunnels)," after "section 554 (relating to smuggling goods from the United States),".

2009—Subsec. (c)(9). Pub. L. 111–21 added par. (9).

2008—Subsec. (c)(7)(D). Pub. L. 110–358 inserted "section 2252A (relating to child pornography) where the child pornography contains a visual depiction of an actual minor engaging in sexually explicit conduct, section 2260 (production of certain child pornography for importation into the United States)," before "section 2280".

Pub. L. 110–246, §4115(c)(1)(A)(i), (B)(ii), substituted "benefits" for "coupons".

Pub. L. 110–246, §4002(b)(1)(B), (D), (2)(M), substituted "Food and Nutrition Act of 2008" for "Food Stamp Act of 1977" and "supplemental nutrition assistance program benefits" for "food stamp".

2006—Subsec. (a)(1). Pub. L. 109–177, §405, inserted last sentence.

Subsec. (b)(3), (4)(A). Pub. L. 109–177, §406(a)(2), struck out "described in paragraph (2)" after "A court".

Subsec. (c)(7)(B)(vii). Pub. L. 109–164 added cl. (vii).

Subsec. (c)(7)(D). Pub. L. 109–177, §409, inserted ", section 2339C (relating to financing of terrorism), or section 2339D (relating to receiving military-type training from a foreign terrorist organization)" after "section 2339A or 2339B (relating to providing material support to terrorists)" and struck out "or" before "section 2339A or 2339B".

Pub. L. 109–177, §403(b), which directed amendment of subsec. (c)(7)(D) by substituting "any felony violation of the Foreign Corrupt Practices Act" for "or any felony violation of the Foreign Corrupt Practices Act", could not be executed because of the amendment by Pub. L. 108–458, §6909(3). See 2004 Amendment note below.

Pub. L. 109–177, §311(c), inserted "section 554 (relating to smuggling goods from the United States)," before "section 641 (relating to public money, property, or records),".

Subsec. (e). Pub. L. 109–177, §403(c)(1), amended subsec. (e) generally. Prior to amendment, subsec. (e) read as follows: "Violations of this section may be investigated by such components of the Department of Justice as the Attorney General may direct, and by such components of the Department of the Treasury as the Secretary of the Treasury may direct, as appropriate and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of the Secretary of the Treasury and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Postal Service, and the Attorney General. Violations of this section involving offenses described in paragraph (c)(7)(E) may be investigated by such components of the Department of Justice as the Attorney General may direct, and the National Enforcement Investigations Center of the Environmental Protection Agency."

2004—Subsec. (c)(7)(D). Pub. L. 108–458, §6909(3), struck out "or" after "any felony violation of the Foreign Agents Registration Act of 1938," and substituted ", or section 92 of the Atomic Energy Act of 1954 (42 U.S.C. 2122) (relating to prohibitions governing atomic weapons)" for semicolon at end.

Pub. L. 108–458, §6909(2), which directed the insertion of "section 2332g (relating to missile systems designed to destroy aircraft), section 2332h (relating to radiological dispersal devices)," after "section 2332(b) (relating to international terrorist acts transcending national boundaries)," was executed by making the insertion after text which contained the words "section 2332b" rather than "section 2332(b)", to reflect the probable intent of Congress.

Pub. L. 108–458, §6909(1), inserted "section 175c (relating to the variola virus)," before "section 215".

2002—Subsec. (c)(6)(B). Pub. L. 107–273, §4005(d)(1), substituted semicolon for period at end.

Subsec. (c)(7)(B)(ii). Pub. L. 107–273, §4002(b)(5)(A), realigned margins.

Subsec. (c)(7)(D). Pub. L. 107–273, §4005(e), repealed Pub. L. 107–56, §805(b). See 2001 Amendment note below.

Pub. L. 107–273, §4002(c)(2), substituted "services)," for "services)," and "Code," for "Code,".

Pub. L. 107–273, §4002(b)(5)(B), struck out "or" at end.

Pub. L. 107–273, §4002(a)(11), made technical corrections to directory language of Pub. L. 104–132, §726(2). See 1996 Amendment note below.

Subsec. (c)(7)(E). Pub. L. 107–273, §4002(b)(5)(C), substituted "; or" for period at end.

Subsec. (c)(7)(F). Pub. L. 107–273, §4002(b)(5)(D), substituted "any" for "Any" and semicolon for period at end.

