# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT
_____

**No. 12-2373**
_____

**UNITED STATES,**
**Appellee**

**v.**

**ROBERT A. GEORGE,**
**Appellant**
_____

**ON APPEAL FROM A JUDGMENT IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF MASSACHUSETTS**
_____

**REPLY BRIEF OF APPELLANT ROBERT A. GEORGE**
_____

**Robert M. Goldstein**
**20 Park Plaza, Suite 1000**
**Boston, MA 02116**
**(617) 742-9015 (Telephone)**
**(617) 742-9016 (Fax)**
**rmg@goldstein-lawfirm.com**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

I.    George preserved his Rule 801(d)(2)(E) objection to the
      Dardinski/Hansen conversations, which the trial court improperly
      admitted, and a new trial on all counts is warranted . . . . . . . . . . . . .    1

      A.    George preserved his hearsay objection. . . . . . . . . . . . . . . . . . .    2

      B.    No later than December 7, 2009, George unequivocally
            communicated his abandonment of any *arguendo* conspiracy, and
            the government therefore failed to present sufficient evidence that
            any subsequent Hansen/Dardinski conversations were during or in
            furtherance of the charged conspiracy . . . . . . . . . . . . . . . . . . . . .    8

            1.    George's communication to Dardinski (rather than Hansen)
                  suffices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

            2.    The government depiction of the December 7, 2009
                  conversation is untenable . . . . . . . . . . . . . . . . . . . . . . . . . .    10

            3.    George's conduct before December 7, 2009, confirms,
                  rather than undermines, his withdrawal . . . . . . . . . . . . . . .    17

            4.    George's post-December 7, 2009 conduct does not alter
                  the analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

      C.    The case at hand is unlike the others cited by the government or
            previously rejected by the Court . . . . . . . . . . . . . . . . . . . . . . . . .    25

II.   The government failed to prove aiding and abetting. . . . . . . . . . . . .    27

III.  The government did not present sufficient evidence of the charged
      conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) . . . . . . . . . . . . . . .    33

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    34

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Reich v. Newspapers of New England, Inc.*,
    44 F.3d 1060 (1st Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

*United States v. Aviles-Colon*,
    536 F.3d 1(1st Cir.2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

*United States v. Bratton-Bey*,
    2013 WL 3943147 (4th Cir.2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*United States v. Cabrera-Rivera*,
    583 F.3d 26 (1st Cir.2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

*United States v. Ciresi*,
    697 F.3d 19 (1st Cir.2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 3, 16

*United States v. Davis*,
    717 F.3d 28 (1st Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

*United States v. Dowdell*,
    595 F.3d 50 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

*United States v. Dunn*,
    758 F.2d 30 (1st Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*United States v. Giry*,
    818 F.2d 120 (1st Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

*United States v. Guevara*,
    706 F.3d 38 (1st Cir.2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*United States v. Juodakis*,
    834 F.2d 1099 (1st Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

iii

*United States v Mercado*,
    412 F.3d 243 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

*United States v. Newton*,
    326 F.3d 253 (1ˢᵗ Cir.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

*United States v. Nieves*,
    322 F.3d 51 (1ˢᵗ Cir.2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

*United States v. Petrozziello*,
    548 F.2d 20 (1ˢᵗ Cir.1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

*United States v. Ramos-Gonzalez*,
    664 F.3d 1 (1ˢᵗ Cir.2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

*United States v. Rodriguez-Marrero*,
    390 F.3d 1 (1ˢᵗ Cir.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

*United States v. Rose*,
    104 F.3d 1408 (1ˢᵗ Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

*United States v. Savarese*,
    686 F.3d 1 (1st Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6, 7

*United States v. Smith*,
    133 S.Ct. 714 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

*United States v. United States Gypsum Co.*,
    438 U.S. 422 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

## **STATUES AND RULES**

Fed.R.Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

Fed.R.Evid. 801. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   *passim*

Fed.R.Evid. 803 (6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

## INTRODUCTION

Robert George does not seek to litigate the facts "anew." GB:3, n.3.[1]

Simply because the jury returned guilty verdicts, however, does not liberate

the government to unfairly characterize the evidence below, or ignore

undisputed but inconvenient evidence. Mr. George, a highly regarded

criminal defense and civil rights attorney, who enjoyed an impeccable

reputation prior to his arrest in this matter, only asks the Court to conduct a

fair, comprehensive review of the lower court proceedings, which he

respectfully submits supports the relief requested in his principal brief.

## ARGUMENT

***I.    George preserved his Rule 801(d)(2)(E) objection to the Dardinski/Hansen conversations, which the trial court improperly admitted, and a new trial on all counts is warranted.***

The government does not suggest that admission of the challenged

Dardinski/Hansen conversations constituted harmless error, nor could it,

given the overflowing prejudice of the recordings, and the extent to which

the government employed them during trial.[2] Instead, the government

---

[1] Citations to the government's brief are denoted as "GB:___."

[2] The government has now forfeited any such argument. *See United States v. Rodriguez-Marrero*, 390 F.3d 1, 18 (1st Cir.2004) (Court has discretion to overlook government waiver of harmless error argument, but it would be "inappropriate in this case to make the government's argument for it on an issue both factually and legally complex"), *citing United States v. Rose*, 104 F.3d 1408, 1414 (1st Cir.1997).

1

argues George did not preserve an objection to their admission, and then substantively contends the evidence does not support a finding that George withdrew from any *arguendo* conspiracy.  GB:56-64.  Both positions lack merit.