2001—Subsec. (b). Pub. L. 107–56, §317, inserted subsec. heading, designated existing provisions as par. (1), inserted heading and inserted ", or section 1957" after "or (a)(3)" in introductory provisions, redesignated former pars. (1) and (2) as subpars. (A) and (B), respectively, of par. (1), realigned margins, and added pars. (2) to (4).

Subsec. (c)(6). Pub. L. 107–56, §318, added par. (6) and struck out former par. (6) which read as follows: "the

term 'financial institution' has the definition given that term in section 5312(a)(2) of title 31, United States Code, or the regulations promulgated thereunder;''.

Subsec. (c)(7)(B). Pub. L. 107–56, §315(1), substituted "destruction of property by means of explosive or fire, or a crime of violence (as defined in section 16)'' for "or destruction of property by means of explosive or fire'' in cl. (ii), inserted a closing parenthesis after "1978'' in cl. (iii), and added cls. (iv) to (vi).

Subsec. (c)(7)(D). Pub. L. 107–56, §376, inserted "or 2339B'' after "2339A.'' Pub. L. 107–56, §805(b), which amended subpar. (D) identically, was repealed by Pub. L. 107–273, §4005(e).

Pub. L. 107–56, §315(2), inserted "section 541 (relating to goods falsely classified),'' before "section 542'', "section 922(l) (relating to the unlawful importation of firearms), section 924(n) (relating to firearms trafficking),'' before "section 956'', "section 1030 (relating to computer fraud and abuse),'' before "1032'', and "any felony violation of the Foreign Agents Registration Act of 1938,'' before "or any felony violation of the Foreign Corrupt Practices Act''.

Subsec. (i). Pub. L. 107–56, §1004, added subsec. (i).

2000—Subsec. (c)(7)(D). Pub. L. 106–569 inserted "any violation of section 543(a)(1) of the Housing Act of 1949 (relating to equity skimming),'' after "coupons having a value of not less than $5,000,''.

1996—Subsec. (c)(7)(B)(ii). Pub. L. 104–132, §726(1), amended cl. (ii) generally. Prior to amendment, cl. (ii) read as follows: "kidnapping, robbery, or extortion; or''.

Subsec. (c)(7)(B)(iii). Pub. L. 104–294, §601(f)(6), struck out one closing parenthesis after "1978''.

Subsec. (c)(7)(D). Pub. L. 104–294, §604(b)(38), amended directory language of Pub. L. 103–322, §320104(b). See 1994 Amendment note below.

Pub. L. 104–132, §726(2), as amended by Pub. L. 107–273, §4002(a)(11), inserted "section 32 (relating to the destruction of aircraft), section 37 (relating to violence at international airports), section 115 (relating to influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member),'' after "an offense under'', "section 351 (relating to congressional or Cabinet officer assassination),'' after "section 215 (relating to commissions or gifts for procuring loans),'', "section 831 (relating to prohibited transactions involving nuclear materials), section 844(f) or (i) (relating to destruction by explosives or fire of Government property or property affecting interstate or foreign commerce),'' after "798 (relating to espionage),'', "section 956 (relating to conspiracy to kill, kidnap, maim, or injure certain property in a foreign country),'' after "section 875 (relating to interstate communications),'', "section 1111 (relating to murder), section 1114 (relating to murder of United States law enforcement officials), section 1116 (relating to murder of foreign officials, official guests, or internationally protected persons),'' after "1032 (relating to concealment of assets from conservator, receiver, or liquidating agent of financial institution),'', "section 1361 (relating to willful injury of Government property), section 1363 (relating to destruction of property within the special maritime and territorial jurisdiction),'' after "section 1203 (relating to hostage taking),'', "section 1751 (relating to Presidential assassination),'' after "1708 (theft from the mail),'', "section 2280 (relating to violence against maritime navigation), section 2281 (relating to violence against maritime fixed platforms),'' after "2114 (relating to bank and postal robbery and theft),'', and substituted "section 2320'' for "or section 2320'' and ", section 2332 (relating to terrorist acts abroad against United States nationals), section 2332a (relating to use of weapons of mass destruction), section 2332b (relating to international terrorist acts transcending national boundaries), or section 2339A (relating to providing material support to terrorists) of this title, section 46502 of title 49, United States Code,'' for "of this title''.

Subsec. (c)(7)(F). Pub. L. 104–191 added subpar. (F).