> A.     <u>George preserved his hearsay objection.</u>

This Court has repeatedly observed that, "[t]o preserve a challenge to a district court's *Petrozziello* ruling, a defendant must object on hearsay grounds when his or her coconspirator's statement is provisionally admitted and must renew the objection at the close of evidence."  *United States v. Ciresi*, 697 F.3d 19, 26 (1st Cir.2012).  George did both, as the government concedes, GB:57.  Nevertheless, the government argues George did not preserve his Rule 801(d)(2)(E) objection because, the government contends, he did not explicitly argue "withdrawal" as a reason to preclude the challenged conversations, citing the general rule that "an objection on one ground does not preserve appellate review of a different ground."  GB:58.  This contention is without merit.

First, George argued withdrawal, if not explicitly then at the very least implicitly.  George explicitly informed the court regarding the need for a provisional ruling pursuant to *United States v. Petrozziello*, 548 F.2d 20 (1st Cir.1977):

2

| The Court: | All right. Anything else that needs to come to my attention this afternoon before we recess for the day? |
|---|---|
| Defense Counsel: | Well, your Honor, I think the Court needs to make a *Petrozziello* ruling. The government has said that the next tape will be of Mr. Dardinski and Mr. Hansen, and I don't know if the Court wants to hear argument this afternoon or tomorrow morning, but I don't think there's sufficient evidence to prove that there's been even by a preponderance of [evidence] a conspiracy for a couple different reasons. |

Appx:467-68.  At the close of evidence, George renewed his objection,

explicitly addressing the court's need to make a final *Petrozziello*

determination.  Appx:1254.  George's requests for *Petrozziello* rulings were,

of course, a short-hand reference regarding the need for the judge to make a

determination that the hearsay statements were "during" and "in

furtherance" of the charged conspiracy.  *See Ciresi*, 697 F.3d at 25 ("district

court's determination 'as to whether [Rule 801(d)(2)(E)] burden has been

met is known in this circuit as a *Petrozziello* ruling'"); *cf. United States v.*

*Ramos-Gonzalez*, 664 F.3d 1, 3-4 (1st Cir.2011) (rejecting government

argument that defendant's failure to "specifically invoke the Sixth

Amendment in his objection" failed to preserve a cognizable Confrontation

Clause challenge; "[i]n context, it was clear that counsel was objecting to the

inability to confront the declarant," and that counsel's "precise language,

3

which may best be understood as a 'short-hand reference to an objection on confrontation grounds,' sufficiently raised the Sixth Amendment issue"); *United States v. Cabrera-Rivera*, 583 F.3d 26, 36 (1st Cir.2009) ("[w]hen taken in the context of the facts of the case... the better reading of the objection is that it was in fact a short-hand reference to an objection on confrontation grounds").[3]

Second, the court clearly was on notice regarding the nature of George's objection, which permitted the court to make its final *Petrozziello* determination, which is the purpose of requiring the renewal of the objection at the close of evidence.  *See United States v. Aviles-Colon*, 536 F.3d 1, 13-14 (1st Cir.2008) (objection at close of evidence "permits the court to make its final *Petrozziello* determination").  After taking "the matter of the *Petrozziello* ruling under advisement...," Appx:1256, the court later ruled the hearsay conversations were properly admitted, noting, *inter alia*, that "[u]nder the standards set forth in *Petrozziello* and its progeny, *the Court finds by a preponderance of the evidence that the statements were made "during the course and in furtherance of a conspiracy*" or joint venture...."

---

[3] Of course, "withdrawal" is the not the test for admissibility, and George properly couched his objection in the language of the governing rule.  For this reason alone, the government argument should be rejected, as it erroneously attempts to convert the relevant inquiry.

4

Appx:1264-65 (emphasis added).[4]

Of course, George's withdrawal argument was no secret. For example, George played the audiotape of his December 7, 2009 statements at the inception of his opening statement, Appx:290, and George's statements on December 7th (that he was not and would not be involved) were a feature of his cross-examination of Dardinski, *see, e.g.*, Appx:671-685. The government well understood the argument as well. *See, e.g.*, Appx:1286-87 (government noting in the context of the jury charge conference that defendant had argued withdrawal from conspiracy during trial).[5]

Third, the general rule relied upon by the government—that an objection on one ground does not preserve appellate review of a different ground—has no application here. George objected on the very ground

---

[4] That the entire argument surrounding the admission of the Dardinski/Hansen conversations occurred in the shadows of the government's motion *in limine* to admit the conversations pursuant to Rule 801(d)(2)(E), *see* Appx:1265 (court allowing motion), further undermines the government's argument here. *See* Dkt. 100.

[5] Additionally, as the government notes (GB:59), in opposing a *Pinkerton* instruction, George asserted that withdrawal impacts *Petrozziello* and *Pinkerton*, and argued "if the jury were to conclude that Mr. George withdrew on April 6 when he said I'm all done or December 7th, when he said 14 times I won't be involved, then by law if the jury finds that he withdrew at that point, he is no longer part of the conspiracy, therefore, there is no *Pinkerton* responsibility." Appx:1276.

advanced on appeal—*i.e.*, the conversations were not admissible pursuant to Rule 801(d)(2)(E).  The cases cited by the government are not analogous.  In *United States v Mercado*, 412 F.3d 243, 247 (1st Cir. 2005) (GB:58-59), the defendant asserted at trial that a prosecutor's questioning of a defense witness about ancillary state charges was "irrelevant" and "prejudicial."  On appeal, the defendant argued the prosecutor's questioning constituted misconduct, which the Court held was an unpreserved objection.  *Mercado*, 412 F.3d at 246-47.  *Mercado* has no force here, where George explicitly argued the statements were inadmissible pursuant to Fed.R.Evid. 801(d)(2)(E) and *Petrozziello*.  Indeed, in *Mercado*, the Court held the defendant's objection properly preserved a Rule 403 objection, despite his apparent failure to cite Rule 403 in the trial court, or argue that any relevance was "substantially outweighed."  *Mercado*, 412 F.3d at 248.