1994—Subsec. (a)(2). Pub. L. 103–325, §413(c)(1)(A)(ii), substituted "transfer'' for "transfer.'' in concluding provisions and two times in subpar. (B).

Pub. L. 103–322, §330019(a)(3), and Pub. L. 103–325, §413(c)(1)(A)(1), amended par. (2) identically, inserting "not more than'' before "$500,000'' in concluding provisions.

Subsec. (b). Pub. L. 103–325, §413(c)(1)(B), inserted "or (a)(3)'' after "(a)(1)'' and substituted "transfer'' for "transfer.''

Subsec. (c)(7)(B)(ii). Pub. L. 103–322, §330021(1), substituted "kidnapping'' for "kidnaping''.

Subsec. (c)(7)(B)(iii). Pub. L. 103–322, §330019(a)(1), and Pub. L. 103–325, §413(c)(1)(C), each amended cl. (iii) by inserting a closing parenthesis after "1978''.

Subsec. (c)(7)(D). Pub. L. 103–322, §330019(b), and Pub. L. 103–325, §413(c)(1)(D), amended subpar. (D) identically, substituting "section 15 of the Food Stamp Act of 1977'' for "section 9(c) of the Food Stamp Act of 1977''.

Pub. L. 103–322, §330011(l), and Pub. L. 103–325, §413(d), made identical amendments repealing Pub. L. 101–647, §3557(2)(E). See 1990 Amendment note below.

Pub. L. 103–322, §320104(b), as amended by Pub. L. 104–294, §604(b)(38), substituted "section 2319 (relating to copyright infringement), or section 2320 (relating to trafficking in counterfeit goods and services),'' for "or section 2319 (relating to copyright infringement)''.

Subsec. (c)(7)(E). Pub. L. 103–322, §330012, and Pub. L. 103–325, §413(c)(1)(E), amended subpar. (E) identically, striking out second period at end.

Subsec. (e). Pub. L. 103–322, §330008(2), and Pub. L. 103–325, §413(c)(1)(F), amended subsec. (e) identically, substituting "Environmental Protection Agency'' for "Environmental Protection Agency.''

Subsec. (g). Pub. L. 103–325, §411(c)(2)(E), in subsec. (g) relating to notice of conviction of financial institutions, substituted "section 5322 or 5324 of title 31'' for "section 5322 of title 31''.

Pub. L. 103–322, §330019(a)(2), and Pub. L. 103–325, §413(c)(1)(G), made identical amendments redesignating subsec. (g) relating to penalty for money laundering conspiracies as (h).

Subsec. (h). Pub. L. 103–322, §330019(a)(2), and Pub. L. 103–325, §413(c)(1)(G), made identical amendments redesignating subsec. (g) relating to penalty for money laundering conspiracies as (h).

1992—Subsec. (a)(2). Pub. L. 102–550, §1531(a), substituted "transportation, transmission, or transfer'' for "transportation'' wherever appearing in subpar. (B) and concluding provisions.

Subsec. (a)(3). Pub. L. 102–550, §1531(b), in concluding provisions, substituted "property represented to be the proceeds'' for "property represented by a law enforcement officer to be the proceeds''.

Subsec. (b). Pub. L. 102–550, §1531(a), substituted "transportation, transmission, or transfer.'' for "transportation'' in introductory provisions.

Subsec. (c)(3). Pub. L. 102–550, §1527(a)(2), inserted "use of a safe deposit box,'' before "or any other payment''.

Subsec. (c)(4)(A). Pub. L. 102–550, §1527(a)(1), added clause (iii), struck out "which in any way or degree affects interstate or foreign commerce,'' after "or aircraft,'' and inserted "which in any way or degree affects interstate or foreign commerce'' after "(A) or transaction''.

Subsec. (c)(6). Pub. L. 102–550, §1526(a), substituted "or the regulations'' for "and the regulations''.

Subsec. (c)(7)(B). Pub. L. 102–550, §1536, designated part of existing provisions as cl. (i) and added cls. (ii) and (iii).

Subsec. (c)(7)(D). Pub. L. 102–550, §§1524, 1534(1), (2), struck out "1341 (relating to mail fraud) or section 1343 (relating to wire fraud) affecting a financial institution, section 1344 (relating to bank fraud),'' after "hostage taking),'', inserted "section 1708 (theft from the mail),'' before "section 2113'', substituted "section 422 of the Controlled Substances Act'' for "section 1822 of the Mail Order Drug Paraphernalia Control Act (100 Stat. 3207–51; 21 U.S.C. 857)'', and struck out "or'' before "section 16''.