*United States v. Savarese*, 686 F.3d 1, 12 (1st Cir. 2012), the only other case cited by the government (GB:59), is equally unavailing.  In *Savarese*, the defendant moved to exclude certain checks, arguing that a lack of original signatures precluded the defendant from producing "expert analysis of the handwriting to determine whether the signatures were forged by the defendant as the government alleges."  *Savarese*, 686 F.3d at 12, n.7. On appeal, he argued the checks were hearsay, pursuant to Rule 801(c), and

did not fit within the Rule 803(6) business records exception.  *Savarese*, 686
F.3d at 12.  The Court refused to address these arguments because the
defendant did not object based on either rule in the trial court.  Here, once
again, George explicitly objected on *Petrozziello* grounds, and argued
(directly and inferentially) that the evidence did not support a finding that a
conspiracy existed at the time the challenged conversations occurred.[6]

Here, George's objections were properly based on *Petrozziello,*
premised directly upon the defendant's position that the conversations were
not during and in furtherance of the charged conspiracy, and the objections
properly permitted the trial court to make a final *Petrozziello* determination,
Appx:1264-1265.  In short, George more than adequately preserved his Rule
801(d)(2)(E) objections, and the Court therefore reviews their admission for
clear error.[7]

_____

[6] The government cites no analogous case—*i.e.*, wherein a defendant raised
the need for *Petrozziello* findings, prior to admission and at the close of
evidence, and extensively argued no conspiracy existed, yet a court declared
such objection inadequate.

[7] In *United States v. Dowdell*, 595 F.3d 50, 73, n.19 (2010), the Court
recognized there "may be some uncertainty as to the proper standard of
review for *Petrozziello* rulings, due to recent cases that employ the abuse of
discretion standard," but noted the Court has "endorsed on countless
subsequent occasions" that it reviews "a trial court's *Petrozziello*
determination for clear error," and that "[i]n the *Petrozziello* context, it is
likely that review for abuse of discretion applies only to the district court's
ultimate decision whether to admit or exclude the statement, and not to the

B.    <u>No later than December 7, 2009, George unequivocally
communicated his abandonment of any *arguendo* conspiracy,
and the government therefore failed to present sufficient
evidence that any subsequent Hansen/Dardinski conversations
were during or in furtherance of the charged conspiracy</u>.

By December 7, 2009, if not earlier, George, by his words and

conduct, unequivocally and affirmatively communicated he had abandoned

any *arguendo* enterprise.  The government arguments to the contrary should

be rejected.

1.    <u>George's communication to Dardinski (rather than
Hansen) suffices</u>.

The government argument that "George's withdrawal claim [ ] fails at

the most elemental level" because George communicated his December 7[th]

disavowal to Dardinski, rather than Hansen, GB:61, is without merit.  First,

the general legal maxim that the law does not recognize an agent of the

government as a cognizable "co-conspirator," *United States v. Giry*, 818

F.2d 120, 126 (1st Cir.1987), has no application to the factual context of a

withdrawal argument.  From George's perspective, on December 7th, he

---

underlying factual findings."  "A finding is clearly erroneous when although
there is evidence to support it, the reviewing court on the entire evidence is
left with the definite and firm conviction that a mistake has been
committed."  *United States v. Newton*, 326 F.3d 253, 257-58 (1st Cir.2003),
*quoting Reich v. Newspapers of New England, Inc*., 44 F.3d 1060, 1080 (1st
Cir.1995).

communicated his disavowal directly to the person who was driving the

*arguendo* conspiracy.  Under the rule advanced by the government (without

any cited legal authority), George could have angrily screamed to Dardinski

the magic words "I disavow your conspiracy, leave me forever alone" (while

pointing a gun at him, for special emphasis), engaged in no further acts, yet

still would be "stuck" in the conspiracy for purposes of Rule 801(d)(2)(E)

because, unbeknownst to George, Dardinski was a cooperating government

informant.  This must not be the law.

        In any event, the government argument ignores that George explicitly

instructed Dardinski to tell Hansen that George would not be involved.

Appx:1446 (December 7, 2009 Transcript) ("Call him back then. See if he

picks up again. *Tell him what I said*") (emphasis added).  Dardinski

confirmed this explicit instruction during cross-examination:

> Q.     He's telling you, Ron Dardinski, I want you to call Michael
>        Hansen and tell him I am not getting involved, right?
> A.     Yes.
>
> Q.     Rather clear, right?
> A.     Yes.
>
> Q.     *Trying to communicate to Mr. Hansen, through you, because*
>        *they're not on talking terms, right?*
> A.     *Yes.*

9

Q.   *And he's telling you in very clear terms, I want you to call
     Michael Hansen, and I want you to tell him I'm not involved,
     right?*

A.   *Yes.*

Appx:679-80 (emphasis added).  George directly conveyed his withdrawal,

at the very least in a manner "reasonably calculated" to reach the alleged co-

conspirator.  *See, e.g., United States v. Smith*, 133 S.Ct. 714, 718 (2013)

(reciting trial court's jury charge); *United States v. Bratton-Bey*, 2013 WL

3943147, *2 (4ᵗʰ Cir.2013), *citing United States v. United States Gypsum

Co.*, 438 U.S. 422, 464-65 (1978).

2.   <u>*The government depiction of the December 7, 2009
     conversation is untenable*</u>.