Pub. L. 102–550, §1534(3), which directed insertion of ", any felony violation of section 9(c) of the Food

Stamp Act of 1977 (relating to food stamp fraud) involving a quantity of coupons having a value of not less than $5,000, or any felony violation of the Foreign Corrupt Practices Act'' before semicolon, was executed by making insertion before semicolon at end to reflect the probable intent of Congress.

Subsec. (g). Pub. L. 102–550, §1530, added subsec. (g) relating to penalty for money laundering conspiracies.

Pub. L. 102–550, §1504(c), added subsec. (g) relating to notice of conviction of financial institutions.

1990—Subsec. (a)(2). Pub. L. 101–647, §108(l), inserted at end "For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true."

Subsec. (a)(3). Pub. L. 101–647, §108(2), inserted "and paragraph (2)" after "this paragraph" in last sentence.

Subsec. (c)(1). Pub. L. 101–647, §106, substituted "State, Federal, or foreign" for "State or Federal".

Subsec. (c)(4). Pub. L. 101–647, §1402, inserted "(A)" before "a transaction" the first place it appears, "(B)" before "a transaction" the second place it appears, "(i)" before "involving" the first place it appears, and "(ii)" before "involving" the second place it appears.

Subsec. (c)(5). Pub. L. 101–647, §105, amended par. (5) generally. Prior to amendment, par. (5) read as follows: "the term 'monetary instruments' means coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, money orders, investment securities in bearer form or otherwise in such form that title thereto passes upon delivery, and negotiable instruments in bearer form or otherwise in such form that title thereto passes upon delivery;".

Subsec. (c)(7)(A). Pub. L. 101–647, §3557(1), substituted "subchapter II of chapter 53 of title 31" for "the Currency and Foreign Transactions Reporting Act".

Subsec. (c)(7)(C). Pub. L. 101–647, §1404(a)(1), struck out "or" at end.

Subsec. (c)(7)(D). Pub. L. 101–647, §3557(2)(A)–(D), substituted "section 2113" for "or section 2113", substituted "theft), or" for "theft) of this title,", inserted "of this title" after "2319 (relating to copyright infringement)", and substituted "paraphernalia" for "paraphanalia".

Pub. L. 101–647, §3557(2)(E), which directed the amendment of subpar. (D) by striking the final period, was repealed by Pub. L. 103–322, §330011(l), and Pub. L. 103–325, §413(d).

Pub. L. 101–647, §2506(2), inserted "section 1341 (relating to mail fraud) or section 1343 (relating to wire fraud) affecting a financial institution," after "section 1203 (relating to hostage taking),".

Pub. L. 101–647, §2506(1), inserted "section 1005 (relating to fraudulent bank entries), 1006 (relating to fraudulent Federal credit institution entries), 1007 (relating to Federal Deposit Insurance transactions), 1014 (relating to fraudulent loan or credit applications), 1032 (relating to concealment of assets from conservator, receiver, or liquidating agent of financial institution)," after "section 875 (relating to interstate communications),".

Pub. L. 101–647, §1404(a)(2), inserted "; or" after "Trading with the Enemy Act" at end.

Pub. L. 101–647, §107, substituted "a felony violation of the Chemical Diversion and Trafficking Act of 1988" for "section 310 of the Controlled Substances Act (21 U.S.C. 830)".

Subsec. (c)(7)(E). Pub. L. 101–647, §1404(a)(2), amended par. (7) by inserting "; or" and subpar. (E) before the period.

Subsec. (c)(8). Pub. L. 101–647, §1205(j), added par. (8).

Subsec. (e). Pub. L. 101–647, §1404(b), inserted at end "Violations of this section involving offenses described in paragraph (c)(7)(E) may be investigated by such components of the Department of Justice as the Attorney General may direct, and the National Enforcement Investigations Center of the Environmental [sic] Protection Agency.''

1988—Subsec. (a)(1)(A). Pub. L. 100–690, §6471(a), amended subpar. (A) generally, designating existing provisions as cl. (i) and adding cl. (ii).

Subsec. (a)(2). Pub. L. 100–690, §6471(b), substituted "transports, transmits, or transfers, or attempts to transport, transmit, or transfer" for "transports or attempts to transport" in introductory provisions.

Subsec. (a)(3). Pub. L. 100–690, §6465, added par. (3).