First, the content of George's words, and the tone and inflection he

used, convincingly refutes the government attempt to recast the message

delivered by George on December 7, 2009.  *See* GB:62-63 (asserting George

merely said "words to the effect" that he "had 'nothing to do with this,'" and

made many other statements that "belied" any withdrawal).  A plain reading

of the transcript, *and most importantly a plain **listening** to the recording*,

overwhelmingly demonstrates that George had one overarching message on

that day: he would not be involved in Dardinski's proposed venture.

George did not answer the phone on December 7ᵗʰ with a typical

greeting such as "hello," but instead answered: "Don't talk to me about that

situation you're talkin' about." App:1443–49.  He employed a strong and determined, if not angry, voice when he uttered the words.  When Dardinski proceeded to discuss the transaction in any event, and began to explain how the checks would be written, George stopped Dardinski in his tracks, saying the word "no" four times: "No, no, no, no, that's, why, let me ask you something? Why am I involved in this?"  Appx:1443.  Dardinski pushes his informant agenda (trying to generate discussion, *see* Appx:665, 668, 735, 746), but George quickly returned to his unwillingness to be involved, telling Dardinski to have Hansen call George, because George is "not doing anything."  Appx:1444.  George then begins to angrily question why Hansen is trying to "leverage" George's participation.  Appx:1444.[8]  Again, while Dardinski generates a brief discussion of ancillary issues, such as trusting Hansen, George quickly returned to the subject matter of his involvement, telling Dardinski he "wasn't making anything on the deal" and questioning why he would get involved in Dardinski's transaction.  Appx:1445.

From that point forward, George's insistence that he will not be involved in any proposed transaction only grows louder, firmer and more resolute.  "[T]hat was for [Hansen], for him to, to, to, set up. I'm not getting in—no, I'm no—ah listen, you know I'd do anything *but I'm not getting*

_____

[8] Of course, as Dardinski conceded, it was the government, not Hansen, which was trying to "leverage" George's participation.  Appx:675-76.

11

*involved*." Appx:1445 (emphasis added).  Dardinski then asks if he should

have Hansen call George, and George tells him: "you can have him call me

*but I'm not getting involved*," the check should go from Hansen to

Dardinski, or Hansen to a company, *"[b]ut I'm not, I'm not involved in*

*this*." Appx:1445 (emphasis added).  He then immediately tells Dardinski,

"you're one of my clients, but I don't, but personally, *there's nothing but*

*trouble in it for me. I'm not getting involved*."  Appx:1445-46 (emphasis

added).  George's tone and infliction clearly demonstrate he means what he

is saying.

George then ridicules the idea that he was involved, telling Dardinski,

"like I have anything to do with it," and Dardinski does not protest, but

simply says, "Right. Alright. Let me figure it out."  Appx:1446.  George

then immediately questions when Dardinski spoke with Hansen, and

instructed Dardinski to call Hansen to tell him what George said.

Appx:1446 ("See if he picks up again. Tell him what I said").  George then

returns to the subject of his involvement, again telling Dardinski "there's no

way that I would get myself involved in something, where I'm not, you

know, where I'm not involved."  Appx:1446.  George explains he's not

doing any legal work related to the transaction and Dardinski says, "right."

Appx:1446.  George then again tells Dardinski, "I have nothing to do with

12

this." Appx:1447.  When Dardinski then says that he figured "it would

insulate me through you," George angrily rejects the suggestion:

> *Yeah but, but what it does is that it implicates me in something that I have nothing to do with . . . I'm not sayin' I don't trust him Ronnie. I'm saying, I'm, I'm not involved.* **I can't do this kind of business. I don't run this kind of business**.

Appx:1447 (emphasis added).  George then told Dardinski, "I mean I'm a

friggin' lawyer.  Where, where am I lending money and making money from

clients.  I can't—*I'm not doing that*."  Appx:1447 (emphasis added).  When

Dardinski suggests they are simply doing what they discussed beforehand,

apparently referring to the April 2009 frame, George also flatly rejects that

statement: "No, before all I was doing was because you were a friend of

mine, was I was putting you together with a guy that could lend you the

money."  Appx:1447.  Dardinski, who knows he's recording the

conversations, does not contest George, but simply says, "alright."

Appx:1447.

George then flatly tells Dardinski that he (Dardinski) came up with

the present scenario ("And then of course you came up with this, because

you couldn't, you know, you couldn't do your, you know whatever you were

supposed to do"), that Dardinski connected with Hansen on his own ("Then

you tied, you guys tied up again on your own") and then again rejected the

proposition that he was involved in the transaction: "it has nothing to do

13

with me. It had nothing to do with me in the first place." Appx:1448. George

eventually ends the conversation on that subject, flatly asserting: "ok, what

else is goin' on? I don't want to talk about that anymore."  Appx:1448.

Second, the events that follow the December 7 conversation render

implausible the government argument that George, at most, was "wary of

talking shop over the phone," and he did not mean what he said, GB:62-63.

Dardinski ended the December 7th conversation telling George he would call

Hansen in the morning, would "figure it out," and give George "a shout back

tomorrow." Appx:1449.  There was no conversation with George the next

day, or any day thereafter.  The next recorded conversation *with George* (as

contrasted with Hansen, discussed below) is April 26, 2010, eleven days

*after* the second Dardinski/Hansen conversation.  Not only was there no

conversation, but, even according to Dardinski, George spent the following

five to six months intentionally shunning Dardinski, refusing to accept or

return his calls, and refusing to meet with Dardinski.  Appx:706.  This

affirmative conduct by George renders the government spin on the

December 7th conversation utterly implausible.