Subsec. (c)(7)(D). Pub. L. 100–690, §7031, substituted "section 513" for "section 511" and "section 545" for "section 543" and inserted "section 657 (relating to lending, credit, and insurance institutions), section 658 (relating to property mortgaged or pledged to farm credit agencies),".

Pub. L. 100–690, §6466, inserted "section 542 (relating to entry of goods by means of false statements),", "section 549 (relating to removing goods from Customs custody),", and "section 2319 (relating to copyright infringement), section 310 of the Controlled Substances Act (21 U.S.C. 830) (relating to precursor and essential chemicals), section 590 of the Tariff Act of 1930 (19 U.S.C. 1590) (relating to aviation smuggling), section 1822 of the Mail Order Drug Paraphernalia Control Act (100 Stat. 3207–51; 21 U.S.C. 857) (relating to transportation of drug paraphernalia [sic]),".

Pub. L. 100–690, §6183, substituted "section 38(c) (relating to criminal violations) of the Arms Export Control Act, section 11 (relating to violations) of the Export Administration Act of 1979, section 206 (relating to penalties) of the International Emergency Economic Powers Act, or section 16 (relating to offenses and punishment) of the Trading with the Enemy Act." for "section 38 of the Arms Export Control Act (22 U.S.C. 2778), section 2 (relating to criminal penalties) of the Export Administration Act of 1979 (50 U.S.C. App. 2401), section 203 (relating to criminal sanctions) of the International Emergency Economic Powers Act (50 U.S.C. 1702), or section 3 (relating to criminal violations) of the Trading with the Enemy Act (50 U.S.C. App. 3)''.

Subsec. (e). Pub. L. 100–690, §6469(a)(1), substituted "and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of the Secretary of the Treasury and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Postal Service, and the Attorney General." for ". Such authority of the Secretary of the Treasury shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury and the Attorney General.''

EFFECTIVE DATE OF 2008 AMENDMENT

Amendment of this section and repeal of Pub. L. 110–234 by Pub. L. 110–246 effective May 22, 2008, the date of enactment of Pub. L. 110–234, except as otherwise provided, see section 4 of Pub. L. 110–246, set out as an Effective Date note under section 8701 of Title 7, Agriculture.

Amendment by sections 4002(b)(1)(B), (D), (2)(M), and 4115(c)(1)(A)(i), (B)(ii) of Pub. L. 110–246 effective Oct. 1, 2008, see section 4407 of Pub. L. 110–246, set out as a note under section 1161 of Title 2, The Congress.

EFFECTIVE DATE OF 2002 AMENDMENT

Pub. L. 107–273, div. B, title IV, §4002(a)(11), Nov. 2, 2002, 116 Stat. 1807, provided that the amendment made by section 4002(a)(11) is effective Apr. 24, 1996.

Pub. L. 107–273, div. B, title IV, §4005(e), Nov. 2, 2002, 116 Stat. 1813, provided that the amendment made by section 4005(e) is effective Oct. 26, 2001.

EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by section 604(b)(38) of Pub. L. 104–294 effective Sept. 13, 1994, see section 604(d) of Pub. L. 104–294, set out as a note under section 13 of this title.

Effective Date of 1994 Amendments

Pub. L. 103–322, title XXXIII, § 330011(*l*), Sept. 13, 1994, 108 Stat. 2145, and Pub. L. 103–325, title IV, § 413(d), Sept. 23, 1994, 108 Stat. 2255, provided that the repeal of section 3557(2)(E) of Pub. L. 101–647 made by those sections is effective as of the date of enactment of Pub. L. 101–647, which was approved Nov. 29, 1990.

### § 1957. Engaging in monetary transactions in property derived from specified unlawful activity

(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

(b)(1) Except as provided in paragraph (2), the punishment for an offense under this section is a fine under title 18, United States Code, or imprisonment for not more than ten years or both. If the offense involves a pre-retail medical product (as defined in section 670) the punishment for the offense shall be the same as the punishment for an offense under section 670 unless the punishment under this subsection is greater.

(2) The court may impose an alternate fine to that imposable under paragraph (1) of not more than twice the amount of the criminally derived property involved in the transaction.

(c) In a prosecution for an offense under this section, the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity.

(d) The circumstances referred to in subsection (a) are—

(1) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States; or

(2) that the offense under this section takes place outside the United States and such special jurisdiction, but the defendant is a United States person (as defined in section 3077 of this title, but excluding the class described in paragraph (2)(D) of such section).