Indeed, while the government characterizes the December 7

conversation as the "very antithesis of an unqualified communication,"

GB:63, George's disavowal of the proposed conspiracy was the precise

14

message taken away by Dardinski, the actual participant to the conversation:

Q.    Could he have been any clearer to you, Mr. Dardinski, that he did not want to be involved in your transaction?
A.    No.

Q.    Couldn't have been any clearer, could he?
A.    No.

        ******

Q.    Could he have been any clearer what his state of mind and intentions were, Mr. Dardinski?
A.    No.

Appx:680-83.

Lastly, that Dardinski actually took that message away from the call is evidenced by, *inter alia*, his conversation with Hansen on December 10, 2009.  On that date, Dardinski complains to Hansen that George will not participate, with Hansen responding that George "never figures it out," that Hansen "could figure it out," that he (Hansen) "didn't know what [Dardinski] was trying to accomplish," that he "didn't understand" what Dardinski even needed, and "now that [he] understand[s]," based on Dardinski's statements during the December 10, 2009 conversation, Hansen can proceed on his own.  Appx:1452-53.  This conversation further demonstrates that George in fact withdrew, and wholly supports George's contention the district court erred in finding the conspiracy existed as of December 16, 2009.

15

While the Court has previously asserted that the threshold for withdrawal is "strict" and not easily met, *Ciresi*, 697 F.3d at 27, it is not an insurmountable barrier. Truly, the defense does not comprehend what more George could have said to Dardinski on December 7, 2009, to communicate his abandonment of any *arguendo* enterprise, understanding the conversation occurred in the context of real life, not within the cozy confines of a corporate boardroom or academia, and George was speaking to a mob enforcer (known to carry a firearm and break people's bones) who had previously (and proudly) proclaimed that Robert George was "scared to death" of him.[9]  Appx:653.

---

[9] There was not simply a "disagreement" between George and Dardinski prior to their Plaza meeting, GB:4, and Dardinski did not simply "complain[]" about a prior fee paid to George while in jail, *id*. Rather, in the recorded jail calls, Dardinski repeatedly declared that he would find George, at his Cape house if necessary, and inflict serious bodily injury or exact repayment (or both). Dardinski's violent nature, history of threatening phone calls to George, and bragging that George was "scared to death" of him undermines (1) the government attempt to convert George's episodic pacification of Dardinski into conspiratorial intent, and (2) the argument that George did not do enough in terms of telling Dardinski that he would not be involved.

3.     *George's conduct before December 7, 2009, confirms,*
*rather than undermines, his withdrawal*.

Nothing George said or did before December 7, 2009, undermined his
affirmative disavowal on that date. *Cf.* GB:61-62. First, on April 6, 2009,
George repeatedly told Dardinski that any proposed transaction, whatever its
nature, was "all done" if it did not occur that day. Appx:1414 ("I don't call
him, I don't call him, it's all done . . . I blow him off today, do not ask, it's
all done"); 1419 ("I'm telling you right now, Ronnie, I'm going, I'm, I'm,
I'm all done" if it does not occur that day); 1420 ("Can I just tell you
something about this guy? We don't do this, we're done with him").[10]

Second, the events that follow April 6, 2009, render implausible the
government argument that these statements merely "evince his impatience to
get the deal done," GB:61. The evidence was undisputed that after April 6,
2009, Dardinski engaged in a relentless, and unsuccessful, campaign to
reach George by telephone. *See, e.g.*, Appx:652-53 (Q: "you were calling
George incessantly during the summer, right." A: "Yes."); Appx:650-51
(Dardinski conceding he got George on phone prior to August 14th meeting
with Hansen because he was "calling [George] incessantly during the

---

[10] While the government argues George made other statements on April 6,
GB:61, the government ignores that George ended the conversation with his
third declaration that they were "all done" if nothing occurred that day.
Appx:1420.

17

summer"). Indeed, Dardinski grew so frustrated by George's refusal to answer or return his calls between April 6, 2009 and August 14, 2009, that he complained to agents (captured by a recording), "[t]he fucking guy won't pick the phone up." Appx:651. George's undisputed shunning of Dardinski after April 6, 2009, fatally undermines the government spin of the April 6th conversation, as George's conduct profoundly illustrates, yet again, that he meant what he said during the call: he was all done with Dardinski's proposed transaction.[11]

That George allegedly provided Dardinski with Hansen's contact information, on some unspecified date prior to August 14, 2009, *see* GB:61, does not undermine the clarity or intent of the April 6 or December 7, 2009 disavowals.[12] Importantly, the government ignores the uncontested

---

[11] The record evidence also demonstrated George did not believe Dardinski was serious about doing any proposed transaction. Appx:1411 (George telling Dardinski on March 31, 2009, that Dardinski was "just, you're just jerking me around"); Appx:1416 (George telling Dardinski on April 6, 2009, that Hansen thinks George is "full of shit"). Thus, the more rational interpretation of the April 6 conversation, based on the events that follow the conversation, is that George did believe Dardinski was "full of it," and therefore pressed Dardinski on April 6th to demonstrate as much, and rid himself of Dardinski.

[12] Of course, George's antecedent conduct (*i.e.*, statements on April 6, 2009, or his *arguendo* providing Hansen's contact information prior to August 14, 2009) does not depreciate the force, clarity or impact of George's subsequent disavowal on December 7, 2009.