(e) Violations of this section may be investigated by such components of the Department of Justice as the Attorney General may direct, and by such components of the Department of the Treasury as the Secretary of the Treasury may direct, as appropriate, and, with respect to offenses over which the Department of Homeland Security has jurisdiction, by such components of the Department of Homeland Security as the Secretary of Homeland Security may direct, and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of the Secretary of the Treasury, the Secretary of Homeland Security, and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Secretary of Homeland Security, the Postal Service, and the Attorney General.

(f) As used in this section—

(1) the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange,

in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title, but such term does not include any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution;

(2) the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; and

(3) the terms "specified unlawful activity" and "proceeds" shall have the meaning given those terms in section 1956 of this title.

(Added Pub. L. 99–570, title I, § 1352(a), Oct. 27, 1986, 100 Stat. 3207–21; amended Pub. L. 100–690, title VI, §§ 6182, 6184, 6469(a)(2), Nov. 18, 1988, 102 Stat. 4354, 4377; Pub. L. 102–550, title XV, §§ 1526(b), 1527(b), Oct. 28, 1992, 106 Stat. 4065; Pub. L. 103–322, title XXXIII, § 330020, Sept. 13, 1994, 108 Stat. 2149; Pub. L. 103–325, title IV, § 413(c)(2), Sept. 23, 1994, 108 Stat. 2255; Pub. L. 109–177, title IV, § 403(c)(2), Mar. 9, 2006, 120 Stat. 243; Pub. L. 111–21, § 2(f)(2), May 20, 2009, 123 Stat. 1618; Pub. L. 112–186, § 4(b)(2), Oct. 5, 2012, 126 Stat. 1429.)

Amendments

2012—Subsec. (b)(1). Pub. L. 112–186 inserted at end "If the offense involves a pre-retail medical product (as defined in section 670) the punishment for the offense shall be the same as the punishment for an offense under section 670 unless the punishment under this subsection is greater."

2009—Subsec. (f)(3). Pub. L. 111–21 added par. (3) and struck out former par. (3) which read as follows: "the term 'specified unlawful activity' has the meaning given that term in section 1956 of this title."

2006—Subsec. (e). Pub. L. 109–177 amended subsec. (e) generally. Prior to amendment, subsec. (e) read as follows: "Violations of this section may be investigated by such components of the Department of Justice as the Attorney General may direct, and by such components of the Department of the Treasury as the Secretary of the Treasury may direct, as appropriate, and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of the Secretary of the Treasury and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Postal Service, and the Attorney General."

1994—Subsec. (f)(1). Pub. L. 103–322, § 330020, and Pub. L. 103–325, § 413(c)(2), amended par. (1) identically, striking out second comma after "(as defined in section 1956 of this title)".

1992—Subsec. (f)(1). Pub. L. 102–550 substituted "section 1956 of this title" for "section 5312 of title 31" and inserted ", including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title," before "but such term does not include".

1988—Subsec. (e). Pub. L. 100–690, § 6469(a)(2), substituted "and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of the Secretary of the Treasury and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Postal Service, and the Attorney General." for ". Such authority of the Secretary of the Treasury shall be exercised in accordance with an agreement which shall be entered

leads to a recovery of a criminal fine, civil penalty, or forfeiture, which exceeds $50,000, for a violation of this chapter.

(b) The Secretary shall determine the amount of a reward under this section. The Secretary may not award more than 25 per centum of the net amount of the fine, penalty, or forfeiture collected or $150,000, whichever is less.

(c) An officer or employee of the United States, a State, or a local government who provides information described in subsection (a) in the performance of official duties is not eligible for a reward under this section.

(d) There are authorized to be appropriated such sums as may be necessary to carry out the provisions of this section.

(Added Pub. L. 98–473, title II, §901(e), Oct. 12, 1984, 98 Stat. 2135.)