18

evidence, noted *supra*, that Dardinski was incessantly calling George from April 6, 2009 to August 2009, and that George would not answer or return those calls. Surely, a withdrawal defense is not defeated because a government informant incessantly harasses the target long enough, and forcefully enough, that he eventually relents and *arguendo* provides a phone number for another person.[13]

Statements by Dardinski to Hansen on August 14, 2009, confirm that, if George actually did provide Hansen's contact information, it was the byproduct of Dardinski's constant harassment, as contrasted with some voluntary act indicative of a continuing intent to participate in any *arguendo* conspiracy. For example, Dardinski told Hansen on August 14, 2009, that he (Dardinski) left George "message after message and [George] wouldn't call [Dardinski] back." Appx:650, 660. "Finally," Dardinski told Hansen, he had "to yell" at George to get a return call. Appx:660-61. Dardinski also conceded that the August 14, 2009 conversation corroborated George's declaration of April 6, 2009:

> Q.    Meaning what you're saying to [Hansen, on August 14, 2009]
>        is, 'forget Bob. Go through him, [and you have to go] back and
>        forth, back and forth. You want to cut the check to me, that

---

[13] Telephone records introduced by the defendant further illustrate Dardinski's relentless telephone campaigns. For example, from August 17, 2009 to September 3, 2009, Dardinski telephoned George fifty-nine times, Exhibit 117; App:1227, and George returned only three of the calls. *Id*.

> would be fine,' right?
>
> A.    Yes.
>
> Q.    Consistent with what Mr. George told you at the end of the April conversation. If it didn't happen that day [April 6, 2009], he was out. And here you were telling Hansen, 'you can't go through Bob. It's back and forth, back and forth. Cut me the check and that would be fine,' right?
>
> A.    Yes.

Appx:662-63.  In fact, Dardinski later testified that George said he would attend the August 14, 2009, meeting, but he did not appear, Appx:703-704, further evincing George's withdrawal from any *arguendo* conspiracy.[14]

Other statements on August 14, 2009 also support the withdrawal argument.  For example, Dardinski told Hansen that George said he (George) would not call Hansen.  Appx:662-63.  Moreover, at the inception of the August 14th meeting, Hansen confirmed he had not spoken to George in months, which likely meant April 2009, as Dardinski conceded. Appx:654-55; Appx:1421.

Under these particular circumstances, even if George provided

---

[14] It is fanciful to suggest that George simply volunteered the contact information, particularly considering that Dardinski bragged that George was "scared to death" of him, that he yelled at George to get him to return his calls prior to August 14, 2009, and Dardinski's concession that he possessed the "capacity to force people to do things they may not want to do."  Appx:653, 658.

Hansen's contact information,[15] such an act does not evince an intent to further Dardinski's transactions with Hansen, thus distinguishing *United States v. Nieves*, 322 F.3d 51, 55 (1st Cir.2009), cited by the government, GB:62.  At most, the evidence established that George finally relented after being constantly harassed and pressured by Dardinski all summer.[16]

4.    *George's post-December 7, 2009 conduct does not alter the analysis*.

Relying upon (1) a single statement by George during the recorded conversations in the Spring 2010, ***after*** the second transaction between Dardinski and Hansen, and (2) that George accepted $20,000 in the Fall 2010, well after the charged conspiratorial period (and while Hansen was actively cooperating with government agents), the government argues that George engaged in actions after December 7, 2010 that "make clear that he did not abandon the enterprise or disavow its goals."  GB:63-64.  Once again, a fair review of the conversations and conduct do not support the government argument.

---

[15] There is record evidence that Dardinski managed to connect with Hansen on his own, without George providing any contact information.  *See* Appx:682 (Dardinski conceding that on December 7, 2009, George told Dardinski that he (Dardinski) and Hansen "tied up again on [their] own").

[16] The government analysis of pre-December 7, 2009 conduct also ignores that George did not call Dardinski once from September 3, 2009 to December 2009 (when Dardinski dropped off the radar).  Trial Exhibit 117.

First, and importantly, nothing George said or did in the Spring 2010 undermines the clarity of his prior withdrawal.  As a whole, the conversations in the Spring 2010 focused upon a subject matter entirely different than any proposed transactions—to wit, George's efforts to use Dardinski as a tool to repair his fractured personal relationship with Hansen. The body of these calls simply has nothing to do with furthering any alleged conspiracy to convert cash to checks.  To the extent Dardinski episodically pushed a different objective, he repeatedly conceded during trial that he and George were like "two ships passing in the night," with completely separate agendas.  *See, e.g*., App:666.  The government's reliance upon a single statement in the context of the entire Spring 2010 discourse, GB:63-64, does not alter that conclusion, which is inescapable from a careful review of the Spring 2010 conversations.

In any event, that George's position did not change in the Spring 2010 is readily apparent from a review of the recorded conversation on June 1, 2010, when George yet again rejected Dardinski's overtures:

Q.    What's he [George] say?
A.    He says he's not getting involved.

Q.    Have you heard him say that before?
A.    Yeah.

Q.    When?
A.    A couple of times.

> Q.    When?
> A.    I don't know the exact dates.
>
> Q.    December 7th, like 15 times?
> A.    Maybe.
>
> Q.    ***All right. Here you are six months later [after December 7, 2009], asking Mr. George for the third time in a conversation, "I got some money. I'll give it to you." And he's telling you what he's been telling you since April of 2009, more than a year before, "I'm not getting involved," right?***
> A.    ***Right***.

Appx:752 (emphasis added); Appx:754 (same).

Second, the record confirms, yet again, that Dardinski managed to re-establish contact with George in late April 2010 (***after*** the second transaction) only because of another relentless telephone campaign, as Dardinski confirmed during his meeting with Hansen on April 15, 2010, when he complained that he could not get George to respond to his calls, and tried to enlist Hansen's help in re-establishing contact with George. Appx:705.  As Dardinski testified:

> Q.    Here you are. It's April [2010]. You clearly have not been able to get Mr. George to respond to your calls and meet you as planned, right?
> A.    Correct.
>
> Q.    So what you do, rather than leave Mr. George alone, is you try to get Hansen to get Mr. George to stop being a pain in the ass [*i.e.*, try to have Hansen help re-establish contact with Dardinski]; you see that?
> A.    Yes.