### § 5324. Structuring transactions to evade reporting requirement prohibited

(a) DOMESTIC COIN AND CURRENCY TRANSACTIONS INVOLVING FINANCIAL INSTITUTIONS.—No person shall, for the purpose of evading the reporting requirements of section 5313(a) or 5325 or any regulation prescribed under any such section, the reporting or recordkeeping requirements imposed by any order issued under section 5326, or the recordkeeping requirements imposed by any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508—

(1) cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a) or 5325 or any regulation prescribed under any such section, to file a report or to maintain a record required by an order issued under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508;

(2) cause or attempt to cause a domestic financial institution to file a report required under section 5313(a) or 5325 or any regulation prescribed under any such section, to file a report or to maintain a record required by any order issued under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508, that contains a material omission or misstatement of fact; or

(3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

(b) DOMESTIC COIN AND CURRENCY TRANSACTIONS INVOLVING NONFINANCIAL TRADES OR BUSINESSES.—No person shall, for the purpose of evading the report requirements of section 5331 or any regulation prescribed under such section—

(1) cause or attempt to cause a nonfinancial trade or business to fail to file a report required under section 5331 or any regulation prescribed under such section;

(2) cause or attempt to cause a nonfinancial trade or business to file a report required

under section 5331 or any regulation prescribed under such section that contains a material omission or misstatement of fact; or

(3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with 1 or more nonfinancial trades or businesses.

(c) INTERNATIONAL MONETARY INSTRUMENT TRANSACTIONS.—No person shall, for the purpose of evading the reporting requirements of section 5316—

(1) fail to file a report required by section 5316, or cause or attempt to cause a person to fail to file such a report;

(2) file or cause or attempt to cause a person to file a report required under section 5316 that contains a material omission or misstatement of fact; or

(3) structure or assist in structuring, or attempt to structure or assist in structuring, any importation or exportation of monetary instruments.

(d) CRIMINAL PENALTY.—

(1) IN GENERAL.—Whoever violates this section shall be fined in accordance with title 18, United States Code, imprisoned for not more than 5 years, or both.

(2) ENHANCED PENALTY FOR AGGRAVATED CASES.—Whoever violates this section while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period shall be fined twice the amount provided in subsection (b)(3) or (c)(3) (as the case may be) of section 3571 of title 18, United States Code, imprisoned for not more than 10 years, or both.

(Added Pub. L. 99–570, title I, §1354(a), Oct. 27, 1986, 100 Stat. 3207–22; amended Pub. L. 102–550, title XV, §§1517(a), 1535(a), 1535(a)(1), Oct. 28, 1992, 106 Stat. 4059, 4064, 4066; Pub. L. 103–322, title XXXIII, §330017(a)(2), Sept. 13, 1994, 108 Stat. 2149; Pub. L. 103–325, title IV, §§411(a), 413(a)(2), Sept. 23, 1994, 108 Stat. 2253, 2254; Pub. L. 107–56, title III, §§353(c), 365(b)(1), (2)(A), Oct. 26, 2001, 115 Stat. 323, 334, 335; Pub. L. 108–458, title VI, §6203(g), Dec. 17, 2004, 118 Stat. 3747.)

REFERENCES IN TEXT

Section 21 of the Federal Deposit Insurance Act, referred to in subsec. (a), is classified to section 1829b of Title 12, Banks and Banking.

Section 123 of Public Law 91–508, referred to in subsec. (a), is classified to section 1953 of Title 12, Banks and Banking.

AMENDMENTS

2004—Subsec. (b). Pub. L. 108–458 substituted "5331" for "5333" wherever appearing.

2001—Subsec. (a). Pub. L. 107–56, §§353(c)(1), (2), 365(b)(2)(A), inserted "Involving Financial Institutions" after "Transactions" in heading, and in introductory provisions, inserted comma after "No person shall" and substituted "section, the reporting or recordkeeping requirements imposed by any order issued under section 5326, or the recordkeeping requirements imposed by any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508—" for "section—".

Subsec. (a)(1). Pub. L. 107–56, §353(c)(3), inserted ", to file a report or to maintain a record required by an order issued under section 5326, or to maintain a record

Case: 12-2373    Document: 00116633902    Page: 118    Date Filed: 01/08/2014    Entry ID: 5792774

required pursuant to any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508'' before semicolon at end.

Subsec. (a)(2). Pub. L. 107–56, §353(c)(4), inserted '', to file a report or to maintain a record required by any order issued under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91–508,'' after ''regulation prescribed under any such section''.

Subsecs. (b) to (d). Pub. L. 107–56, §365(b)(1), added subsec. (b) and redesignated former subsecs. (b) and (c) as (c) and (d), respectively.

1994—Subsec. (a). Pub. L. 103–322, §330017(a)(2) and Pub. L. 103–325, §413(a)(2), amended subsec. (a), introductory provisions, identically, substituting ''section 5313(a) or 5325 or any regulation prescribed under any such section'' for ''section 5313(a), section 5325, or the regulations issued thereunder or section 5325 or regulations prescribed under such section 5325'' and striking out ''with respect to such transaction'' before dash.