23

Appx:705. Dardinski went so far as to lie to Hansen in his effort to re-establish contact with George in April 2010. Appx:707. While Dardinski eventually "did something" between April 15, 2010 and April 26, 2010 to get George to speak to him again, Appx:708, the fact that George eventually resumed speaking with Dardinski does not undermine the unequivocal disavowal that occurred many months earlier, particularly considering the record evidence that Dardinski once again harassed George to re-establish that contact.

Third, and finally, that George ultimately took $20,000 from Hansen, in July and September 2010, long after the charged conspiratorial period ended, does not rebut the fact that he long before withdrew from any *arguendo* conspiracy. *Cf.* GB:64. George repeatedly told Dardinski he was not getting anything from Hansen. *See, e.g.*, Appx:713 (Q: "Mr. George says, 'That's all I need. We're all patched up. I get nothing out of him.' Right?" A: "Yes." Q: "Meaning, again, *for the umpteenth time*, Mr. George telling you he's not looking for anything from Mr. Hansen other than to reestablish their friendship and relationship, right?" A: "Yes.") (emphasis added). More importantly, though, George's acceptance of the $20,000 does not eradicate the pre-existing withdrawal, it merely confirms that George ultimately did not reject a gift of $20,000 in cash, which the government,

24

through Hansen, repeatedly pushed on him.

C.    <u>*The case at hand is unlike the others cited by the government or previously rejected by the Court*</u>.

Here, the Court is presented with all that has been missing in preceding cases: (1) repeated statements by Appellant that he was "all done" if the transaction was not consummated on April 6, 2009, (2) refusal on the part of Appellant to thereafter answer phone calls relentlessly placed by the government informant, (3) Appellant's consistent refusal to thereafter return those relentless phone calls, (4) Appellant's refusal to thereafter appear for a meeting (August 14, 2009), (5) the government informant complaining to the alleged co-conspirator that he could not get Appellant to answer or return his calls, (6) government informant conceding he had to threaten Appellant to get a return call (August 14, 2009 recording), (7) conversation between Dardinski and Hansen that they will consummate the transaction without Appellant (August 14, 2009 recording), (8) undisputed evidence that Appellant ceased all communication with his only alleged co-conspirator in April 2009, (9) statements by the government informant and alleged co-conspirator on December 8 and 10, 2009, demonstrating that the alleged co-conspirator (Hansen) did not even "understand" what Dardinski was looking to do, and that Appellant was no longer part of their plan, (10) months and months and months of inaction by the Appellant, (11) repeated, affirmative

oral disavowals by the Appellant, captured in secret recordings, in the days before the first transaction, with an explicit instruction for the informant to carry that disavowal to the only alleged co-conspirator, (12) undisputed evidence that Appellant refused to accept or return the informant's calls after December 7, 2009, and refused to appear for allegedly scheduled meetings after December 7, 2009, (13) no substantive contact between Appellant and either Hansen or Dardinski between December 7, 2009 and April 15, 2010, and (14) Appellant's subsequent confirmation (June 1, 2010) that he refuses to participate in any proposed transactions.

In the end, this case is demonstrably unlike the parade of others that have failed before the Court.  George did not simply "avoid contact" with Dardinski, "without more," *cf*. GB:62.  This is not the typical appellant who alone argues inaction, *cf*. GB:62, rather than affirmative communication.  *Cf. United States v. Guevara*, 706 F.3d 38, 46, n.9 (1st Cir.2013).  This is not a case of "mere cessation of activity in furtherance of the conspiracy," *United States v. Juodakis*, 834 F.2d 1099, 1102 (1st Cir.1987), or mere "disagreement" amongst two alleged co-conspirators, *United States v. Dunn*, 758 F.2d 30, 38 (1st Cir.1985).

Rather, the evidence in this case demonstrates a clear, affirmative and unequivocal disavowal by George of the charged conspiracy, both by his

words and conduct.  As such, the trial court's admission of the December 16, 2009 and April 15, 2010 conversations between Dardinski and Hansen (if not the August 14, 2009 conversation) necessitates reversal of all counts of conviction.

## II.    *The government failed to prove aiding and abetting.*

Asserting it "easily satisfied" the standard for aiding and abetting, GB:47-48, the government offers that the Hansen/Dardinski transactions were a "reasonably foreseeable consequence" of (1) George's conversations with Dardinski in March and April 2009, and (2) George *arguendo* providing Hansen's contact information to Dardinski prior to their August 14, 2009 meeting.  The government arguments are unsustainable.

First, rather than "reasonable foreseeability," the standard is whether George "assisted" in or "caused" the commission of a crime, and whether he "*intended* to assist in the commission of that crime or to cause it to be committed." *United States v. Davis*, 717 F.3d 28, 33 (1st Cir. 2013) (emphasis added); Appx:1390-91 (jury instructions).  There was no *Pinkerton* instruction.  For all of the reasons discussed *supra* and within his principal brief, George did not "assist" or "cause" the transactions at issue,

27

nor did he possess any such intent.[17]

Second, the government argument that George's statements do not satisfy the withdrawal argument, GB:48, while erroneous for reasons discussed *supra*, is irrelevant. The test here is whether the evidence established George's intent to assist or cause the transactions at issue, not whether his statements satisfy the decidedly different test for withdrawal.

The evidence was woefully inadequate to prove the aiding and abetting offenses, and these two counts of conviction must be reversed.