Subsec. (a)(1), (2). Pub. L. 103–322, §330017(a)(2)(A) and Pub. L. 103–325, §413(a)(2)(A), amended pars. (1) and (2) identically, substituting ''section 5313(a) or 5325 or any regulation prescribed under any such section'' for ''section 5313(a), section 5325, or the regulations issued thereunder or section 5325 or regulations prescribed under such section 5325''.

Subsec. (c). Pub. L. 103–325, §411(a), added subsec. (c).

1992—Pub. L. 102–550, §1525(a)(1), designated existing provisions as subsec. (a), inserted heading, and added subsec. (b).

Pub. L. 102–550, §§1517(a), 1535(a)(1), inserted the following duplicative provisions ''or section 5325 or regulations prescribed under such section 5325'' and '', section 5325, or the regulations issued thereunder'' after ''section 5313(a)'' wherever appearing.

EFFECTIVE DATE OF 2004 AMENDMENT

Amendment by Pub. L. 108–458 effective as if included in Pub. L. 107–56, as of the date of enactment of such Act, and no amendment made by Pub. L. 107–56 that is inconsistent with such amendment to be deemed to have taken effect, see section 6205 of Pub. L. 108–458, set out as a note under section 1828 of Title 12, Banks and Banking.

EFFECTIVE DATE

Pub. L. 99–570, title I, §1364(a), Oct. 27, 1986, 100 Stat. 3207–34, provided that: ''The amendment made by section 1354 [enacting this section] shall apply with respect to transactions for the payment, receipt, or transfer of United States coins or currency or other monetary instruments completed after the end of the 3-month period beginning on the date of the enactment of this Act [Oct. 27, 1986].''

§ 5325. Identification required to purchase certain monetary instruments

(a) IN GENERAL.—No financial institution may issue or sell a bank check, cashier's check, traveler's check, or money order to any individual in connection with a transaction or group of such contemporaneous transactions which involves United States coins or currency (or such other monetary instruments as the Secretary may prescribe) in amounts or denominations of $3,000 or more unless—

(1) the individual has a transaction account with such financial institution and the financial institution—

(A) verifies that fact through a signature card or other information maintained by such institution in connection with the account of such individual; and

(B) records the method of verification in accordance with regulations which the Secretary of the Treasury shall prescribe; or

(2) the individual furnishes the financial institution with such forms of identification as the Secretary of the Treasury may require in regulations which the Secretary shall prescribe and the financial institution verifies and records such information in accordance with regulations which such Secretary shall prescribe.

(b) REPORT TO SECRETARY UPON REQUEST.—Any information required to be recorded by any financial institution under paragraph (1) or (2) of subsection (a) shall be reported by such institution to the Secretary of the Treasury at the request of such Secretary.

(c) TRANSACTION ACCOUNT DEFINED.—For purposes of this section, the term ''transaction account'' has the meaning given to such term in section 19(b)(1)(C) of the Federal Reserve Act.

(Added Pub. L. 100–690, title VI, §6185(b), Nov. 18, 1988, 102 Stat. 4355.)

REFERENCES IN TEXT

Section 19(b)(1)(C) of the Federal Reserve Act, referred to in subsec. (c), is classified to section 461(b)(1)(C) of Title 12, Banks and Banking.

§ 5326. Records of certain domestic coin and currency transactions

(a) IN GENERAL.—If the Secretary of the Treasury finds, upon the Secretary's own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle and prevent evasions thereof, the Secretary may issue an order requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area—

(1) to obtain such information as the Secretary may describe in such order concerning—

(A) any transaction in which such financial institution or nonfinancial trade or business is involved for the payment, receipt, or transfer of United States coins or currency (or such other monetary instruments as the Secretary may describe in such order) the total amounts or denominations of which are equal to or greater than an amount which the Secretary may prescribe; and

(B) any other person participating in such transaction;

(2) to maintain a record of such information for such period of time as the Secretary may require; and

(3) to file a report with respect to any transaction described in paragraph (1)(A) in the manner and to the extent specified in the order.

(b) AUTHORITY TO ORDER DEPOSITORY INSTITUTIONS TO OBTAIN REPORTS FROM CUSTOMERS.—

(1) IN GENERAL.—The Secretary of the Treasury may, by regulation or order, require any