### III.    *The government did not present sufficient evidence of the charged conspiracy*.

The government argument that it need not prove the funds derived from wire fraud or narcotics, only unlawful activity, GB:34, does not match the prosecution's trial theory, where the government explicitly argued George knew Dardinski's funds derived from either wire fraud or narcotics,

---

[17] Moreover, the government's "reasonably foreseeable consequence" argument is unpersuasive. Dardinski first mentioned the proposed transaction sometime in February or March at the South Shore Plaza, and George told him on April 6th that they were "all done" if it did not occur that day, yet *nothing* happened for eight months. Dardinski completely disappeared on September 3, 2009. Exhibit 117. The government argument ignores the significant time gap that exists in this case, all of the evidence detailed *supra* regarding George's refusal to accept or return Dardinski's calls, and that the Spring 2009 conversations concerned a transaction far different in nature than the December 2009 and April 2010 transactions. In any event, the affirmative declarations of December 7, 2009 *overwhelmingly* demonstrate that it was not George's intent to assist or cause the subsequent transactions.

*see, e.g.,* Appx:1305-07, 1309-10, 1312, 1316, which is why the court instructed the jury that it must find George knew the money derived from either narcotics or wire fraud, Appx: 1385, 1386.

In any event, the evidence was insufficient to prove an agreement between George and Hansen to launder criminal funds, whatever their origin. The government argument here relies principally on the alleged South Shore Plaza conversation, George's statement on April 6, 2009 that the other person "agreed to do the rest," and Hansen's question on August 14, 2009, whether it was "worth it" for Dardinski. GB:35-36.

First, even accepting *arguendo* the government argument that George's April 6th comment ("agreed to do the rest") related back to Dardinski's March 18th reference to cocaine, GB:35-36, the record is deficient regarding what George *actually told* Hansen in April 2009, and what agreement (if any) he reached with George. There is no record evidence that George explained to Hansen that "the rest" derived from narcotics or another crime, that he told Hansen the transactions would include criminal proceeds, or that Hansen agreed to launder criminally-derived money. Indeed, what George actually said on April 6, 2009, is that "he's agreed to do the rest … *but I didn't push him on it because he thinks I'm full of shit*." Appx:1416 (emphasis added). This undermines, not

supports, the proposition that George would have provided details to Hansen regarding the *arguendo* criminal origin of the funds.

Second, even accepting the government's interpretation of Hansen's August 14, 2009 conversation, GB:36, it only proves that on August 14, 2009, Hansen understood the money came from a criminal offense, not from whom that understanding derived (*i.e*., whether it came from George or Dardinski), or, importantly, when he reached that understanding. The August 14th conversation is not sufficient to establish an antecedent agreement between Hansen and George to launder criminal funds; Hansen never acknowledged that he reached an antecedent agreement with George to launder criminal proceeds, App:1421-35; App:662-64, and in fact <u>denied</u> any such agreement during his post-proffer meetings with the government, *see, e.g*., Appx:120 (noting Hansen proffer statements docketed by government); Appx:301-02 (defense noting anticipated testimony if Hansen called by government). There simply is a void of evidence that Hansen ever agreed *with George* to launder *criminal* funds, and thus there is a failure of evidence as to Count 1.

Third, the government's contention that sufficient evidence existed for a rational jury to conclude that George and Hansen agreed to launder drug money, GB:36, is equally misplaced. George categorically rejected that

proposition the one time "cocaine" was actually discussed in a recorded conversation.[18]  While the government asserts that Hansen "exhibited no surprise" when Dardinski mentioned drugs during their first transaction (December 16, 2009), Hansen told George months later that he "wigged out" when Dardinski mentioned drugs during the conversation. App:1524. Again, context is important; just because a businessman (Hansen) does not interrupt a mafia enforcer (Dardinski) when he mentions drugs during an in-person meeting, and tell him how offended he is, but instead plays along, does not establish that Hansen previously agreed with George to launder drug money.

Lastly, the government's reliance upon George's use of the word "launder" during colloquial conversations with persons untrained in the law is unpersuasive.  *See, e.g*., GB:40.  Simply because George used the term does not mean he was exhibiting an exacting analysis of the federal statutes. Indeed, to the extent George used the word, it was repeatedly in the context that he would <u>not</u> be involved in *criminal* money laundering.  *See, e.g*., Appx:1453, 1523, 1537.

---

[18] On March 18, 2009, George did not simply tell Dardinski that he did not want to hear about cocaine money, *cf*. GB:6-7; he also told Dardinski that he "obviously" could not help him with any such transaction.  Appx:1409.

## <u>CONCLUSION</u>

For the foregoing reasons, as well as those advanced in his principal

brief, George respectfully requests that the Court grant the relief requested in

his principal brief.


Respectfully Submitted,
ROBERT A. GEORGE,
By His Attorney,

**/s/ Robert M. Goldstein**
Robert M. Goldstein, Esq.
Mass. Bar No. 630584
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com


Dated:  January 31, 2014

32

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

**Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B)(ii) because the brief contains 6999 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii) (*i.e*., the corporate disclosure statement, table of contents, table of citations, addendum, and certificates of counsel).

2.  This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Microsoft Word.


**/s/ Robert M. Goldstein**
Robert M. Goldstein
Dated: January 31, 2014

## <u>CERTIFICATE OF SERVICE</u>

I, Robert M. Goldstein, hereby certify that on this date, January 31, 2014, I electronically served a copy of the foregoing document on the following registered participant of the CM/ECF system: Assistant U.S. Attorney Mark T. Quinlivan.


<u>**/s/ Robert M. Goldstein**</u>
Robert M. Goldstein

34